**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Case No. 1:25-cv-1285 |
| STATE OF ILLINOIS; JB PRITZKER, Governor of Illinois, in his Official Capacity; THE CITY OF CHICAGO; BRANDON JOHNSON, Mayor of Chicago, in his Official Capacity; LARRY SNELLING, Chicago Police Superintendent, in his Official Capacity; COOK COUNTY, ILLINOIS; COOK COUNTY BOARD OF COMMISSIONERS; TONI PRECKWINKLE, President of the Cook County Board of Commissioners, in her Official Capacity; THOMAS J. DART, Cook County Sheriff, in his Official Capacity, | Hon. Lindsay C. Jenkins |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS CITY OF CHICAGO,
BRANDON JOHNSON, AND LARRY SNELLING'S
<u>MOTION TO DISMISS UNDER RULE 12(B)(6)</u>**

# TABLE OF CONTENTS

BACKGROUND ......................................................................................................... 3

    I.     The City Has Followed A Welcoming City Policy For Decades. ......................... 3

    II.    The Byrne JAG Litigation. ................................................................................ 5

ARGUMENT ............................................................................................................... 6

    I.     The WCO Is Not Preempted. ............................................................................ 6

          A.    The WCO's restrictions on participating in civil immigration enforcement do not conflict with the INA. ............................................... 7

              1.    Under the INA, local participation in federal immigration enforcement is voluntary, so the WCO creates no conflict by declining to participate. ............................................................... 9

              2.    Under the Tenth Amendment's anti-commandeering doctrine, the INA cannot be construed to require the City to participate in federal law enforcement efforts. .................................................. 13

          B.    The WCO's information sharing restrictions are not expressly preempted by 8 U.S.C. §§ 1373 and 1644. ............................................... 16

              1.    Under *Murphy*, the statutes do not qualify as preemption provisions. .................................................................................... 16

              2.    Sections 1373 and 1644 are unconstitutional under the Tenth Amendment and, as invalid laws, cannot preempt the WCO. ...... 18

              3.    The text of the WCO is consistent with sections 1373 and 1644, and therefore is not preempted by those statutes. ......................... 20

    II.    The WCO Does Not Discriminate Against The Federal Government. ................ 22

    III.   The WCO Does Not Directly Regulate The Federal Government. ..................... 24

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. United States*,
    567 U.S. 387 (2012) .................................................................... 6, 7, 8, 22

*City & Cty. of San Francisco v. Barr*,
    965 F.3d 753 (9th Cir. 2020) ............................................................ 6, 21

*City & Cty. of San Francisco*,
    349 F. Supp. 3d 924 (N.D. Cal. 2018) ................................................. 19

*City of Chicago v. Barr*,
    405 F. Supp. 3d 748 (N.D. Ill. 2019) .................................................. 18

*City of Chicago v. Barr*,
    513 F. Supp. 3d 828 (N.D. Ill. 2021) .................................................. 19

*City of Chicago v. Barr*,
    961 F.3d 882 (7th Cir. 2020) ....................................................... passim

*City of Chicago v. Sessions*,
    321 F. Supp. 3d 855 (N.D. Ill. 2018) ...................................... 18, 19, 25

*City of Chicago v. Sessions*,
    888 F.3d 272 (7th Cir. 2018) ........................................................ 2, 12, 13

*City of El Cenizo v. Texas*,
    890 F.3d 164 (5th Cir. 2018) ......................................................... 10, 15

*City of Phila. v. Attorney General*,
    916 F.3d 276 (3d Cir. 2019) .................................................................. 6

*City of Phila. v. Sessions*,
    309 F. Supp. 3d 289 (E.D. Pa. 2018) .............................................. 19, 21

*City of Providence v. Barr*,
    954 F.3d 23 (1st Cir. 2020) ................................................................... 6

*Colorado v. U.S. Dep't of Just.*,
    455 F. Supp. 3d 1034 (D. Colo. 2020) ............................................... 18

*Cty. of Ocean v. Grewal*,
    475 F. Supp. 3d 355 (D.N.J 2020) .............................................. passim

*Cty. of Santa Clara v. Trump*,
    250 F. Supp. 3d 497, 534 (N.D. Cal. 2017) ........................................ 15

*Galarza v. Szalczyk*,
  745 F.3d 634 (3d Cir. 2014) ................................................................11, 15

*Gonzalez v. ICE*,
  975 F.3d 788 (9th Cir. 2020) ...................................................................... 12

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ...................................................................................... 19

*Hillsborough Cty. v. Automated Med. Labs., Inc.*,
  471 U.S. 707 (1985) ........................................................................................ 7

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) ...................................................................................... 22

*Kansas v. Garcia*,
  589 U.S. 191 (2020) ................................................................................ 16, 20

*McHenry Cty. v. Raoul*,
  44 F.4th 581 (7th Cir. 2022) ............................................................... passim

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018) ............................................................................ 14, 16, 19

*New York v. U.S. Dep't of Justice*,
  951 F.3d 84 (2d Cir. 2020). ........................................................................... 6

*New York v. United States*,
  505 U.S. 144 (1992) ................................................................................ 14, 17

*Newcomb v. Brennan*,
  558 F.2d 825 (7th Cir. 1977) ......................................................................... 3

*North Dakota v. U.S.*,
  495 U.S. 423 (1990) ...................................................................................... 23

*Ocean Cty. Bd. of Comm'rs v. Att'y Gen. of New Jersey*,
  8 F.4th 176 (3d Cir. 2021) ................................................................11, 17, 18

*Oregon v. Trump*,
  406 F. Supp. 3d 940 (D. Or. 2019) ............................................................. 19

*Orellana v. Cty. of Suffolk,* No. 17-CV-4267,
  2025 WL 481723 (E.D.N.Y. Jan. 2, 2025) ................................................. 12

*Palm v. 2800 Lake Shore Drive Condo. Ass'n*,
  2013 IL 110505, ¶ 32 ...................................................................................... 8

iv

*Patriotic Veterans, Inc. v. Indiana,*
    736 F.3d 1041 (7th Cir. 2013) ........................................................ 7, 8

*Printz v. United States,*
    521 U.S. 898 (1997) ........................................................................ 14

*United States v. California,*
    314 F. Supp. 3d 1077 (E.D. Cal. 2018) ......................................... 20

*United States v. California,*
    921 F.3d 865 (9th Cir. 2019) .................................................... passim

*United States v. Morrison,*
    529 U.S. 598 (2000) ......................................................................... 8

*United States v. Valdez-Hurtado,*
    638 F. Supp. 3d 879 (N.D. Ill. 2022) ............................................. 11

*United States v. Washington,*
    596 U.S. 832 (2022) ....................................................................... 23

*United States v. Whiting,*
    563 U.S. 582 (2011) ............................................................. 8, 12, 21

*Virginia Uranium, Inc. v. Warren,*
    587 U.S. 761 (2019) ....................................................................... 12

*Washington v. United States,*
    460 U.S. 536 (1983) ....................................................................... 23

**Statutes**

8 U.S.C. § 1103(a) ................................................................................ 10

8 U.S.C. § 1182(a)(2) .............................................................................. 9

8 U.S.C. § 1226(a) .................................................................................. 9

8 U.S.C. § 1226(c) .................................................................................. 9

8 U.S.C. § 1227(a) .................................................................................. 9

8 U.S.C. § 1231(a) .................................................................................. 9

8 U.S.C. § 1357(g) ................................................................................ 10

8 U.S.C. § 1373 ............................................................................... passim

8 U.S.C. § 1644 .................................................................... 7, 16, 17, 18

MCC § 2-173-005 .................................................................................................... 4

MCC § 2-173-010 ................................................................................................. 4, 5

MCC § 2-173-020(a) ...................................................................................... passim

MCC § 2-173-020(b) ............................................................................................. 23

MCC § 2-173-030(a) ...................................................................................... passim

MCC § 2-173-030(b) ............................................................................................. 23

**Regulations**

8 C.F.R. § 287.7 ................................................................................................5, 11

**Constitutional Provisions**

Ill. Const. Art. VII, § 6(a) ..................................................................................... 8

The fundamental purpose of the City's Welcoming City Ordinance ("WCO") is to promote public safety and protect all Chicagoans from crime. To fight crime effectively, the police must have open lines of communication with all Chicago communities, including undocumented residents. Chicago police have pursued a community policing strategy for decades, and it depends on officers being able to establish trust and candor with residents in every neighborhood. When those bonds are formed, residents are willing to provide vital information to solve crimes and prevent violence, such as an offender's name or whereabouts. But the system breaks down if residents fear that speaking to the police will lead to them or their loved ones being deported. That will chill, and may even halt, cooperation with the police.

For these reasons, the WCO states that Chicago police shall not "participate in civil immigration enforcement operations or assist the civil enforcement of federal immigration law." Municipal Code of Chicago ("MCC") § 2-173-020(a). Keeping the police separate from civil immigration enforcement removes the chill from talking to the police.

Just as important, and in perfect accord with the WCO's goal of combatting crime, nothing in the WCO prevents the police from enforcing state and local criminal laws against anyone, undocumented or not. The WCO likewise leaves officers free to assist with *criminal* immigration enforcement or the investigation of other federal crimes.

The goal of this careful balance is to keep all Chicagoans safe. In this lawsuit, however, the United States seeks to overturn this policy, one that Chicagoans' elected representatives have crafted over four decades. And this is not the first time. In 2017, and again in 2018, the Department of Justice tried to coerce the City into jettisoning its welcoming city policy by withholding law enforcement grant funding (known as Byrne JAG funds) from the City. Rather than forego its policy, the City filed two lawsuits against the Attorney General, and prevailed.

1

*See, e.g.*, *City of Chicago v. Barr*, 961 F.3d 882, 887 (7th Cir. 2020). Judge Leinenweber of this District, and the Seventh Circuit, both held that the grant funding statute enacted by Congress did not authorize DOJ to withhold funding just because the administration disagreed with the City's decision on how best to utilize its police officers. The Seventh Circuit, moreover, recognized that the City is "clearly in the best position to determine the security needs of [its] own communities," *City of Chicago v. Sessions*, 888 F.3d 272, 291 (7th Cir. 2018), and is entitled to decide "that its law enforcement needs would be better met if its undocumented residents could report crimes and communicate with its police force without fear of immigration consequences," *Barr*, 961 F.3d at 891–92. The court understood that the trust between the police and residents, "once destroyed by the mandated cooperation and communication with the federal immigration authorities, would not easily be restored." *Sessions*, 888 F.3d at 291.

This lawsuit is simply the next escalation by the federal administration. No longer is the government offering the City an ostensible and unlawful "choice" between keeping its welcoming city policy or receiving critical federal funds. Now, it wants to nullify the City's policy, asserting that the Immigration and Nationality Act ("INA") preempts the WCO under the Supremacy Clause. But this legal theory is just as flawed as the one before. Here again, the statutes enacted by Congress do not support the attack on the City's policy. The INA imposes requirements on aliens and defines the roles of federal immigration officials. It does not prevent laws like the WCO. Nor does it require state and local governments to participate in civil immigration enforcement. Under the INA, state and local participation is entirely voluntary. Indeed, the INA cannot require participation, for that would amount to unlawful commandeering of States and municipalities in violation of the Tenth Amendment.

Plaintiff's attempt to invalidate the WCO on intergovernmental immunity grounds fares

no better. The WCO does not discriminate against the federal government, for it does not treat other governmental bodies more favorably, and the WCO's decision to opt out of a federal program does not constitute discrimination. The WCO also does not directly regulate federal immigration agents; it addresses only the roles of Chicago employees.

If the administration believes more resources are needed to realize its immigration enforcement goals, it can ask Congress to enact new measures or provide more funding, and Congress can decide. What the federal government cannot do, however, is conscript local governments into administering federal civil immigration law. Under the federal system that divides power between Congress on the one hand, and States and municipalities on the other, Chicago remains free to deploy its police officers in the ways that best keep all Chicagoans safe. The Complaint should be dismissed with prejudice.

## BACKGROUND

### I. The City Has Followed A Welcoming City Policy For Decades.

The City has long recognized the importance of building trust between the Chicago Police Department ("CPD") and immigrant communities to encourage cooperation with law enforcement and promote public safety. The City's welcoming city policy began in 1985, when Mayor Harold Washington issued an executive order that prohibited City agencies and employees from requesting information about or otherwise assisting with the investigation of a person's citizenship or immigration status. *See* Exhibit A, Executive Order No. 85-1, "Equal Access to City Services, Benefits, and Opportunities" (Mar. 7, 1985).[1] Then, in 2006, the Chicago City Council codified and expanded that policy by enacting the WCO. *See* Exhibit B,

---

[1] The Court may take judicial notice of municipal executive orders and ordinances. *See Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977).

Coun. J. 3-29-06, pp. 74325 to 74330. The City Council found that directing CPD to enforce federal civil immigration law would "chill[]" effective law enforcement because "fear of deportation" would lead "witnesses and victims" to avoid cooperation with police. *Id.* at 74327. The WCO has since been amended, and continues to recognize that in Chicago, where one in five residents is an immigrant, "the cooperation of all persons, both documented citizens and those without documentation status, is essential to achieve the City's goals of protecting life and property, preventing crime and resolving problems." MCC § 2-173-005. At base, the WCO "promot[es] the safety of all [the City's] residents." *Id.*[2]

To achieve these goals, the WCO provides that "[n]o agent or agency shall participate in civil immigration enforcement operations or assist the civil enforcement of federal immigration law." MCC § 2-173-020(a).  More specifically, Chicago police may not stop, arrest, or detain individuals "solely on the belief that the person is not present legally in the United States," or when presented with an administrative warrant or immigration detainer. MCC § 2-173-020(a)(1)(A)–(C). An administrative warrant is not a criminal warrant signed by a judge; rather, it is a civil immigration document issued by a federal agency. *See* MCC § 2-173-010 (defining "[a]dministrative warrant"). And an "immigration detainer" is a "request" from an immigration agent asking local law enforcement to "maintain custody" of an individual or advise the Department of Homeland Security ("DHS") prior to the individual's release so that DHS can

---

[2] Empirical research confirms that so-called "sanctuary jurisdictions" have lower crime rates than other jurisdictions. *See, e.g.*, Tom K. Wong, "The Effects of Sanctuary Policies on Crime and the Economy," Center for American Progress (Jan. 26, 2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ (finding that 35.5 fewer crimes are committed per 10,000 people in sanctuary counties compared to nonsanctuary counties); Catalina Amuedo-Dorantes & Monica Deza, "Can Sanctuary Policies Reduce Domestic Violence?" Center for Growth and Opportunity at Utah State University (May 20, 2020), https://www.thecgo.org/research/can-sanctuary-policies-reduce-domestic-violence/ (finding that "the adoption of sanctuary policies is accompanied by a lower rate of domestic homicides involving a female Hispanic victim").

"assume custody" for civil immigration enforcement. 8 C.F.R. § 287.7(a), (d).

The WCO also prohibits Chicago police from allowing U.S. Immigration and Customs Enforcement ("ICE") to access detainees in police custody or allowing ICE to use City facilities. MCC § 2-173-020(a)(2). It further states that police may not respond to an ICE inquiry for a person's "custody status, release date, or contact information," *id.* -020(a)(3), nor may police maintain or share a person's citizenship or immigration status information, *id.* -030(a)(1), subject to exceptions.

Critically, the above restrictions on participating in civil immigration enforcement do not apply to criminal matters. By its terms, the WCO's restrictions apply only to "civil immigration enforcement," *id.* -020(a), and also allow police to respond to a criminal judicial warrant, *see id.* -010, -030(a). CPD, meanwhile, has issued regulations instructing officers that the WCO "does not preclude [them] from responding and taking police action . . . in response to alleged violations of the Illinois Compiled Statutes or Municipal Code of Chicago," both of which contain myriad criminal laws. Ex. C, CPD Special Order S06-14-03, Part IV.C. ("Exception"), Part IV.G.6 ("Note"). The regulations also state that if, in response to a request for assistance with civil immigration enforcement, officers learn that an individual is subject to a criminal warrant, the police will take the person into custody. *Id.* Part V.F.2. As these provisions make clear, the WCO does not apply to criminal matters. Chicago police remain free to assist on criminal law enforcement operations, including criminal immigration enforcement, whether or not the target is undocumented.

## II.    The Byrne JAG Litigation.

In 2017 and 2018, the Department of Justice attempted to override various WCO provisions by withholding grant funding unless the City agreed to follow conditions that were contrary to the WCO. Specifically, the Attorney General demanded that the City provide

advance notice before releasing aliens in the City's custody (contrary to MCC § 2-173-020(a)(3)) and allow ICE unfettered access to aliens in police custody (contrary to -020(a)(2)). DOJ also required the City to certify that it would comply with 8 U.S.C. § 1373, a statute that prohibits restrictions on sharing citizenship or immigration status information with federal authorities. The Seventh Circuit held that the Attorney General lacked authority to impose those conditions under the Byrne JAG statute, and that DOJ could not withhold the grant funding. *See Barr*, 961 F.3d at 931. The First, Third, and Ninth Circuits reached similar conclusions.[3]

## ARGUMENT

### I.  The WCO Is Not Preempted.

The Complaint does not state any valid preemption claim. Preemption under the Supremacy Clause can take three forms: Congress can enact language in a statute that expressly preempts state law (express preemption); Congress's intent to displace state law can be evident from a pervasive scheme of federal regulation in a field (field preemption); or preemption can occur when state law conflicts with federal law (conflict preemption). *See Arizona v. United States*, 567 U.S. 387, 399–400 (2012). Plaintiff alleges that the WCO conflicts with various sections of the INA, and that two provisions of the WCO governing the maintenance and sharing of information are expressly preempted by the INA. Both preemption theories fail.

First, as to conflict preemption, Plaintiff argues that the WCO conflicts with the INA because the WCO prevents CPD from assisting when ICE seeks to detain an alien for a civil immigration violation. Compl. ¶¶ 67-70, 77. But there is no conflict here, because the INA does not require City officers to participate in civil detention efforts. The INA's terms make clear that

---

[3] *See City of Providence v. Barr*, 954 F.3d 23, 45 (1st Cir. 2020); *City of Phila. v. Attorney General*, 916 F.3d 276, 279 (3d Cir. 2019); *City & Cty. of San Francisco v. Barr*, 965 F.3d 753, 761 (9th Cir. 2020). *But see New York v. U.S. Dep't of Justice*, 951 F.3d 84, 123–24 (2d Cir. 2020).

local participation is voluntary. The City may therefore decide, as it has in the WCO, to have its police focus on local criminal enforcement and preserve the necessary trust with local residents. That decision, moreover, does not amount to obstruction or interference with federal objectives. Indeed, any reading of the INA as foreclosing the City's choice would, in effect, force the City's police officers to participate in federal immigration enforcement. And that would violate the Tenth Amendment's anticommandeering doctrine, which forbids the federal government from conscripting local police officers into administering a federal regulatory scheme.

Second, as to Plaintiff's express preemption theory, Plaintiff invokes 8 U.S.C. §§ 1373 and 1644, which prohibit the City from restricting the police from maintaining or sharing citizenship or immigration status information. Compl. ¶¶ 66, 78. This theory fares no better. Sections 1373 and 1644 are not valid preemption provisions in the first place, as recent Supreme Court precedent makes clear. The statutes, moreover, are facially unconstitutional under the anticommandeering doctrine, because they purport to restrict the City's ability to enact legislation managing its police force. For both of these reasons, sections 1373 and 1644 exert no preemptive force over the WCO. And even if they were valid preemption provisions, the WCO is not the kind of law expressly preempted by them.

A.      **The WCO's restrictions on participating in civil immigration enforcement do not conflict with the INA.**

In assessing any form of preemption, the Court "begin[s] with the assumption that a state's historic police powers cannot be preempted by a federal act unless the preemption was the clear intent of Congress." *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1049 (7th Cir. 2013); *see also Arizona*, 567 U.S. at 400. This presumption applies to the City as well as the State, for preemption "of local ordinances is analyzed in the same way as that of statewide laws." *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).

The WCO easily qualifies as an exercise of the police power, for its core purpose is to empower Chicago police to fight local crime and keep all residents safe. In the prior Byrne JAG litigation, the Seventh Circuit made clear that "Chicago, in deciding that its law enforcement needs would be better met if its undocumented residents could report crimes and communicate with its police force without fear of immigration consequences, is exercising its police power— an area of power long recognized as resting with the states." *Barr*, 961 F.3d at 891–92. There is, in fact, "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime." *United States v. Morrison*, 529 U.S. 598, 618 (2000).[4]

Conflict preemption occurs when "compliance with both federal and state regulations is a physical impossibility," or "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (cleaned up). Plaintiff pursues the latter form of conflict preemption, arguing that the WCO is an "obstacle[] to the enforcement of federal immigration law." Compl. ¶ 77. This preemption is not "lightly applied" and "does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.'" *Patriotic Veterans*, 736 F.3d at 1049 (quoting *United States v. Whiting*, 563 U.S. 582, 607 (2011) (plurality opinion)); *see also*

---

[4] Under Illinois law, the City's police power is vast. The City is a home rule unit of local government, and, as such, is vested by the Illinois Constitution with the power to "exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals, and welfare; to license; to tax; and to incur debt." Ill. Const. Art. VII, § 6(a). This grant of authority results in the City possessing "the same powers as the sovereign" in Illinois, unless those powers are limited by the Illinois General Assembly. *See Palm v. 2800 Lake Shore Drive Condo. Ass'n*, 2013 IL 110505, ¶ 32.

*McHenry Cty. v. Raoul*, 44 F.4th 581, 591 (7th Cir. 2022). Nor can Plaintiff succeed by pointing to "some brooding federal interest." *McHenry Cty.*, 44 F.4th at 591 (cleaned up).

Plaintiff's conflict preemption claim is based on INA provisions authorizing ICE to detain aliens. Plaintiff contends that certain provisions of the WCO conflict with this authority because they restrict the police from participating in or assisting with civil immigration detention. Specifically, Plaintiff challenges the WCO's restrictions on the police holding people in custody based solely on a civil immigration warrant or detainer, *see* MCC § 2-173-020(a)(1); on the police responding to requests for custody status and release date information, *see id.* -020(a)(3); and on ICE accessing police facilities or detainees when enforcing civil immigration law, *see id.* -020(a)(2). *See* Compl. ¶¶ 9, 48, 67–70. As a matter of law, these provisions present no conflict with the INA.

> **1.      Under the INA, local participation in federal immigration enforcement is voluntary, so the WCO creates no conflict by declining to participate.**

The INA does not obligate the City to do any of the things restricted by the WCO. Rather, the INA sections Plaintiff cites delineate how *federal* agents operate within the *federal* immigration system. Both 8 U.S.C. §§ 1182(a)(2) and 1227(a)(2) list various offenses that result in an alien being inadmissible to the United States or removable by federal authorities. 8 U.S.C. § 1226(a) authorizes federal agents to arrest an alien based on a warrant issued by the Attorney General (rather than a warrant signed by a judge) and discusses when the alien may be released. 8 U.S.C. § 1226(c) requires federal authorities to take certain aliens into federal custody after their release from state or local custody. And 8 U.S.C. § 1231(a) addresses the timing and procedures for the federal government's removal of an alien, including whether the alien may or must be detained by federal authorities during that process. These statutes regulate the federal

government and therefore do not conflict with anything in the WCO, which regulates City agencies and employees.

Other INA provisions, moreover, expressly acknowledge that participation by state and local governments is voluntary. Section 1357(g) authorizes the Attorney General to enter into "agreements" with state or local authorities to assist with immigration arrests and detention. 8 U.S.C. § 1357(g)(1). But it also states that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into [such] an agreement." *Id.* § 1357(g)(9). Indeed, in rejecting a preemption challenge to a similar INA provision allowing the Attorney General to enter into "cooperative agreements" with state and local entities for supplying alien detention facilities, *see* 8 U.S.C. § 1103(a)(11)(B), the Seventh Circuit held that the statute "contemplates discretionary and voluntary choices by States or local entities to assist the federal government with immigration detention, or not." *McHenry Cty.*, 44 F. 4th at 589. It "does not command that they do so." *Id.*; *see also United States v. California*, 921 F.3d 865, 889 (9th Cir. 2019) ("Federal law provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities."); *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Federal law does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement.").

For these reasons, the Ninth Circuit in *California* rejected Plaintiff's preemption challenge to a California statute—the California Values Act (also known as SB 54)—very similar to the WCO. Like the WCO, SB 54 "limit[ed] law enforcement's 'discretion to cooperate with immigration authorities.'" *California*, 921 F.3d at 876 (citation omitted). More specifically, SB 54 prohibited state and local law enforcement agencies from "detaining an individual on the basis of a hold request; providing information regarding a person's release date or other personal

information, such as the individual's home address or work address; and assisting immigration authorities in certain activities." *Id.* (cleaned up). The Ninth Circuit held that these state prohibitions were not preempted. The court explained that "SB 54 does not directly conflict with any obligations that the INA or other federal statutes impose on state or local governments," because "the INA does not require any particular action on the part of California or its political subdivisions." *Id*. at 887, 889. Aside from 8 U.S.C. § 1373 (a statute we address below in Part I.B), "the various statutory provisions to which the United States points direct *federal* activities, not those of state or local governments." *Id.* at 887. *See also Cty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 362, 381 (D.N.J. 2020) (discussing section 1357(g), and dismissing preemption challenge to New Jersey's Immigrant Trust Directive because "[t]here is no indication that Congress, in enacting the INA, sought to usurp" local "decision[s] not to cooperate with the enforcement of federal immigration law"), *aff'd on other grounds*, 8 F.4th 176 (3d Cir. 2021).

The same is true as to 8 C.F.R. § 287.7(a), which governs immigration "detainers." A detainer is a notification from federal agents that they want to take custody of an alien being held by local law enforcement. *See* 8 C.F.R. § 287.7(a). As Plaintiff recognizes, however, a detainer is merely a "request" that a local entity hold an alien or notify DHS prior to an alien's release date. Compl. ¶¶ 33–34. A detainer "does not compel state or local LEAs to detain suspected aliens subject to removal pending release to immigration officials," and local law enforcement is "free to disregard" it. *Galarza v. Szalczyk*, 745 F.3d 634, 645 (3d Cir. 2014); *see also California*, 921 F.3d at 887 ("an administrative warrant issued by federal authorities" does not "compel[] any action by a state or local official"); *United States v. Valdez-Hurtado*, 638 F. Supp. 3d 879, 890 (N.D. Ill. 2022) ("This Court agrees with *Galarza*, and the federal courts that have cited it, in concluding that ICE detainers are mere requests.") (discussing cases). Because a detainer is not a

command that an alien be held for later federal arrest, the WCO's decision not to respond to detainers does not conflict with federal law. In fact, responding to detainers could result in a violation of federal law. In honoring a detainer, the police may end up holding detainees beyond the time they would normally be released by the police. And that, in turn, could subject the City to liability under the Fourth Amendment for unlawful prolonged seizures unsupported by a neutral determination of probable cause.[5]

In short, nothing in the INA requires the City to participate in federal immigration enforcement activities. When assessing preemption claims, courts have a "duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 765 (2019). And here, Congress chose not to write the INA to require local participation, leaving the City free to exercise its own judgment about how to best keep Chicagoans safe. *See California*, 921 F.3d at 887. It cannot conflict with the INA for the City to exercise that choice. "Given that Congress specifically preserved" the City's authority to make its own decisions, "it stands to reason that Congress did not intend to prevent [it] from using appropriate tools to exercise that authority." *Whiting*, 563 U.S. at 600–01.

Plaintiff is not helped by contending that the WCO "imped[es]" or "obstruct[s]" federal efforts. Compl. ¶ 11. The Seventh Circuit called it a "red herring" for the Attorney General to "characterize[] the issue as whether localities can be allowed to thwart federal law enforcement." *Sessions*, 888 F.3d at 282. This is because "[t]he City, like other 'welcoming' or 'sanctuary' cities

---

[5] *See, e.g.*, *Gonzalez v. ICE*, 975 F.3d 788, 798 (9th Cir. 2020) ("Because the Fourth Amendment requires probable cause to seize or detain an individual for a civil immigration offense, it follows that the Fourth Amendment requires a prompt probable cause determination by a neutral and detached magistrate to justify continued detention pursuant to an immigration detainer."); *Orellana v. Cty. of Suffolk*, No. 17-CV-4267, 2025 WL 481723, at *15 (E.D.N.Y. Jan. 2, 2025)*, appeal filed*, No. 25-321 (2d Cir.) (holding that municipality violated Fourth Amendment by continuing to detain plaintiffs solely on the basis of immigration detainers).

or states, does not interfere in any way with the federal government's lawful pursuit of its civil immigration activities." *Id.* at 281. Being present in the City "will not immunize anyone to the reach of the federal government," for federal immigration agents may—and do—"freely operate in 'sanctuary' localities." *Id.* The WCO simply directs Chicago officers to focus on local criminal enforcement, which protects the public safety of all Chicagoans. That is not "affirmative *interference* with federal law enforcement at all." *Id.* at 282. Put another way, "refusing to help is not the same thing as impeding." *California*, 921 F. 3d at 888 (cleaned up).

Equally important, obstacle preemption does not arise just because the City's approach to public safety may lead "federal authorities to expend greater resources to enforce immigration laws." *Id*. This "does not create the kind of 'direct' obstacle necessary to trigger conflict preemption." *Cty. of Ocean*, 475 F. Supp. 3d at 382 (cleaned up). Treating the City's decision "to refrain" from participation as an obstacle would create an implied mandate to participate. *California*, 921 F.3d at 887, 890. But such a mandate cannot be implied. *Id.* at 890. Again, the INA leaves the choice to state and local governments.

For all these reasons, the INA does not preempt the WCO provisions directing Chicago police to refrain from participating in federal civil immigration detention. The City is free to conclude that the best use of its limited police resources is fighting local crime and building the community trust necessary to do so effectively.

> 2.  **Under the Tenth Amendment's anti-commandeering doctrine, the INA cannot be construed to require the City to participate in federal law enforcement efforts.**

Plaintiff's conflict preemption theory also fails for a separate and fundamental reason: The INA cannot be construed to compel the City's participation in civil immigration enforcement (and thereby preempt the WCO's restrictions on participation) because that would constitute commandeering of local officials in violation of the Tenth Amendment.

Under the anticommandeering doctrine, "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). Indeed, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162 (1992).

As if foreseeing this case, the Supreme Court held in *Printz* that Congress cannot require the "forced participation" of local governments in a federal law enforcement regime. 521 U.S. at 918. *Printz* struck down a federal statute that required local law enforcement officers to conduct background checks on gun purchasers in accord with federal law. The Court explained that "[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Id.* at 935. *See also Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018) (the anticommandeering principle "is important" for multiple reasons, including because it "reduces the risk of tyranny and abuse" from the federal government and "prevents Congress from shifting the costs of regulation to the States") (cleaned up); *Printz*, 521 U.S. at 922 ("The power of the Federal Government would be augmented immeasurably if it were able to impress into its service—and at no cost to itself—the police officers of the 50 States.").

This constitutional principle squarely applies here. Congress can no more force local officers to participate in federal immigration enforcement than it can force them to spend time and money administering a federal firearm regime. Indeed, numerous courts have explained that construing the INA as requiring state and local officials to assist with federal immigration demands would amount to unconstitutional commandeering. *See California*, 921 F.3d at 891

14

("California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal [immigration] efforts," and the federal government "could not *require* California's cooperation without running afoul of the Tenth Amendment."); *El Cenizo*, 890 F.3d at 178 ("[T]he Tenth Amendment prevents Congress from compelling Texas municipalities to cooperate in immigration enforcement."); *Galarza*, 745 F.3d at 644 (holding that if immigration detainers were construed as "a command" to local officers, that "would violate the anti-commandeering doctrine of the Tenth Amendment"); *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 534 (N.D. Cal. 2017) ("By seeking to compel states and local jurisdictions to honor civil detainer requests . . . the Executive Order violates the Tenth Amendment's provisions against conscription.").

When the federal government first attempted to coerce the City into casting aside its welcoming city policy in the Byrne JAG litigation, *see supra* at 5–6, the Seventh Circuit explained: "The federal government cannot merely conscript the police forces of the state or local governments to achieve its ends; that would eviscerate the principles of federalism that rest at the very foundation of our government." *Barr*, 961 F.3d at 892; *see also McHenry Cty.*, 44 F.4th at 590 & n.4 (recognizing that a statute "*order[ing]* State and local governments to house immigration detainees" would "raise its own constitutional questions under the anticommandeering doctrine"). The anticommandeering doctrine protects the City's freedom to decide, as it did in the WCO, that Chicagoans are safer when police officers maintain open lines of communication with immigrant communities to fight local crime. The Constitution does not allow the federal government to divert officers from this crucial mission. For this additional reason, the INA does not preempt the WCO's limitations on participating in civil immigration enforcement.

**B.    The WCO's information sharing restrictions are not expressly preempted by 8 U.S.C. §§ 1373 and 1644.**

In Count I, Plaintiff also claims two sections of the INA—8 U.S.C. §§ 1373 and 1644—expressly preempt certain sections of the WCO. Sections 1373 and 1644 prohibit States and local governments from restricting their employees from maintaining or sharing citizenship or immigration status information. Plaintiff contends that this results in express preemption of two provisions in the WCO—MCC § 2-173-020(a)(3) and -030(a)(1)—because they do the thing that sections 1373 and 1644 prohibit—namely, they restrict the police from maintaining and sharing the information covered by the statutes. Compl. ¶¶ 74, 78.

Sections 1373 and 1644 do not expressly preempt the WCO for three reasons. First, preemption doctrine applies only to statutes that regulate private actors, but sections 1373 and 1644 regulate government entities. Second, the statutes are unconstitutional under the anticommandeering doctrine, because they amount to direct orders to state and local governments. Accordingly, the statutes cannot be enforced against the City and have no preemptive effect. Third, even if the statutes were constitutional and preemption analysis applied, their text does not preempt the WCO's information provisions.

**1.    Under *Murphy*, the statutes do not qualify as preemption provisions.**

In *Murphy*, the Supreme Court explained that "every form of preemption is based on a federal law that regulates the conduct of private actors, not the States." 584 U.S. at 479. And after *Murphy*, the Supreme Court reaffirmed that state law is preempted only if the federal law "imposes restrictions or confers rights on private actors." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020). This private actor requirement is a natural corollary to the anticommandeering doctrine, because "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit

those acts." *New York*, 505 U.S. at 166 (collecting cases).

Sections 1373 and 1644 do not satisfy the private-actor requirement for preemption claims. They regulate state and local actors, not private parties. They therefore lack preemptive force under *Murphy*. Specifically, section 1373(a) states in relevant part that a "*a Federal, State, or local government entity or official may not* prohibit, or in any way restrict, any government entity or official from sending to . . . [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a) (emphasis added). Applying *Murphy*, the Third Circuit held that this language does not preempt state or local law because it "is a clear prohibition on state action" and "says nothing about private actors, so it cannot be fairly read to regulate them." *Ocean Cty. Bd. of Comm'rs v. Att'y Gen. of State of New Jersey*, 8 F.4th 176, 182 (3d Cir. 2021).

The result is the same for section 1373(b). It similarly states that "*no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from* doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending such information to, or requesting or receiving such information from, [DHS]. (2) Maintaining such information. (3) Exchanging such information with any other Federal, State, or local government entity." (emphasis added). While the subsection says that "no person," rather than "no official," shall restrict or prohibit information sharing, "person" must be read narrowly to mean someone cloaked with government authority— *i.e.*, a government actor. "That's because private actors can neither "prohibit[]" state action nor "restrict[]" it." *Ocean Cty.*, 8 F.4th at 182. So section 1373(b), like section 1373(a), regulates only government actors, not private parties.

Section 1644, for its part, contains substantively the same restrictions as section 1373,

17

and therefore also does not regulate private conduct. *See id.*[6]

The fact that "neither § 1373 nor § 1644 regulates private actors is fatal" to Plaintiff's preemption claim because "[a] federal statute that does not regulate private actors cannot serve as a basis for preemption." *Ocean Cty.*, 8 F.4th at 182 (citing *Murphy*); *see also, e.g.*, *Colorado v. U.S Dep't of Just.*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020) ("By their plain terms, [sections 1373 and 1644] affect state and local government entities and officials; they do not regulate private actors as *Murphy* requires for preemption."). While the Seventh Circuit has not yet addressed whether sections 1373 and 1644 have preemptive force, it is likely to reach the same result. In *McHenry County*, the court cited *Ocean County* approvingly, remarking that the Supreme Court "said at least three times in *Murphy* that a valid preemption provision is one that regulates private actors." 44 F.4th at 588. Because section 1373 and 1644 do not regulate private actors, they are not statutes that can preempt the WCO.

> **2.** **Sections 1373 and 1644 are unconstitutional under the Tenth Amendment and, as invalid laws, cannot preempt the WCO.**

Sections 1373 and 1644 also cannot preempt the WCO because they are unconstitutional under the anticommandeering doctrine. In the Byrne JAG litigation, Judge Leinenweber held that the two statutes violate the Tenth Amendment on their face. *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 869–73 (N.D. Ill. 2018) (holding section 1373 unconstitutional); *City of Chicago v. Barr*, 405 F. Supp. 3d 748, 762–63 (N.D. Ill. 2019) (holding section 1644 unconstitutional).

These holdings are correct. In *Murphy*, the Supreme Court applied the anticommandeering doctrine to invalidate a federal statute that prohibited States from enacting a

---

[6] Section 1644 provides in relevant part that "no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States." 8 U.S.C. § 1644.

law (one authorizing sports gambling). 584 U.S. at 481. Sections 1373 and 1644 are structured

the same way: they too purport to prohibit state and local governments from enacting a law (one

prohibiting sharing or maintaining citizenship or immigration status information). As in *Murphy*,

there is "simply no way to understand" these provisions prohibiting a type of legislation "as

anything other than a direct command to the States. And that is exactly what the

anticommandeering rule does not allow." *Id*. at 480.

Personnel decisions, moreover, are "of the most fundamental sort" to state sovereignty.

*Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). But by preventing the City from restricting

certain conduct (information sharing) by its employees, sections 1373 and 1644 effectively

"eliminate[] the City's ability to control its employees' communications," and thereby "effect[] a

federally-imposed restructuring of power within state government." *Sessions*, 321 F. Supp. 3d at

870, 873. That is untenable because "[a] state's ability to control its officers and employees lies

at the heart of state sovereignty." *Id.* at 869.

Although Judge Leinenweber's declaratory judgment that sections 1373 and 1644 are

unconstitutional was later withdrawn as unnecessary to provide the City with complete relief in

the Byrne JAG litigation, *City of Chicago v. Barr*, 513 F. Supp. 3d 828, 832–33 (N.D. Ill. 2021),

the Seventh Circuit nonetheless found his analysis "compelling," 961 F.3d at 898. And other

courts have held that sections 1373 and 1644 amount to unlawful commandeering. *See Oregon v.

Trump*, 406 F. Supp. 3d 940, 971 (D. Or. 2019), *aff'd in part, vacated in part sub nom. City &

Cty. of San Francisco v. Garland*, 42 F.4th 1078, 1079 (9th Cir. 2022); *City of Phila. v. Sessions*,

309 F. Supp. 3d 289, 331 (E.D. Pa. 2018), *aff'd in part, vacated in part on other grounds sub

nom. City of Phila. v. Attorney Gen.*, 916 F.3d 276, 291 (3d Cir. 2019); *City & Cty. of San

Francisco*, 349 F. Supp. 3d 924, 953 (N.D. Cal. 2018), *aff'd in part, vacated in part on other

*grounds*, 965 F.3d at 761. *See also United States v. California*, 314 F. Supp. 3d 1077, 1101 (E.D. Cal. 2018) (finding Section 1373 "highly suspect" because it "dictate[s] what states may and may not do, in contravention of the Tenth Amendment"), *aff'd on other grounds*, 921 F.3d 865 (9th Cir. 2018).

For these reasons, sections 1373 and 1644 are unconstitutional and cannot preempt the WCO. *See Kansas*, 589 U.S. at 202 ("[F]ederal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress.").

**3.    The text of the WCO is consistent with sections 1373 and 1644, and therefore is not preempted by those statutes.**

Even on the view that sections 1373 and 1644 are valid and exert preemptive force, they do not preempt the two WCO information sharing provisions challenged by Plaintiff.

To start, sections 1373 and 1644 cover a very narrow category of information. Section 1373's text addresses only "information regarding [a person's] citizenship or immigration status." And section 1644 addresses even less—only "immigration status" information—and so is subsumed within section 1373 (and therefore is not discussed separately below).

This narrow scope dooms Plaintiff's express preemption challenge to MCC § 2-173-020(a)(3). That provision states that "no agency or agent [of the City] shall . . . expend their time responding to ICE inquires or communicating with ICE regarding a person's custody status, release date, or contact information." *See also* Compl. ¶¶ 9, 48, 66. Section 1373 simply does not apply to this provision, because "citizenship or immigration status" information (the subject of section 1373) is not the same as a person's "custody status, release date, or contact information" (the subject of MCC § 2-173-020(a)(3)). "[T]he phrase 'information regarding the citizenship or immigration status . . .' is naturally understood to refer to a person's legal classification under federal law" and "does not include information like release dates and addresses." *California*, 921

20

F.3d at 891. For this reason, the *California* court found that section 1373 did not preempt a California statute's restriction on sharing a person's "release date" or other "personal information," such as "the individual's home address or work address." *Id.* at 876, 893. And numerous other courts have held that the two categories of information do not overlap.[7]

The second WCO provision Plaintiff identifies is MCC § 2-173-030(a)(1), which states that "[u]nless required to do so by statute . . . no agent or agency shall request, maintain, or share the citizenship or immigration status of any person." *See* Compl. ¶¶ 49, 66. To be sure, this subsection, unlike -020(a)(3), addresses the type of information covered by section 1373: one's citizenship or immigration status. Nonetheless, -030(a)(1) still is not expressly preempted because it includes a savings clause: the phrase "[u]nless required to do so by statute . . ." MCC § 2-173-030(a).

The savings clause means that subsection -030(a)(1)'s prohibition on maintaining or sharing a person's citizenship or immigration status yields in the face of a valid federal statute. *See Whiting*, 563 U.S. at 599 (The "authoritative statement" of a statute is its "plain text," including its "saving[s] clause."). Assuming for the sake of argument that section 1373 is valid, it is, in the words of the savings clause, a "statute" that "require[s]" that there be no prohibition on maintaining and sharing citizenship or immigration information. Through the savings clause, section 1373 therefore negates subsection -030(a)(1)'s prohibition on maintaining or sharing

---

[7] *See, e.g.*, *City & Cty. of San Francisco*, 965 F.3d at 764 ("Section 1373 does not cover release dates"; "citizenship or immigration status . . . is the only information to which § 1373 extends."); *Cty. of Ocean*, 475 F. Supp. 3d at 375 ("a plain reading of sections 1373(a) and 1644 reflects that the only information" at issue in those statutes "is the legal status—i.e., citizenship or immigration status—of an individual"); *City of Phila.*, 309 F. Supp. 3d at 333 ("'citizenship or immigration status,' plainly means an individual's category of presence in the United States—e.g., undocumented, refugee, lawful permanent resident, U.S. citizen, etc.—and whether or not an individual is a U.S. citizen, and if not, of what country," and "[w]hen an individual will be released from a particular City facility, cannot be considered 'information regarding' his immigration status").

citizenship or immigration information. And with that language negated, there is nothing left in the WCO that falls within section 1373's express prohibition.[8]

There is a separate and final reason for reading MCC 2-173-030(a)(1) as yielding to section 1373: That would eliminate any conflict with section 1373, and ordinances subject to preemption challenges should be construed in a way that avoids "creat[ing] a conflict with federal law." *Arizona*, 567 U.S. at 415; *see also Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (courts should avoid constitutional questions if possible). For all these reasons, sections 1373 and 1644 do not preempt subsections -020(a)(1) and -030(a) of the WCO.[9]

*     *     *

Because the WCO is not preempted under any theory, the Court should dismiss Count I with prejudice.

## II. The WCO Does Not Discriminate Against The Federal Government.

In Count II, Plaintiff alleges that the WCO "discriminates against the Federal Government" because it "single[s] out federal immigration officials, expressly and implicitly, for unfavorable and uncooperative treatment when other law enforcement officials are not so treated." Compl. ¶¶ 82–83. Plaintiff alleges that this purported discriminatory treatment violates

---

[8] This reading of the WCO should come as no surprise to Plaintiff, for it is consistent with the City's explanation when DOJ raised questions about section 1373 on the eve of the Byrne JAG litigation: The City explained that if "the City's officers or agents do happen to possess citizenship or immigration status information, the Welcoming City Ordinance expressly permits them to share this information with federal immigration enforcement officials" and "does not restrict" responding to requests from those officials. Compl., *City of Chicago v. Sessions*, Case No. 17-cv-5720 (N.D. Ill.), Dkt.1, ¶ 51.

[9] The savings clause analysis for MCC § 2-173-030(a)(1) also applies to subsection -020(a)(3) insofar as it incorporates subsection -030(a). *See* MCC § 2-173-020(a) ("No agent or agency shall participate in civil immigration enforcement operations or assist the civil enforcement of federal immigration law, unless required to disclose information as addressed in Section 2-173-030(a)."). This provides an alternative ground for rejecting Plaintiff's preemption challenge to subsection -020(a)(3), in addition to the fact that (as discussed above) the subsection simply does not address citizenship and immigration status information, which is the only information covered by section 1373.

the doctrine of intergovernmental immunity, under which the "Supremacy Clause generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *United States v. Washington*, 596 U.S. 832, 835 (2022). But the WCO does not violate this doctrine because it does not discriminate against the federal government.

To successfully challenge a law as discriminatory, Plaintiff must identify some actor similarly situated to the federal government that receives more favorable treatment under that law. *McHenry Cty.*, 44 F.4th at 594 ("Differential treatment is critical to a discrimination-based intergovernmental immunity claim."); *see also North Dakota v. U.S.*, 495 U.S. 423, 438 (1990) ("[T]he State does not discriminate against the Federal Government . . . unless it treats someone else better than it treats them.") (quoting *Washington v. United States*, 460 U.S. 536, 544 (1983)). Plaintiff points to no similarly situated actor here. Nor could it. The WCO does not require City agents or agencies to treat the federal government less favorably than other law enforcement agencies. MCC § 2-173-030(a) prohibits City agents and agencies from disclosing immigration-related information not just to federal immigration authorities but to anyone, including state and local governmental entities, except in limited circumstances. If anything, federal authorities receive more favorable treatment: as explained *supra* Part I.B.3, City officers may respond to citizenship or immigration information requests by federal officials to the extent that section 1373 negates the WCO's prohibition on disclosure.

To be sure, other provisions in the WCO expressly mention federal agencies. MCC § 2-173-030(b) provides that City agents and agencies may not provide access to certain databases "to any federal agency, if the [City] agency or agent determines that the purpose of such access is for the enforcement of civil immigration law." And MCC § 2-173-020(b) lists several federal agencies that the City cannot engage with for certain activities. But these are nothing more than

23

specific examples of the WCO's core restriction on participating in civil immigration enforcement. And declining to participate in that federal sphere of operations is not discrimination. Indeed, in *McHenry County*, the Seventh Circuit rejected a claim akin to Plaintiff's here, explaining that "a policy choice by the State not to cooperate with the federal government's [immigration] detention operations in Illinois" does not constitute discrimination under the intergovernmental immunity doctrine. 44 F.4th at 594; *see also Cty. of Ocean*, 475 F. Supp. 3d at 385 (rejecting claim that state prohibition on information sharing constituted discrimination because it interfered with federal "authority to regulate federal immigration law").

Last, the Tenth Amendment's anticommandeering doctrine forecloses Plaintiff's discrimination claim. That doctrine prevents state and local entities from being forced to participate in federal immigration enforcement. *See supra* Part I.A.2. But "[a] finding that [the WCO] violates the doctrine of intergovernmental immunity would imply that [the City] *cannot* . . . refus[e] to assist their enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule." *California*, 921 F.3d at 891. The intergovernmental immunity doctrine cannot be used as an end run around the Tenth Amendment.

For all these reasons, the WCO does not discriminate against the federal government, and Plaintiff's intergovernmental immunity claim in Count II should be dismissed with prejudice.

## III. The WCO Does Not Directly Regulate The Federal Government.

In Count III, Plaintiff attempts a different variant of an intergovernmental immunity claim, alleging that the Ordinance "effects direct regulation of the Federal Government" because, "[b]y refusing to honor civil detainers and warrants expressly authorized by Congress," the City has "unlawfully eliminated these means for federal immigrations [sic] officials to carry out their statutory functions." Compl., ¶¶ 86–87.

24

There is no direct regulation here. Direct regulation occurs when a local law or regulation "places a prohibition on the Federal Government." *McHenry Cty.*, 44 F.4th at 592 (citations omitted). But the WCO contains no prohibition on federal action; on its face, it applies to and regulates only Chicago's own agents and agencies. *See id.* at 593 (rejecting direct regulation claim against Illinois statute because it "regulates only State and local entities and law enforcement—not the federal government"); *see also Cty. of Ocean*, 475 F. Supp. 3d at 385 ("[T]he Directive does not regulate the United States directly; it regulates only the conduct of state and local law enforcement agencies in the State of New Jersey."). Nothing in the WCO prevents the federal government from directing its own agents and resources to effectuate civil detainers or warrants.

Again, decisions about whether the City's limited resources should be spent on federal immigration enforcement efforts are squarely within the City's power. *See Sessions*, 321 F. Supp. 3d at 869 ("A state's ability to control its officers . . . lies at the heart of state sovereignty."). Plaintiff's theory that, by deciding not to participate with federal officials, the City is directly regulating them runs headfirst into the Tenth Amendment. Count III should be dismissed with prejudice.

## **CONCLUSION**

The Court should grant the City's Motion to dismiss Plaintiff's claims against the City under Rule 12(b)(6) with prejudice.


Dated: March 4, 2025                                  Respectfully submitted,

                                                     MARY B. RICHARDSON-LOWRY
                                                     Corporation Counsel of the City of Chicago

                                                     */s/ Andrew Worseck*
                                                       Deputy Corporation Counsel

ANDREW W. WORSECK
andrew.worseck@cityofchicago.org
ELLEN W. MCLAUGHLIN
ellen.mclaughlin@cityofchicago.org
AMIE L. MEDLEY
amie.medley@cityofchicago.org
EMILY A. VERNON
emily.vernon@cityofchicago.org
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
2 N. LaSalle St., Ste. 520
Chicago, IL 60602
(312) 744-7129

*Attorneys for Defendants City of Chicago,
  Brandon Johnson, and Larry Snelling*

# EXHIBIT A



## OFFICE OF THE MAYOR

### CITY OF CHICAGO

HAROLD WASHINGTON
MAYOR

### EXECUTIVE ORDER  85-1

IN ORDER to assure that all residents of the City of Chicago, regardless of nationality or citizenship, shall have fair and equal access to municipal benefits, opportunities and services, IT IS HEREBY ORDERED:

SECTION 1.  The policy of the Office of the Mayor is declared to be to encourage equal access by all persons residing in the City of Chicago, regardless of nation of birth or current citizenship, to the full benefits, opportunities and services, including employment and the issuance of licenses, which are provided or administered by the City of Chicago.  To that end, the provisions of this Order shall be liberally construed to provide such access to the extent consistent with applicable legislative and common law provisions.

SECTION 2.  The following definitions shall apply to this Order:

      (a)  <u>Agency</u>.  "Agency" means every department, agency, division, commission, council, committee, board, other body, or person established by, or acting on behalf of the City of Chicago at the direction of the Mayor, except the City Council and its committees.

      (b)  <u>Agent</u>.  "Agent" means any person employed by or acting on behalf of an agency as defined in Section 2(a).

(c) **Mayor.** "Mayor" means the Mayor of the City of Chicago or his duly authorized agent.

(d) **Citizenship or residency status.** "Citizenship or residency status" means all matters regarding questions of citizenship of the United States or any other country, questions of authority from the Immigration and Naturalization Service of the United States Department of Justice to reside or otherwise be present in the United States, and the time or manner of a person's entry into the United States. The use in this Order of the term "residency" shall not mean street address or location of residence in Chicago or elsewhere.

SECTION 3. No agent or agency shall request information about or otherwise investigate or assist in the investigation of the citizenship or residency status of any person unless such inquiry or investigation is required by statute, ordinance, federal regulation or court decision.

SECTION 4. No agent or agency shall disseminate information regarding the citizenship or residency status of any person unless required to do so by legal process.

SECTION 5. No agent or agency shall condition the provision of City of Chicago benefits, opportunities or services on matters related to citizenship or residency status unless required to do so by statute, ordinance, federal regulation or court decision.

SECTION 6. All applications, questionnaires and interview forms used in relation to City of Chicago benefits, opportunities or services shall be promptly reviewed by the pertinent agencies and any questions regarding citizenship or residency status other than those required by statute, ordinance, federal regulation or court decision, shall be deleted therefrom within 60 days of the date of this Order.

SECTION 7. This Order takes effect upon its signature by the Mayor and its receipt and filing with the City Clerk.

HAROLD WASHINGTON
MAYOR OF THE CITY OF CHICAGO

DATED: _March 7, 1985_

Received and Filed: March 7, 1985

WALTER S. KOZUBOWSKI
City Clerk

# EXHIBIT B

(Published by the Authority of the City Council of the City of Chicago)

**COPY**



# JOURNAL of the PROCEEDINGS
## of the
# CITY COUNCIL
## of the
# CITY of CHICAGO, ILLINOIS

---

Regular Meeting -- Wednesday, March 29, 2006

at 10:00 A.M.

(Council Chambers -- City Hall -- Chicago, Illinois)

---

**OFFICIAL RECORD.**

**VOLUME I**

**RICHARD M. DALEY**
**Mayor**

*JOURNAL OF THE PROCEEDINGS OF THE CITY COUNCIL*
Regular Meeting -- Wednesday, March 29, 2006

# TABLE OF CONTENTS

| | Page |
|---|---|
| Communications From City Officers | 72338 |
| Reports Of Committees | 72383 |
| Committee On Finance | 72383 |
| Committee On The Budget And Government Operations | 73222 |
| Committee On Buildings | 73225 |
| Committee On Education And Child Development | 73234 |
| Committee On Health | 73236 |
| Committee On Historical Landmarks | 73238 |
| Committee On Housing And Real Estate | 73283 |
| Committee On License And Consumer Protection | 73619 |
| Committee On Police And Fire | 73632 |
| Committee On Special Events And Cultural Affairs | 73638 |
| Committee On Traffic Control And Safety | 73656 |
| Committee On Transportation And Public Way | 73701 |
| Committee On Zoning | 73934 |

*JOURNAL OF THE PROCEEDINGS OF THE CITY COUNCIL*
Regular Meeting -- Wednesday, March 29, 2006

Page

Joint Committee

    Committee On Finance And Human Relations  . . . . . . . . . .  74325

    Committee On Zoning And Education
And Child Development . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74330

Agreed Calendar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74335

New Business Presented By Aldermen . . . . . . . . . . . . . . . . .  74469

    Traffic Regulations, Traffic Signs, Etc. . . . . . . . . . . . . . . . .  74469

    Zoning Ordinance Amendments  . . . . . . . . . . . . . . . . . . . .  74513

    Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74518

    Unclassified Matters  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74539

    Free Permits, License Fee Exemptions, Etc.  . . . . . . . . . . . .  74621

Approval Of The Journal  . . . . . . . . . . . . . . . . . . . . . . . . . . .  74634

Unfinished Business  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74635

Miscellaneous Business . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74637

3/29/2006          REPORTS OF COMMITTEES          74325

## JOINT COMMITTEE.

## COMMITTEE ON FINANCE

## AND

## COMMITTEE ON HUMAN RELATIONS.

––––––––––

AMENDMENT OF TITLE 2 OF MUNICIPAL CODE OF CHICAGO
BY CREATION OF NEW CHAPTER 173 TO DISALLOW
DISCLOSURE OF AND CONDITIONING BENEFITS AND
SERVICES ON INDIVIDUAL'S CITIZENSHIP
AND RESIDENCY STATUS.

A Joint Committee, comprised of the members of the Committee on Finance and the members of the Committee on Human Relations, submitted the following report:

CHICAGO, March 29, 2006.

*To the President and Members of the City Council:*

Your Committee on Finance and Committee on Human Relations, having had under consideration a substitute ordinance authorizing the amending of the Municipal Code of the City of Chicago by creating new Chapter 2-173 regarding equal access to benefits, opportunities and services administered by the City of Chicago, having had the same under advisement, begs leave to report and recommend that Your Honorable Body *Pass* the proposed substitute ordinance transmitted herewith.

This recommendation was concurred in by a viva voce vote of the members of the Joint Committee.

Respectfully submitted,

(Signed)   EDWARD M. BURKE,
*Committee on Finance,*
*Chairman.*

(Signed)   BILLY OCASIO,
*Committee on Human Relations,*
*Chairman.*

On motion of Alderman Burke, the said proposed substitute ordinance transmitted with the foregoing committee report was *Passed* by yeas and nays as follows:

*Yeas* -- Aldermen Flores, Preckwinkle, Hairston, Lyle, Beavers, Stroger, Beale, Pope, Balcer, Cárdenas, Olivo, Burke, T. Thomas, Coleman, L. Thomas, Murphy, Rugai, Troutman, Brookins, Muñoz, Zalewski, Chandler, Solis, Ocasio, E. Smith, Carothers, Reboyras, Suarez, Matlak, Austin, Colón, Mitts, Allen, Laurino, Doherty, Natarus, Daley, Tunney, Levar, Shiller, Schulter, M. Smith, Moore, Stone -- 44.

*Nays* -- None.

Alderman Beavers moved to reconsider the foregoing vote. The motion was lost.

The following is said ordinance as passed:

WHEREAS, The City of Chicago is a home rule unit of government pursuant to the 1970 Illinois Constitution, Article VII, Section 6(a); and

WHEREAS, Pursuant to its home rule power, the City of Chicago may exercise any power and perform any function relating to its government and affairs, including the power to regulate for the protection of the public health, safety, morals and welfare; and

WHEREAS, To this end, the City of Chicago is dedicated to providing its residents with equal access to the services, opportunities, and protection it provides or administers; and

WHEREAS, Conditioning the provision of services, opportunities, and protection on citizenship or immigrant status or inquiring about such status in the course of said provision directly contravenes the city's commitment to ensuring equal access; and

WHEREAS, Local governments are increasingly pressured to become involved in the enforcement of federal civil immigration laws by conditioning services and opportunities on, or inquiring about, immigrant status; and

WHEREAS, The enforcement of civil immigration laws has historically been a federal government responsibility -- a power vested first in the Immigration and Naturalization Service and then in the Department of Homeland Security; and

WHEREAS, Initiatives such as the proposed Federal Clear Law Enforcement for Criminal Alien Removal Act, which would require local governments to give their local law enforcement agencies express authority to enforce immigration laws, also signal pressure to expend limited local resources on traditionally federal functions; and

Case: 1:25-cv-01285 Document #: 35 Filed: 03/04/25 Page 43 of 52 PageID #:187

WHEREAS, Encouraging local governments that are not specifically equipped or trained to implement immigration and anti-terrorist measures to do so is likely to result in inconsistencies and decentralization that undermine instead of strengthen these measures; and

WHEREAS, The City of Chicago joins several major cities, including Los Angeles, San Francisco, Seattle, Minneapolis, and Saint Paul, among others, that have official policies prohibiting their municipal agencies from inquiring about immigration status and unilaterally enforcing immigration law provisions; and

WHEREAS, Requiring, or even promoting, local enforcement of immigration laws gives rise to an increased threat of immigrant and minority profiling and harassment; and

WHEREAS, Such an environment would cause a chilling effect on crime prevention and solving if both witnesses and victims are called upon to weigh a need to cooperate with local authorities against a fear of deportation, thereby undermining long-standing efforts to engender trust and cooperation between law enforcement officials and immigrant communities; and

WHEREAS, For the past one hundred fifty (150) years, the City of Chicago and its surrounding area has been hope and home to immigrants from throughout the globe; and

WHEREAS, The metropolitan Chicago area is home to over 1.4 million immigrants -- nearly twenty percent (20%) of the region's population -- from more than one hundred (100) countries, representing all major world regions, and consisting of approximately twenty-six percent (26%) European, twenty-three percent (23%) Asian and forty-seven percent (47%) Latin American immigrants; and

WHEREAS, With these numbers, Chicago ranks fifth (5th) nationally in the size of its immigrant population, behind the New York, Los Angeles, San Francisco and Miami metropolitan regions; and

WHEREAS, Chicago experienced a forty (40) year long declining population trend that foreign-born residents reversed during the 1990's when they also accounted for ninety percent (90%) of the net growth in its labor force; and

WHEREAS, Immigrants are twenty-six percent (26%) of Chicago's workforce; and

WHEREAS, The above-cited figures are but a shadow of an indication of the contributions made by Chicago's immigrants to the city's history, character and functions; and

WHEREAS, The city's policy is to ensure that all of its residents be able to access city services to which they are eligible or entitled, without regard to their immigration status under federal law; and

WHEREAS, Executive Order 89-6 has as its intended effect to "encourage equal access by all persons residing in the City of Chicago, regardless of nation of birth or current citizenship, to the full benefits, opportunities and services, including employment and the issuance of licenses, which are provided or administered by the City of Chicago"; and

WHEREAS, There is a need to herald this intent as a known and enforced law of the City of Chicago; now, therefore,

*Be It Ordained by the City Council of the City of Chicago:*

SECTION 1. The above recitals are expressly incorporated and made part hereof as though fully set forth herein.

SECTION 2. Title 2 of the City of Chicago Municipal Code is hereby amended by inserting a new Chapter 2-173 underscored as follows:

2-173-010 Definitions.

As used in this ordinance, the following words and phrases shall mean and include:

(a) Agency. "Agency" means every department, agency, division, commission, council, committee, board, other body, or person established by authority of an ordinance, executive order, or City Council order.

(b) Agent. "Agent" means any person employed by or acting on behalf of an agency as defined in Section (a).

(c) Citizenship or residency status. "Citizenship or residency status" means all matters regarding questions of citizenship of the United States or any other country, questions of authority from the Department of Homeland Security -- or federal entity charged with enforcing civil immigration laws -- to reside in or otherwise be present in the United States, and the time or manner of a person's entry into the United States. The use in this ordinance of the term "residency" shall not mean street address or location of residence in Chicago or elsewhere.

2-173-020 Requesting Information Prohibited.

No agent or agency shall request information about or otherwise investigate or assist in the investigation of the citizenship or residency status of any person unless such inquiry or investigation is required by Illinois State Statute, federal regulation, or court decision. Notwithstanding this provision, the Corporation Counsel may investigate and inquire about immigration status when relevant to potential or actual litigation or an administrative proceeding in which the City is or may be a party.

3/29/2006 REPORTS OF COMMITTEES 74329

2-173-030 Disclosing Information Prohibited.

Except as otherwise provided under applicable federal law, no agent or agency shall disclose information regarding the citizenship or residency status of any person unless required to do so by legal process or such disclosure has been authorized in writing by the individual to whom such information pertains, or if such individual is a minor or is otherwise not legally competent, by such individual's parent or guardian.

2-173-040 Conditioning Benefits, Services, Or Opportunities On Immigrant Status Prohibited.

No agent or agency shall condition the provision of City of Chicago benefits, opportunities, or services on matters related to citizenship or immigrant status unless required to do so by statute, federal regulation, or court decision. Where presentation of an Illinois driver's license or identification card is accepted as adequate evidence of identity; presentation of a photo identity document issued by the person's nation of origin, such as a driver's license, passport, or matricula consular (consulate-issued document) shall be accepted and shall not subject the person to a higher level of scrutiny or different treatment than if the person had provided an Illinois driver's license or identification card except that this sentence does not apply to the completion of the federally mandated I-9 forms.

2-173-050 No Private Cause Of Action.

This chapter does not create or form the basis for liability on the part of the City, its agents, or agencies. The exclusive remedy for violation of this chapter shall be through the City's disciplinary procedures for officers and employees under regulations including but not limited to this City personnel rules, union contracts, civil service commission rules, or any other agency rules and/or regulations. A person alleging a violation of this chapter shall forward a complaint to the Office of the Inspector General ("Inspector General") who shall process it in accordance with the complaint-processing procedures established in Chapter 2-56 of this Code except that if the complaint is against any member of the City Council or any employee or staff person of any City Council committee, the Inspector General shall promptly transmit said complaint to the chairman of the City Council Committee on Committees, Rules and Ethics for processing or such successor committee having jurisdiction over said matters and if the complaint is against any member of the Chicago Police Department, the Inspector General shall transmit it to the Chicago Police Department for processing.

2-173-060 Expunging File Information.

All applications, questionnaires, and interview forms used in relation to City of Chicago benefits, opportunities, or services shall be promptly reviewed by the

74330          JOURNAL--CITY COUNCIL--CHICAGO          3/29/2006

pertinent agencies and any questions regarding citizenship or residency status other than those required by statute, ordinance, federal regulation, or court decision, shall be deleted within 60 days of the passage of this ordinance.

2-173-070  Severability.

If any provision, clause. section, part, or application of this chapter to any person or circumstance is declared invalid by any court of competent jurisdiction, such invalidity shall not affect, impair, or invalidate the remainder hereof or its application to any other person or circumstance. It is hereby declared that the legislative intent of the City Council that this chapter would have been adopted had such invalid provision, clause, section, part or application not been included herein.

SECTION 3. This ordinance shall be in full force and effect upon its passage and publication.

----

**JOINT COMMITTEE.**

**COMMITTEE ON ZONING**

**AND**

**COMMITTEE ON EDUCATION AND CHILD DEVELOPMENT.**

----

AMENDMENT OF TITLE 17, CHAPTER 4 OF MUNICIPAL CODE OF CHICAGO (CHICAGO ZONING ORDINANCE) BY ESTABLISHMENT OF CHICAGO PUBLIC SCHOOLS CAPITAL IMPROVEMENT PROGRAM AND FLOOR AREA BONUSES RELATED THERETO.

(Application Number TAD-341)

A Joint Committee, comprised of the members of the Committee on Zoning and the members of the Committee on Education and Child Development, submitted the following report:

# EXHIBIT C

| Chicago Police Department | **Special Order S06-14-03** |
|---|---|
| **RESPONDING TO INCIDENTS INVOLVING CITIZENSHIP STATUS** | |

| **ISSUE DATE:** | 23 February 2021 | **EFFECTIVE DATE:** | 23 February 2021 |
|---|---|---|---|
| **RESCINDS:** | 25 March 2020 Version | | |
| **INDEX CATEGORY:** | 06 - Processing Persons | | |
| **CALEA:** | | | |

## I. PURPOSE

This directive:

A. continues the procedures for responding to incidents involving citizenship status delineated in the Welcoming City Ordinance, Title 2-173 of the Municipal Code of Chicago (MCC).

B. _continues_ the Immigration Detainer/Administrative Warrant Log (CPD-31.110).

C. _satisfies CALEA Law Enforcement Standards in Chapter 1._

## II. GENERAL INFORMATION

Pursuant to federal law, the enforcement of immigration law generally rests with the U.S. Immigration and Customs Enforcement and Removal Operations (ICE ERO) and not with the state and local police.

## III. DEFINITIONS

For the purpose of this directive, the following definitions apply:

A. "Administrative warrant" means an immigration warrant of arrest, order to detain or release aliens, notice of custody determination, notice to appear, removal order, warrant of removal, or any other document that can form the basis for an individual's arrest or detention for a civil immigration enforcement purpose, non-limiting examples of which include Form I-200 "Warrant for the Arrest of Alien," Form I-205 "Warrant of Removal/Deportation," any predecessor or successor form, and all wants, hits, or requests contained in the "Immigration Violator File" of the FBI's National Crime Information Center database. This definition does not include a criminal warrant issued upon a judicial determination of probable cause, and in compliance with the requirements of the Fourth Amendment to the U.S. Constitution and Article I, Section 6, of the Illinois Constitution.

B. "Immigration detainer" means a request by ICE to a federal, state, or local law enforcement agency to provide notice of release or maintain custody of an individual based on an alleged violation of a civil immigration law, non-limiting examples of which include detainers issued pursuant to Sections 1226 or 1357 of Title 8 of the United States Code or Sections 287.7 or 236.1 of Title 8 of the Code of Federal Regulations, Form I-247A "Immigration Detainer - Notice of Action" and any predecessor or successor form.

C. The United States Department of Homeland Security (DHS) protects the United States against threats. Its wide-ranging duties include aviation security, border control, emergency response, and cyber security. Agencies within DHS include the U.S. Immigration and Customs Enforcement Agency (ICE) and U.S. Customs and Border Patrol (CBP). Homeland Security Investigations (HSI) and Enforcement and Removal Operations (ERO) are components of ICE.

D. "Immigration agent" means any person tasked with the enforcement of civil immigration law employed by ICE ERO, HSI, CBP, or any successor agencies.

E. "Immigration agency" means an agency tasked with enforcement of federal civil immigration laws including ICE ERO, HSI, CBP, or any successor agencies.

F. *"Contact information" means any information that assists in contacting an individual, including, but not limited to, telephone numbers, social media identifiers, electronic mail addresses, or home or work addresses.*

## IV. POLICY

A. Department members will provide police service to all persons in the City of Chicago, regardless of their citizenship *or immigration* status.

B. *Department members will not utilize threats of deportation, or engage in verbal abuse of any person based upon the person's or the person's family members' actual or perceived citizenship or immigration status.*

C. Department members will **not** participate in civil immigration enforcement operations or assist the civil enforcement of federal immigration law.

    **EXCEPTION:** This does **not** preclude Department members from responding and taking police action should a contemporaneous public safety concern arise or in response to alleged violations of the Illinois Compiled Statutes or Municipal Code of Chicago.

D. The Department will **not** enter into an agreement under Section 1357(g) of Title 8 of the United States Code or any other provision of federal law that permits state or local governmental entities to enforce federal civil immigration law.

E. The Department will **not** enter into or renew any agreement providing direct access to any electronic database or other data-sharing platform maintained by *the Department* or otherwise provide direct access to such database, to any federal agency if the *Department* determines that the purpose of such access is for the enforcement of civil immigration law.

F. Department members will **not** stop, arrest, detain, or continue to detain a person:

    1. *solely on the belief* that *the* person has committed a civil immigration violation or *is not legally present in the United States*.

    2. based *upon* an administrative warrant, *including but not limited to, those* entered into the Federal Bureau of Investigation's National Crime Information Center (NCIC) database, successor database, or similar database maintained by the United States.

    3. based upon an immigration detainer.

G. Department members will **not** :

    1. permit immigration agents access to a person being detained by, or in custody of, the Department or a Department member, *including by telephone*.

    2. permit immigration agents to use Department facilities for investigative interviews or other investigative purpose.

    3. while on duty, expend time responding to an immigration agency's inquiry or communicating with an immigration agency regarding a person's custody status, release date, *or contact information*.

        **NOTE:** *Department members are only authorized to communicate with immigration agencies to clarify whether any matter involves enforcement based solely on a violation of a civil immigration law (MCC 2-173-020(a)(3)). Department members will **not** participate in civil immigration enforcement operations or assist the civil enforcement of federal immigration law.*

    4. *transfer any person into ICE custody for the sole purpose of civil immigration enforcement.*

5. *request, maintain, or share the citizenship or immigration status of any person unless such disclosure has been authorized in writing by the individual to whom such information pertains, or if such individual is a minor or is otherwise not legally competent, by such individual's parent or guardian.*

   **NOTE:** *The prohibition in Item IV-G-5 does not apply when required by statute, federal regulation, court order, or a lawfully issued judicial warrant (MCC 2-173-030(a)).*

6. *set up a traffic perimeter or provide on-site support to assist a civil immigration enforcement operation.*

   **NOTE:** *This does not preclude Department members from responding and taking police action should a contemporaneous public safety concern arise or in response to alleged violations of the Illinois Compiled Statutes or Municipal Code of Chicago.*

H. *The Department will cooperate with those who report crimes, regardless of whether such report is made by a witness or a victim, and regardless of the citizenship or nation of origin of the reporter. Upon receiving a request for completion of a law enforcement certification form or statement required by federal immigration law certifying that a person is a victim of qualifying criminal activity, Department members will follow the procedures delineated in the Department directive titled "U Visa Nonimmigrant Status Certification."*

I. *Where presentation of an Illinois driver's license or identification card is accepted as adequate evidence of identity, presentation of a photo identity document issued by the person's nation of origin, such as a driver's license, passport, or matricula consular (consulate-issued document) will be accepted and will not subject the person to a higher level of scrutiny or different treatment than if the person had provided an Illinois driver's license or identification card (MCC 2-173-040(b)).*

## V. PROCEDURES

A. *If the Department receives a request from an immigration agency to provide assistance with a civil immigration enforcement operation, a supervisor from the district of occurrence will respond to the scene and determine whether such request is to assist in the enforcement of civil immigration law.*

B. *If the supervisor determines that the request is to assist in the enforcement of civil immigration law, the supervisor will decline the request and notify the Office of Emergency Management and Communications (OEMC) of the request for assistance with civil immigration enforcement.*

C. *If the supervisor determines that the request is not to assist in the enforcement of civil immigration law, the supervisor will ensure that appropriate police action is taken.*

D. If an investigation reveals an individual is the subject of:

1. an administrative warrant or immigration detainer that is based solely on a violation of an administrative immigration law and:

   a. is not in custody, Department members will **NOT** take the subject into custody for the administrative warrant.

   b. is in custody for an unrelated charge, Department members will:

      (1) **NOT** enforce the administrative warrant.

      (2) indicate the presence and non-enforcement of the administrative warrant in the narrative of the Arrest Report.

2. a criminal warrant, Department members will take the individual into custody and process him or her in accordance with the procedures outlined in the Department directives titled "Non-Traffic Arrest Warrant Procedures" and "Processing Persons Under Department Control."

## VI. REPORTING REQUIREMENTS

A.  Members of the Administrative Support Division who receive an immigration detainer or administrative warrant will note the receipt on the Immigration Detainer/Administrative Warrant Log (CPD-31.110). The Director, Administrative Support Division, will ensure that this Log is forwarded to the *Commander*, Strategic Initiatives Division, on a quarterly basis.

B.  Any other Department member receiving an immigration detainer or administrative warrant from an immigration agency will submit an Information Report via the Automated Information Report System.

C.  All Information Reports submitted pursuant to this directive will be consistent with the Department directive titled "Information Reporting System" with the category of "Receipt of Immigration Detainer/Administrative Warrant." The Information Report will include:

    1.  the date that the immigration detainer or administrative warrant was received; and

    2.  the file number and subject's information including name, date of birth, and sex.

D.  A Department member receiving a request from an immigration agency via OEMC will follow the procedures outlined in Item V of this directive.

E.  The Strategic Initiatives Division will issue a quarterly report consistent with the reporting requirement of the Welcoming City Ordinance (MCC 2-173-069).

(Items indicated by *italics/double underline* were added or revised.)


Authenticated by KC                                              David O. Brown
                                                                 Superintendent of Police

21-012 JJR

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew Worseck, hereby certify that a copy of the foregoing document was filed on March 4, 2025, with the Clerk of the United States District Court for the Northern District of Illinois using the CM/ECF system, which will send notifications of such filing to all parties that have appeared in this action.

<u>/s/ Andrew Worseck</u>
Deputy Corporation Counsel