# EXHIBIT 1:

BRIEF OF AMICI CURIAE

BRIGHTON PARK NEIGHBORHOOD COUNCIL,

ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, ORGANIZED

COMMUNITIES AGAINST DEPORTATIONS AND

RAISE THE FLOOR ALLIANCE

**IN THE
UNITED STATES DISTRICT
COURT NORTHERN DISTRICT
OF ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No.25-cv-1285 ) Judge Lindsay C. Jenkins ) |
| STATE OF ILLINOIS, et al., | ) ) |
| Defendants. | ) |

**BRIEF OF *AMICI CURIAE*
BRIGHTON PARK NEIGHBORHOOD COUNCIL,
ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS,
ORGANIZED COMMUNITIES AGAINST DEPORTATIONS AND
RAISE THE FLOOR ALLIANCE**

**INTRODUCTION**

Through this lawsuit, the United States seeks a result that would unleash devastating consequences throughout Illinois. The U.S. Government requests that this Court invalidate city, county and state laws that prevent local police forces from engaging in immigration enforcement, referred to throughout this brief as Sanctuary Laws. *See* Doc.1 at 75-88. The local government Defendants correctly argue that the U.S. Government's attempt to commandeer local law enforcement violates the U.S. Constitution. *See e.g.*, Doc. 28, 32, 35. But the relief requested here isn't just unconstitutional. If this Court accepts the U.S. Government's legal position and requires local public safety officials to enforce federal immigration laws, immigrant communities will be forced into an impossible Catch 22. People will risk deportation every time they seek medical care, enroll their children in school, shop for groceries or report unlawful employment practices. As a result, the risk of a public health crisis will increase exponentially. Public education will be undermined. Local economies will crumble. And employers who violate wage and hour laws and abuse their employees will escape accountability.

Amici Curiae are Illinois-based organizations that provide advocacy and support to the state's neighborhoods and immigrant communities. They are also leaders in the national Sanctuary City Movement, which advocates for a constellation of policies and support aimed at creating vibrant, welcoming communities where immigrants and all people can thrive. Amici request that in its deliberations, the Court consider the perspectives described herein of those most adversely affected by the United States' requested relief: immigrants of all statuses including the undocumented and those living in mixed status families.[1] These individuals help build the state's strong economy, work to provide for their families, and have deeply invested in their communities. Some are minor children

---

[1] *FAQ: The Affordable Care Act & Mixed-Status Families*, NAT'L IMMIGR. L. CTR. (May 1, 2024)("A "mixed-status family" is a family whose members include people with different immigration statuses. One example of a mixed-status family is one in which the parents are undocumented and the children are U.S.-born citizens."). (Throughout this brief, cited sources are hyperlinked in the title of each citation).

who have never known any home other than Illinois. Despite their many positive contributions to their adopted homes, the President Trump describes undocumented people as "poisoning the blood of this country,"[2] a hallmark of nativist and white supremacist rhetoric, and refers to undocumented people as "animals" and "not human."[3] The United States' complaint amplifies the President's hateful rhetoric by attempting to conflate immigration with crime while ignoring indisputable data demonstrating that migrants in Illinois *have not* been responsible for "a violent crime wave"[4] and that crime in Chicago *has decreased* during the same timeframe the City's population of migrants increased.[5] *See* Doc. 1 at 1 (undocumented people ". . . live and work among innocent Americans, who may later become their crime victims."); *id.* at 6 (commandeering local law enforcement for immigration enforcement is required to "keep America safe").

As described in detail below, given the demonstrable, community-wide benefits directly attributable to Sanctuary Laws, the federal government's request to invalidate these protections is not grounded in any legitimate governmental interest. Instead, it is animated by President Trump's long standing and well-documented animus towards immigrants.[6] Amici therefore urge the court to dismiss this lawsuit with prejudice.

---

[2] Jacob Rosen, Olivia Rinaldi, Kathryn Watson, *Trump blasted for saying immigrants are "poisoning the blood of our country*" CBS NEWS (Dec. 18, 2023).

[3] Nathan Lane, Tim Reid, and Graham Slattery, *Trump calls migrants 'animals,' intensifying focus on illegal immigration*, REUTERS (Apr. 3, 2024).

[4] *Id.*

[5] CompStat Week 03 Report Covering the Week of 13-Jan-25 through 19-Jan-25, CHICAGO POLICE DEPARTMENT (demonstrating decreasing crime rate).

[6] *See CASA de Maryland, Inc. v. Trump,* 355 F. Supp. 3d at 325 (D. Md. 2018) (holding that termination of Temporary Protected Status for Haitian refugees during Mr. Trump's first term violated equal protection based in large part on Mr. Trump's racially discriminatory public statements). As that court noted of Mr. Trump's words: "One could hardly find more direct evidence of discriminatory intent towards Latino immigrants." *Id.*; *see also* Myah Ward, *We watched 20 Trump rallies. His racist, anti-immigrant messaging is getting darker*, POLITICO (October 12, 2024), (President Trump asserts he would "rescue" Americans from the rapists, "blood thirsty criminals," and "most violent people on earth" whom he insists are ruining the "fabric" of the country and its culture, a reference to the Latinx immigrants); *Full Text: Trump announces a presidential bid*, WASH. POST (June 16, 2015), ("When Mexico sends its people, they're not sending their best…. They're

2

**INTERESTS OF AMICI CURIAE**

Brighton Park Neighborhood Council ("BPNC") is a community-based, nonprofit organization serving a working-class neighborhood on Chicago's Southwest Side. BPNC's mission is to create a safer community, improve the learning environment at public schools, preserve affordable housing, provide a voice for youth, protect immigrant rights, promote gender equality, and end all forms of violence, including police violence.

Illinois Coalition for Immigrant and Refugee Rights ("ICIRR") is a non-profit organization based in Chicago, Illinois. ICIRR promotes the rights of immigrants and refugees to full and equal participation in civic, cultural, social, and political life in Illinois and beyond. ICIRR has nearly 100 member organizations throughout Illinois. Member organizations include community health centers, health and nutrition programs, social service providers, neighborhood associations, and other organizations that work to ensure immigrants receive the support they need for their families to be successful.

Organized Communities Against Deportations ("OCAD") is an undocumented-led group that organizes against deportations, detention, criminalization, and incarceration, of Black, brown, and immigrant communities in Chicago and surrounding areas. Through grassroots organizing, legal and policy work, and cross-movement building, OCAD aims to defend its communities, challenge the institutions that target and dehumanize its communities, and build collective power.

Raise the Floor Alliance ("RTF") is a coalition of community-based worker centers who build power in low-wage industries, predominantly among non-union workers. RTF's efforts are

---

sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists." ); Mary Kekatos, *READ: Donald Trump's inauguration speech transcript*, ABC News (Jan. 20, 2025), (claiming that the previous administration "fails to protect our magnificent, law-abiding American citizens, but provide sanctuary and protection for dangerous criminals, many from prisons and mental institutions that have illegally entered our country from all over the world" and declaring that the Trump administration will "begin the process of returning millions and millions of criminal aliens back to the places from which they came.").

3

focused on industries with high rates of immigrant and undocumented populations–domestic work and cleaning, day labor, temporary staffing, warehouses, restaurants, and food production.

## ARGUMENT

The U.S. Government's attempt to eviscerate Sanctuary Laws will impose immediate, severe, and long-lasting harm to individuals and families throughout Illinois. These harms are not limited to people against whom the U.S. initiates immigration proceedings. As explained in detail below, without Sanctuary Laws, entire communities will be susceptible to public health crisis, educational system disruptions and economic meltdowns.

### A. Sanctuary Laws Protect Public Health and Ensure that Immigrant Families Access Life Saving Medical Care.

Sanctuary Policies benefit all Illinois communities by removing barriers to medical care that would otherwise deter people who are undocumented from receiving preventative care and obstruct children of immigrants from receiving lifesaving medical interventions. In the absence of Sanctuary Laws, undocumented people and mixed status families will be forced to choose between accessing health care or risking deportation. This outcome creates risks for all people in Illinois regardless of immigration status.

If people who are undocumented and those in mixed status households forgo preventative health care because Sanctuary Laws are deemed unlawful, communities may see increases in communicable illnesses. Eliminating protections that will discourage people who are undocumented from accessing preventative care "will lead to increased instances of infectious, yet treatable disease."[7] Ensuring that all community members—regardless of immigration status--have access to preventative care doesn't just save lives, it also saves medical expenses. According to Dr. Hogai

---

[7] Melissa Marietta, *Undocumented immigrants should receive social services*, 81 INT'L SOC. SCI. REV. 61, 62 (2006); James Dwyer, *Illegal immigrants, health care, and social responsibility*, 34 HASTINGS CTR. REP. 34, 37 (2004)(["M]easures that deny care to (undocumented people), or make them afraid to seek care, could lead to an increase in tuberculosis.").

4

Nassery, "it's less expensive to provide prenatal care for an undocumented woman than to provide medical care for her premature infant and it's more economical to regulate a man's high blood pressure than to take care of him after a massive stroke."[8]

Yet the relief sought by the United States would create significant barriers to preventative health care for people who are undocumented and for mixed status families in Illinois. For example, Priscilla Tovar[9] is 60 years old and came to Chicago 22 years ago from Mexico. Her 21-year-old son was born in Chicago, and she lives with her son and her husband. When COVID-19 vaccinations became available, the entire Tovar family received their shots. However, if Sanctuary Laws were eliminated, she "wouldn't feel safe getting vaccinated. Not with a president who is trying by any means to get people who don't have papers and claiming that we are a burden to the government." Similarly, Natalia Ruiz, who is 26 years old and has lived in Chicago for four years after coming here from Honduras, received COVID-19 vaccinations when she had a valid visa. Her visa has since expired and if Chicago's Sanctuary Laws were eliminated, her concerns about deportation would prevent her from seeking any kind of preventative care—including vaccinations.

Any erosion in Sanctuary Laws will create adverse and even deadly health outcomes for people in mixed status families, the U.S. citizen children of undocumented parents and people who are undocumented. For undocumented and mixed status families, "the fear of deportation. . . contributes to avoidance of care. A natural consequence of these barriers to healthcare resources is an exacerbation of preexisting health conditions."[10] When Arizona's local law enforcement began

---

[8] *Id.*

[9] Individuals described in this section are identified through pseudonyms. Interviews with the identified individuals are on file with Amicus counsel and available at the Court's request.

[10] Sheyda M. Aboii, *Undocumented Immigrants and the Inclusive Health Policies of Sanctuary Cities*, 9 HARV. PUB. HEALTH REV. 1, 5 (2016).

engaging in immigration enforcement, "healthcare providers . . . noted a drop in patient visits, diabetes and HIV consultation attendance, vaccinations, prenatal care, and filled prescriptions."[11]

Ms. Tovar and her family are terrified because the elimination of Sanctuary Laws would significantly affect her health. She is a breast cancer survivor who is currently in remission, but she has a significant risk of recurrence and must be examined by her cancer care team twice a year. If the Trump Administration succeeds in eliminating Sanctuary Laws, she's unsure if she will continue attending her appointments because of deportation fears. Ms. Tovar's fears create tension between her and her son, who is a United States citizen. He doesn't want his mother to miss a doctor's appointment for any reason. Ms. Tovar anticipates an impossible choice between receiving lifesaving cancer care or risking deportation. Compounding this situation, Ms. Tovar's mental health is deeply affected by President Trump's anti-immigrant animus. She explains, "President Trump talks about us like we are not human. As if we are the worst that exist in this world. As if we have no value. He has a target on the Latino community. Hearing his words creates so much anxiety for me, I feel like it's mental abuse."

Clara Gomez is a lawful permanent resident who has lived in Chicago for 24 years and was born in Mexico. She is 46 years old and the mother of five children. Ms. Gomez works painting homes and cleaning apartments. As a result of the repetitive nature of her work, she developed carpal tunnel syndrome for which she receives medication and physical therapy. Because Ms. Gomez has been able to receive medical care without fear of adverse immigration consequences, her symptoms are under control, and she can work to support her children. She fears what will happen to her family if shifts in immigration policy cause her to lose her healthcare and she becomes unable to work. However, Ms. Gomez' greatest concern is not for herself, but rather for her youngest child, who lives with diabetes and requires monthly doctor's appointments. Ms. Gomez worries that—even though

---

[11] *Id.*

she has lawful status to live and work in the U.S.—if Sanctuary Laws disappear, she will risk deportation when taking her U.S.-born child to the doctor.

Sofia Garcia sheds tears when contemplating her child's future in a world without Sanctuary Laws. Originally from Honduras, Ms. Garcia is 36 years old and has lived in Chicago for seven years with her two children and partner. One of Ms. Garcia's children lives with epilepsy. Because of Chicago's Sanctuary Laws, Ms. Garcia obtained a diagnosis for her child who now receives regular care and lives a vibrant life. But Ms. Garcia's child needs consistent care, and if Sanctuary Laws disappear, Ms. Garcia will risk deportation to ensure her child receives the medical services they need. This reality creates tremendous stress for Ms. Garcia's child, who is old enough to know that— if this lawsuit succeeds— their medical needs could result in their mother's deportation. Ms. Garcia's child fears separation from their mother and feels tremendous guilt that their medical condition could result in her deportation.

Even with Sanctuary Laws in place, mixed status families face considerable barriers accessing health care. For example, a Chicago Public School middle school student survived a traumatic car accident and suffered an open wound on their hand. The student's family was unable to access medical services until the school enrollment process led to a referral to the local public hospital, which, like the school, was able to assure the family that their information would not be shared with immigration authorities.

Numerous studies confirm the realities of the families described above ---health outcomes for the children of undocumented parents are far better in jurisdictions with Sanctuary Laws, where parents do not have to fear deportation when seeking care for their children.[12]

---

[12] Ashley R. Houston, Carmel Salhi, Alisa K. Lincoln, *Messaging inclusion with consequence: U.S. sanctuary cities and immigrant wellbeing*, 8 J. MIGR & HEALTH 100199 (2), (2023); Koball, H., Kirby, J., & Hartig, S., The Relationship Between States' Immigrant-Related Policies and Access to Health Care Among Children of Immigrants, 24 J. Immigr. Minor. Health 834,838 (2022)("State policies that limit federal immigration enforcement involvement are associated with improved

### B. Sanctuary Policies Protect Public Education, Students and Families

In the City of Chicago, almost one in five residents are immigrants.[13] If Sanctuary Laws disappeared, thousands of Chicago Public School students would be impacted by economic hardships, threats of family separation, and barriers to accessing services.[14] In prior years, the federal government has guided its agents to avoid sensitive locations like schools in immigration enforcement actions—but that guidance has recently been rescinded.[15] Now, Chicago's families fear that as a result of this lawsuit, Chicago's public schools will no longer be safe places for education and support services.

The immigration raids that will almost assuredly result if Sanctuary Laws are invalidated will harm students' well-being and create academic discrepancies among students.[16] Students afraid for their loved ones in proceedings tend to become chronically absent and decline in their academic performance.[17] Parents' detentions or removals force parents to be less engaged in their children's education."[18] Consequently, students cannot take full advantage of the academic, behavioral, or social skills that parents would otherwise be able to offer.[19] These concerns are particularly prevalent in neighborhoods served by Amicus BPNC. As a result of threats of immigration raids and the rollback

---

access to preventative health services among immigrants' children, most of whom are U.S. citizens."); *Fact Sheet: U.S. Citizen Children Impacted by Immigration Enforcement*, American Immigration Council (June 24, 2021).

[13] *Profile of the foreign-born population in Chicago, Illinois*, VERA INST.

[14] April Menendez & Carola Suárez-Orozco, *Understanding and Supporting Undocumented Students in Schools*, HARV. GRADUATE SCH. EDUC. (Oct. 2024).

[15] Rebecca Santana, *Trump Administration Throws Out Policies Limiting Migrant Arrests at Sensitive Spots like Churches*, ASSOCIATED PRESS (Jan. 21, 2025).

[16] Nicole Chavez, Suma Setty & Hannah Liu, *Still at Risk: The Urgent Need to Address Immigration Enforcement's Harms to Children*, CTR. FOR L. & SOC. POL'Y 12-14 (June 13, 2023),

[17] *Fact Sheet: U.S. Citizen Children Impacted by Immigration Enforcement*, AM. IMMIGR. COUNCIL (June 24, 2021).

[18] *Id.*

[19] *See id.*

of Sanctuary Laws, many families living in the southwest Chicago communities BPNC serves have disengaged from social services and schools.[20] BPNC's caseworkers report that their clients have stopped attending in-person caseworker meetings, have stayed home from school and work, and feel unsafe grocery shopping and running other errands. The parents and children express terror about how immigration enforcement could affect their families and community.

This harm is not just concentrated on students—teachers will also suffer in the absence of Sanctuary Laws. One study conducted during the first Trump Administration found that education providers were struggling to support children and families who were under additional stress, including some who had experienced the detention or deportation of a parent.[21]

Chicago Public School teachers and administrators help mixed status and undocumented families overcome enormous barriers to access education and social services. These barriers include parents who do not know that school is free; parents who believe they will have to disclose their immigration statuses to send their children to school; and parents who are afraid to register or sign in because of fear that it will expose them or other family members to deportation. Schools have been able to enroll these children and families into school and provide other services because they can truthfully tell families that schools are sanctuary sites where federal immigration authorities cannot enter. If those protections are removed, Chicago's most vulnerable families will fall out of reach and the children will suffer most of all.

### C. Sanctuary City Policies Benefit Local Economies while Immigration Raids Create Economic Devastation.

Sanctuary Laws provide an economic benefit to both U.S. Citizens and people who are undocumented. "[I]mmigrant-inclusive policies [like Sanctuary Laws] have positive effects on the

---

[20] The information in this section is taken from testimonies written by caseworkers from Brighton Park Neighborhood Council. They are on file with *Amicus* counsel and available at the Court's request.

[21] *Immigration Policy's Harmful Impacts on Early Care and Education*, CENTER ON LAW AND POLICY,1,15 (2018).

local economy and can contribute to reversing economic decline."[22] Median household annual income is, on average, $4,353 higher in sanctuary counties compared to non-sanctuary counties. This holds true for white, Black, and Latine households.[23] The poverty rate is 2.3percent lower, on average, in sanctuary counties compared to non-sanctuary counties.[24] Unemployment is, on average, 1.1 percent lower in sanctuary counties compared to non-sanctuary counties.[25] One study posits that Sanctuary Laws provide economic benefits across racial lines because "sanctuary counties are keeping families together—and when households remain intact and individuals can continue contributing, this strengthens local economies."[26]

Should Sanctuary protections disappear, the adverse economic consequences would be vast and far reaching. Without Sanctuary Laws, immigration raids will generate a pervasive climate of fear among immigrant communities, causing affected individuals to avoid public spaces, reduce shopping and limit other forms of local economic participation.[27] As a result, small businesses—particularly those serving immigrant neighborhoods—will experience sudden downturns, decreased revenue, and, in some cases, closures.[28] Raids and the ensuing labor instability would jeopardize vital sectors of Illinois economy, including hospitality, manufacturing, and service industries—sectors that

---

[22] In Kwon Park, Burkhard von Rabenau & Zhe Hong, *The effects of 'sanctuary city' policies on the local economy*, 27 INT'L J. URB. SCI. 19 Abstract (2022),

[23] Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, CTR. FOR AM. PROGRESS (Jan. 26, 2017).

[24] *Id.* at 8

[25] *Id.* at 10

[26] *Id.*

[27] Octavio Blanco, *The Economic Consequences of ICE Raids Are Far Reaching*, MARKETPLACE (Aug. 22, 2019).

[28] Jacqueline Hagan, David Leal, and Nestor Rodriguez, *Deporting Social Capital: Implications for Immigrant Communities in the United States,* 50 INT'L MIGRATION REV. 282, 298-99 (2015).

10

employ a large share of immigrant workers.[29] Sudden detention or deportation of employees disrupts productivity and forces employers to grapple with elevated hiring and training costs.

Illinois benefits significantly from immigrant entrepreneurs who launch restaurants, retail shops, and professional services that bolster the local economy and create jobs.[30] When immigration policy shifts sow fear in these communities, prospective or current immigrant business owners are less likely to invest capital, expand operations, or even register new ventures.[31] This chilling effect stifles innovation, deprives communities of additional tax revenue, and curtails a crucial source of job growth, ultimately harming not just immigrant neighborhoods but all Illinois residents.[32]

The tangible economic advantages of Sanctuary Laws are illustrated both by academic research and the testimonials of local employers in immigrant communities. One study found that Sanctuary protections "increase[] overall per capita income, wages, GDP, and total employment," as well as lowering the local unemployment rate.[33] In Chicago, multiple employers and workers consulted in the preparation of this brief highlighted the economic benefits of sanctuary city policies and the negative impacts of deportation threats and raids in the City.

One business owner in the Pilsen neighborhood, Maria Miranda,[34] immigrated to the United States from Mexico when she was sixteen. After studying in the U.S. and working in the corporate

---

[29] Alexia Elejalde-Ruiz, *No Unauthorized Immigrants? Manufacturing, Hospitality Workforces Would Struggle*, CHI. TRIB. (Jan. 13, 2017).

[30] Kelly Bauer, *Chicago's Immigrant Businesses Created $659 Million In Income In 1 Year, Report Says*, Block Club Chi. (Jan. 7, 2019).

[31] Billal Rahman, *Chicago Businesses Sound Alarm Over Trump's Immigration Raids*, NEWSWEEK (Jan. 20, 2025).

[32] Paul McDaniel, *Entrepreneurship and Innovation in Welcoming Cities: Lessons from Chicago, Dayton, and Nashville*, AM. IMMIGR. COUNCIL (Feb. 2016).

[33] Alexander D. Natanson, *Economic Impacts of Sanctuary and ICE Policies Inclusive and Exclusive Institutions*, OREGON STATE UNIV. APPLIED ECON., 2.

[34] The information in this section is based on interviews with local employers, and is on file with Amicus counsel and available at the Court's request.

world and in the restaurant industry, she opened two businesses, a nail salon and a restaurant. Many of her businesses' employees and clients are immigrants. The threats to Sanctuary Laws—and of mass deportations—have directly impacted her business. After President Trump won the election on a campaign marked by anti-immigrant vitriol and promises to take a punitive and aggressive approach to migration, the profit at both her nail salon and restaurant dropped by more than 45%. Ms. Miranda paints a picture of a neighborhood economy where people are afraid to go outside, regardless of their status—"for my business, or any business in the city, especially in communities like Pilsen and Little Village, the end of sanctuary city laws would be the end of the neighborhoods…. Every single profession would be affected." A client of Amicus BPNC experiences the same concerns. His employer, a meatpacking plant, laid off ten employees due to a decreased demand from local restaurants.

Dr. Evelyn Figueroa is the Executive Director of the Figueroa Wu Family Foundation, which operates the Pilsen Food Pantry. Should the federal government prevail in this lawsuit, the demand for the Pilsen Food Pantry's services will far outpace the organization's supply. The immigration raids that will occur without Sanctuary Laws will result in forced family separations and sudden job losses, creating a tremendous strain on Chicago's social safety net, including shelters, food pantries, and emergency assistance programs.[35] Local governments and nonprofits—like the Pilsen Food Pantry— would be required to meet the basic needs of individuals affected by raids—needs that previously might have been covered by steady employment.[36] These costs are a hidden tax on all local residents, who bear the financial burden of replacing lost wages and stabilizing communities adversely affected by immigration enforcement.

---

[35] *See e.g.,* CBS Chicago, *Chicago Food Pantries Stretched Thin as They Work to Feed Asylum Seekers*, CBS NEWS (May 30, 2023).

[36] Regina Day Langhout et al., *The Effects of Deportation on Families and Communities*, SOC'Y FOR CMTY. RSCH. & ACTION (2018).

### D. Sanctuary Policies Protect Immigrant Workers from Workplace Abuse and Exploitation and Help Hold Accountable Employers That Violate the Law

Immigrant workers face increased risk of exploitation because of the potential for immigration-related retaliation by their employers.[37] In the case of undocumented workers, "[t]heir employers can exploit fears of deportation to discourage them from reporting legal violations and protesting substandard conditions."[38] Communities throughout Illinois have strong interests in addressing these fears because "the threat of using immigration status against a worker or their family and friends ripples across workplaces and industries, bringing down wages and conditions for all workers and making fair competition more difficult for law-abiding businesses."[39] Illinois Sanctuary Laws provide stability and legal protections that allow immigrant workers to pursue accountability for abuses they face at work.

Longtime Chicago organizer Jessica Rojas[40] has worked for over a decade to inform immigrant workers of their legal rights. She facilitates workshops to train workers on how to pursue legal remedies to address harms like wage theft, abusive employers, and dangerous working conditions. Ms. Rojas supports workers navigating the legal complaint process and connects them with the relevant investigatory government agencies. In 2021, advocates successfully lobbied Chicago City Council to amend the Welcoming City Ordinance to remove "carve outs" that allowed some situations where police would share information ICE. Ms. Rojas says that prior to the passage of the 2021 amendments to the ordinance, protections against retaliation for undocumented workers

---

[37] Tanya Goldman, *The Labor Standards Enforcement Toolbox, Tool 5: Addressing and Preventing Retaliation and Immigration-Based Threats to Workers*, RUTGERS CTR. FOR INNOVATION IN WORKER ORG. (Apr. 2019).

[38] *Id.* at 2.

[39] Rebecca Dixon, *Statement on the Essential Role of Immigrant Workers*, NAT'L EMP. L. CTR., SENATE COMMITTEE ON THE JUDICIARY (May 21, 2021).

[40] Individuals described in this section are identified through pseudonyms. Interviews with the identified individuals are on file with Amicus counsel and available at the Court's request.

appeared almost non-existent. Many workers would initiate legal claims, but they would stop the process prior to resolution because of deportation fears. Workers feared that information they reported to the Illinois Department of Labor or the Chicago Office of Labor Standards would be used to facilitate their deportations.

After the successful effort to amend the Welcoming City Ordinance, Ms. Rojas says there is less fear among the workers and her organizing community. Since President Trump's January 2025 inauguration, Chicago communities have contended with threats of heightened immigration enforcement. Even so, because of Sanctuary Laws, workers continue their campaigns to recover illegally withheld wages and to report other abuses.

Sanctuary Laws ensure that people who are undocumented can initiate legal processes to seek justice from government officials who engage in unlawful abuse and violence. Amici Raise the Floor Alliance's (RTF) legal department supports immigrant workers in bringing litigation that addresses harms perpetuated by both government officials and employers. In one case, RTF supported Ricardo Lopez[41] in filing a police report after a group of off-duty police officers assaulted Mr. Lopez when he went to seek short-term employment at a Chicago Home Depot. Mr. Lopez is currently working with his lawyers to hold accountable the officers who harmed him. He is participating in this process only because Chicago's Sanctuary Laws offer him some protection against retaliation.

Another worker organizer, Alvaro Reyes, who has worked in labor rights for over 30 years, said that the existence of Illinois Sanctuary Policies allowed immigrant workers to "lose the fear of the government agencies." More than ever, workers are willing to testify and provide evidence in their legal cases. In August 2021, the Chicago Office of Labor Standards (OLS) initially met with six workers who reported violations of a local ordinance requiring employers to provide workers

---

[41] Individuals described in this section are identified through pseudonyms. Interviews with the identified individuals are on file with Amicus counsel and available at the Court's request.

schedules two weeks in advance. After OLS requested to interview additional workers, Mr. Reyes and his team connected OLS to over 50 additional workers who provided testimony. Mr. Reyes says that—prior to the passage of the Welcoming City Ordinance—identifying 50 undocumented workers willing to speak to the government about the unlawful acts of their employer would have been unthinkable. The workers participated in this process largely because they knew that OLS was governed by Chicago's Sanctuary Policies.

In each of these situations, immigrant workers reported abuse they faced at work because they were assured Illinois and Chicago-area laws and policies would protect them from additional immigration-related retaliation by state and local agencies.

## Conclusion

For the forgoing reasons, Amici respectfully request that this Court grant Defendants' Motion to Dismiss with prejudice. Further, should this Court decide to hear oral arguments on Defendants' Motions to Dismiss, Counsel for Amici requests limited argument time to represent the interests of Amici.


Dated: March 28, 2025                              Respectfully Submitted:

/s/ Sheila A. Bedi
Sheila A. Bedi
Wallace Hilke
Eliana Green
Community Justice and Civil Rights Clinic
Northwestern Pritzker School of Law
375 E. Chicago Ave.,
8th Floor Chicago, IL 60611
Phone: 312-503-2492
Sheila.bedi@law.northwestern.edu
wally.hilke@law.northwestern.edu
eliana.green@law.northwestern.edu

15

Sejal Zota
Dinesh McCoy
Daniel Werner
Just Futures Law
1629 K Street N.W., Suite 300
Washington, DC 20006
Phone: (617) 812-2822
sejal@justfutureslaw.org
dinesh@justfutureslaw.org
daniel@justfutureslaw.org

Daniel Massoglia
MK Law, LLC
2020 Janice Avenue
Melrose Park, IL 60160
P: 312 545 8660
E: dm@mklawchicago.com

*Counsel for Amici*