**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-1285 |
| | ) | Judge Lindsey C. Jenkins |
| STATE OF ILLINOIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**BRIEF OF AMICI CURIAE ACLU OF ILLINOIS, ILLINOIS COALITION FOR**
**IMMIGRANT AND REFUGEE RIGHTS, MUJERES LATINAS EN ACCIÓN**
**AND NATIONAL IMMIGRANT JUSTICE CENTER**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTEREST OF *AMICI* ...................................................................................................1

ARGUMENT .....................................................................................................................2

    I.     The Sanctuary Policies Protect Public Safety .........................................................3

          A.  The sanctuary policies help alleviate reluctance to work with law enforcement due to fear of immigration consequences ..........................................................3

          B.  The sanctuary policies preserve law enforcement resources for enforcing criminal law ............................................................................................................7

          C.  The Government's claim that sanctuary policies make Americans less safe is fallacious ...................................................................................................................8

    II.    The Sanctuary Policies Help Ensure that Illinois Law Enforcement Officers Act According to the Constitution and State Law ........................................................10

    III.   Sanctuary Policies Preserve Strong Economies Driven by Immigrants .............................................................................................................12

          A.  Local governments with sanctuary policies have stronger economies. ...........12

          B.  Illinois immigrants without documentation pay taxes that fund state and local government and public services .....................................................................13

          C.  If Illinois, Cook County, and Chicago are required to assist with the federal government's mass deportations, families and the economy will suffer .........14

CONCLUSION .................................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abriq v. Hall*,
    295 F. Supp. 3d 874 (M.D. Tenn 2018) .............................................................10

*C.F.C. v. Miami-Dade Cnty.*,
    349 F. Supp. 1236 (S.D. Fla. 2018)...................................................................10

*Chicago v. Sessions*,
    888 F.3d 272, 280 (7th Cir. 2018), reh'g en banc granted in part on other grounds, 17-
    2991, 2018 WL 4268817 (7th Cir. June 4, 2018), vacated, 17-2991, 2018 WL 4268814
    (7th Cir. Aug. 10, 2018) ........................................................................... 3,6,8

*Creedle v. Miami-Dade Cnty.*,
    349 F. Supp. 3d 1276 (S.D. Fla. 2018)..............................................................10

*JGG v. Trump*,
    No. 1:25-cv-00766 (D. D.C.) (filed Mar. 15, 2025)...........................................12

*Las Americas Immigrant Advocacy Center v. Noem*,
    No. 1:25-cv-00418 (D. D.C.) (Filed Feb. 12, 2025) ..........................................12

*Khalil v. Joyce*,
    No. 2:25-cv-01963 (D. N.J.) (filed Mar. 9, 2025)..............................................12

*Make the Road N.Y. v. Huffman*,
    No. 1:25-cv-00190 (D. D.C.) (filed Jan. 22, 2025)............................................12

*Morales v. Chadbourne*,
    966 F. Supp. 2d 19 (D.R.I. 2014), aff'd in part, dismissed in part, 793 F.3d (1st Cir. 2015)
    ………………………………………………………………………………………11

*Castanon Nava v. Dept. of Homeland Sec.*,
    No. 1:18-cv-03757 (N.D. IL), Dkt. 164 (Mar. 13, 2025)...................................11

*Orellana v. Nobles Cnty.*,
    230 F. Supp. 3d 934 (D. Minn. 2017) ..............................................................11
*Villars v. Kubiatowski*,
    45 F. Supp. 3d 791 (N.D. Ill 2014) ..................................................................11

**Statutes and Law**

5 Ill. COMP STAT 805/1 ...............................................................................3

5 Ill. COMP STAT 805/10 .............................................................................5

5 Ill. COMP STAT 805/15 (e), (h)(2), (3) .....................................................4

5 Ill. COMP STAT 805/15 (h) ........................................................................8

5 Ill. COMP STAT 805/15(i) ..........................................................................8

8 U.S.C. § 1357 (a)(2) ..................................................................................11

725 Ill. COMP STAT 5/110-2(b).....................................................................9

725 Ill. COMP STAT 5/110-2(c).....................................................................9

725 Ill. COMP STAT 5/110-4(b).....................................................................9

Chicago Code Sec. 2-173-005 .......................................................................4

Chicago Municipal Code Sec. 46-37 ..............................................................3

Cook County Municipal Code Ch. 2-173 ........................................................3

**Other Authorities**

ACLU, *Local jurisdictions remain legally vulnerable for honoring ICE detainers,*(Feb. 3, 2020) (listing cases), https://assets.aclu.org/live/uploads/document/ 200626detainer_one-pager-_aclu_branded.chw_.pdf. ...............................................................11

Catalina Amuedo-Dorantes and Monica Deza, *Can Sanctuary Policies Reduce Domestic Violence*? 4, Working Paper 2020-008, The Center for Growth and Opportunity at Utah State University (May 2020), https://www.congress.gov/118/meeting/house/116200/documents/ HHRG-118-JU01-20230713-SD001.pdf. (emphasis in original) ...................................6

Civil Rights Litigation Clearinghouse, Univ. of Mich., https://clearinghouse.net/collections/38759 (last visited Mar. 24, 2025). ....................................12

Marta Ascherio, Do Sanctuary Policies Increase Crime? Contrary evidence from a county-level investigation in the United States, 106 Social Science Research, 102743 (August 2022)............6

City of Chicago, Office of Budget and Management, FAQ, https://www.chicago.gov/city/en/depts/obm/supp_info/faq.html (last visited Mar. 20, 2025)......14

Carl Davis, Marco Guzman, & Emma Sifre, *Tax Payments by Undocumented Immigrants*, Institute on Taxation and Economic Policy, 3 (July 30, 2024), https://sfo2.digitaloceanspaces.com/itep/ITEP-Tax-Payments-by-Undocumented-Immigrants-2024.pdf. ................................................................................................13

Debunking the Myth of Immigrants and Crime, Fact Sheet, American Immigration Council (Oct. 2024), https://www.americanimmigrationcouncil.org/sites/default/files/research/debunking_the_myth_of_immigrants_and_crime.pdf (citing studies)................................................................7

Chloe N. East, et al., The Labor Market Effects of Immigration Enforcement, IZA Institute of Labor Economics, 26-27 (Apr. 2018), https://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=2788436 ......................................15

Luis Ferré-Sadurní, *New York City to Pay $92.5 Million to Improperly Detained Immigrants*, N.Y. Times, Dec.18, 2024. ................................................................................................11

David K. Hausman, Sanctuary policies reduce deportations without increasing crime, PNAS vol. 117 no. 44 (Nov. 3, 2020), https://www.pnas.org/doi/epdf/10.1073/pnas.2014673117 ...............10

Michael T. Light, et al., Comparing crime rates between undocumented immigrants, legal immigrants, and native-born US citizens in Texas. 117 Proc. Nat'l Acad. Sci. USA 51 (Dec. 7, 2020). ................................................................................................7

Robert Lynch & Michael Ettlinger, The Economic Impact on Citizens and Authorized Immigrants of Mass Deportation, Univ. of New Hamp., Casey School of Public Policy, 8 (Aug. 29, 2024), https://carsey.unh.edu/sites/default/files/media/2025-01/literature-review-economic-impact-mass-deportation.pdf ................................................................15

Silva Mathema, State-by-State Estimates of Family Members of Unauthorized Immigrants, Center for American Progress (Mar. 16, 2017), https://www.americanprogress.org/article/state-state-estimates-family-members-unauthorized-immigrants/ ........................................14

Susana A. Mendoza, Illinois State Comptroller, *What Did Your Tax Dollars Pay for Fiscal Year 2023?*, https://illinoiscomptroller.gov/__media/tax%20refund%20insert%20FY%202023_web%20only.pdf. ................................................................................................14

Rebecca Davis O'Brien & Miriam Jordan, A Chill Sets in for Undocumented Workers, and Those Who Hire Them, N.Y. Times, Mar. 9, 2025, https://www.nytimes.com/2025/03/09/business/economy/immigrant-workers-deportation-fears.html ................................................................................................14

Akash Pillai, et al., Potential Impacts of Mass Detention and Deportation Efforts on the Health and Well-Being of Immigrant Families, KFF (Feb. 6, 2025), https://www.kff.org/racial-equity-and-health-policy/issue-brief/potential-impacts-of-mass-detention-and-deportation-efforts-on-the-health-and-well-being-of-immigrant-families/ ........................................................................15

Tony Preckwinkle, Pres., Cook County Bd. of Comms., *Fiscal 2025 Cook County Annual Appropriation Bill*, Executive Summary, 12, https://www.cookcountyil.gov/sites/g/files/ywwepo161/files/documents/2025-02/Volume%20I%20Adopted%202025_Web.pdf. ........................................................................14

Michael Runner, et al., Family Violence Prevention Fund, Intimate Partner Violence in Immigrant and Refugee Communities: Challenges, Promising Practices and Recommendations 11, Robert Wood Johnson Foundation (Mar. 2009), https://irp.cdn-website.com/25448aaa/files/uploaded/IPV-in-Immigrant-and-Refugee-Communities-Challenges-Promising-Practices-Recommendations.pdf. ........................................................................6

Nell Salzman et al, 'People are scared": Fear permeates every aspect of life in Chicago, under threat of mass immigration deportations, Chicago Tribune, Jan. 25, 2025, https://www.chicagotribune.com/2025/01/26/trump-chicago-immigration-deportation-fear/ ......14

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 31, 2017, statement of Sen. Omar Aquino at 95).. ........................................................................7

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 4, 2017, statement of Sen. John Cullerton at 118-19) ........................................................................4

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 31, 2017, statement of Sen. Daniel Biss at 95)…... ........................................................................4

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 31, 2017, statement of Sen. Don Harmon at 91)... ........................................................................10

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 29, 2017, statement of Sen. Lou Lang at 38-39). ........................................................................10

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 29, 2017, statement of Sen. Theresa Mah at 38-39) ........................................................................10

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 31, 2017, statement of Sen. Iris Martinez at 95).. ........................................................................4

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 31, 2017, statement of Sen. Patricia Van Pelt at 91) ........................................................................4

S. 100th Gen. Assemb., Reg. Sess. Tr. (Ill. 2017) (May 31, 2017, statement of Sen. Kwame Raoul at 94).. ........................................................................7

Sixth Judicial Circuit, Circuit Administrative Order 95-7, App'x 1, (Nov. 8, 1995) (rescinded Jun. 3, 2021), https://sixthcircuitcourt.com/pdf/1995AdminOrders.pdf............................................5

Nik Theodore, Insecure Communities Latino Perceptions of Police Involvement in Immigrant Enforcement 5-6, University of Illinois at Chicago (May 2013), https://greatcities.uic.edu/wp-content/uploads/2014/05/Insecure_Communities_Report_FINAL.pdf............................................5

Tom K. Wong, The Effects of Sanctuary Policies on Crime and the Economy 5, Center for American Progress, (Jan. 26, 2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ ........................................................................5,12

## INTERESTS OF *AMICI*

The ACLU of Illinois (ACLU-IL) is a state affiliate of the American Civil Liberties Union, and a statewide, nonprofit, nonpartisan organization with more than 50,000 members across Illinois. The ACLU-IL is dedicated to protecting the principles embodied in the U.S. Constitution, Illinois Constitution, and civil rights statutes through litigation, advocacy, and public education. The ACLU-IL has long advocated for the constitutional and civil rights of immigrants through know-your-rights presentations and other public education, legislative advocacy, and litigation – both as direct counsel and amicus.

The Illinois Coalition for Immigrant and Refugee Rights (ICIRR) is the state's largest multiethnic immigrant advocacy organization. ICIRR is dedicated to promoting the rights of immigrants and refugees to full and equal participation in the civic, cultural, social, and political life of our diverse society. ICIRR has advocated on the local, state, and federal level for legislative and administrative policies that uphold the dignity of immigrants and their ability to safe, secure lives in their new home country. The policies have included promotion of US citizenship, access to student assistance, driver's licenses, and health care, and protection against harmful detention and family separation, including the Chicago Welcoming City Ordinance, Cook County Detainer Ordinance, Illinois TRUST Act, and Illinois Way Forward Act.

Mujeres Latinas en Acción, founded in 1973, is the nation's oldest Latina-led organization. Mujeres Latinas en Acción empowers Latinas and their families by providing various bilingual support services and leadership development programs. Each year, the organization serves nearly 2,000 community members, including immigrants, with domestic violence and sexual abuse support services and leadership programming. Mujeres believes that systems of oppression can be challenged through community engagement and collective

leadership, and that the voices of those most impacted by discrimination must remain at the forefront.

The National Immigrant Justice Center (NIJC) is a national nonprofit organization with its headquarters in Chicago, Illinois. NIJC provides legal services to immigrants, refugees, and asylum seekers, reaching more than 10,000 individuals annually. NIJC draws on this experience providing consultations and direct legal representation to inform its efforts to educate the public and advocate for immigration policies that promote a fair immigration system. NIJC focuses on transparency and accountability within the immigration system and strives to ensure that immigration enforcement is carried out in accordance with the constitution and the statutory system that Congress created.

## ARGUMENT

As Illinois has explained, Mem. Supp. Mot. to Dismiss, Dkt. 25 at 7, the Constitution reserves broad "police powers" to the states that include the authority to direct the activities of law enforcement officers. The term "police powers" does not refer solely to an abstract legal concept but to actions that state and local policymakers take to protect the health, safety, and welfare of their residents. Illinois, Cook County, and Chicago determined that law enforcement participation in civil immigration enforcement did not serve these interests. Notwithstanding the Government's allegations (Dkt. 1, ¶¶ 2-3, 6-7, 11, 74-75), Defendants did not make these decisions out of malice for the federal government or to thwart immigration enforcement, but for sound public policy reasons supported by evidence.

*Amici* submit this brief to describe a few reasons why jurisdictions like Defendants choose to limit their law enforcement agencies' participation in immigration enforcement. First,

sanctuary policies[1] protect public safety by mitigating the fear that reporting a crime or cooperating with police will lead to someone's deportation. Such policies also ensure that the local law enforcement agencies can allocate scarce resources for their core mission of enforcing criminal law. Second, sanctuary policies prevent state and local law enforcement from violating state law or the Constitution by holding people in custody past their release date or engaging in questionable immigration enforcement tactics. Finally, sanctuary policies protect the substantial contributions that immigrants make to the tax base and overall economic well-being.

## I.     The Sanctuary Policies Protect Public Safety.

### A.  The sanctuary policies help alleviate reluctance to work with law enforcement due to fear of immigration consequences.

Governments like Chicago, Cook County, and Illinois have reasonably determined that "their local law enforcement efforts are handcuffed by … unbounded cooperation with immigration enforcement. They have concluded that persons who are here unlawfully—or who have friends or family members here unlawfully—might avoid contacting local police to report crimes as a witness or a victim if they fear that reporting will bring the scrutiny of the federal immigration authorities to their home." *City of Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018), *reh'g en banc granted in part, opinion vacated in part on other grounds,* 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated,* 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018). Chicago's Welcoming City Ordinance observes that "assistance from a person, whether documented or not, who is a victim of, or a witness to, a crime is important to promoting the safety of all its residents. The cooperation of the City's immigrant communities is essential to

---

[1] *Amici* use the term "sanctuary policies" for state and local policies that limit participation in civil immigration enforcement, including the laws challenged here, the Illinois TRUST Act, 5 ILCS 805/1 *et seq.*, Cook County Municipal Code Sec. 46-37, and the Chicago Welcoming City Ordinance, Chicago Municipal Code Ch. 2-173.

prevent and solve crimes and maintain public order, safety and security in the entire City." Chicago Code Sec. 2-173-005.

Likewise, the General Assembly originally enacted the TRUST Act in large part to advance public safety by promoting cooperation between law enforcement agencies and communities. *See* 100th General Assembly, Senate Tr., May 4, 2017, at 118-19 (Sen. J. Cullerton) ("[W]e call it the Trust Act because we want to foster trust between police and immigrant communities and refocus resources on fighting priority crimes.") As one TRUST Act proponent explained, "if a person is afraid to go to the hospital because they think that they might be detained or they're afraid to let their children go to school, thinking that they will come get the children and have them go home to get their parents, or if they're afraid to speak to law enforcement, we all are in danger." *Id.* at 130 (Sen. Van Pelt). *See also* 100th General Assembly, Senate Tr., May 31, 2017, at 91 (Sen. Biss) ("Nobody should be scared to call 9-1-1 in the State of Illinois. It's not sensible. It's not fair. It's not good for public safety."); *Id.* at 95 (Sen. Martinez) ("the TRUST Act … will give a sense of the police and communities working together to make sure that they can report a domestic violence. They're not afraid to actually go ahead and have somebody arrested in their home, afraid to give up that because of their – because of their legal status.").

Targeted amendments to the TRUST Act in 2021 further supported the effort to ensure cooperation between law enforcement and immigrant communities. For example, the amendments assured members of immigrant families and communities that cooperating with local law enforcement would not subject them or their loved ones to questioning about their immigration or citizenship status, interrogation by ICE, or transfer to ICE custody. 5 ILCS 805/15(e), (h)(2),(3). Another public safety amendment concerned probation officers. For

4

decades, some probation officers had routinely advised ICE of upcoming appointments with "foreign-born" probationers—sometimes pursuant to Circuit Court administrative orders. *See* Circuit Administrative Order 95-7, App'x 1, Sixth Judicial Circuit, Nov. 8, 1995 (rescinded Jun. 3, 2021).[2] The natural effect of such reporting was to deter some immigrants from attending appointments, putting themselves in legal jeopardy and making it difficult for probation officers to determine whether a person was complying with conditions for release. The General Assembly addressed this issue by adding probation officers to the list of law enforcement officers governed by the TRUST Act. 5 ILCS 805/10.

Empirical evidence supports the use of sanctuary policies to drive down crime by fostering cooperation between police and immigrant communities. A 2012 survey of Latinos in Cook County (Chicago), Illinois, Harris County (Houston), Texas, Los Angeles, and Maricopa County (Phoenix), Arizona demonstrates that the fear of immigration consequences deters undocumented immigrants, and many Latinos overall, from providing information to police. For example, 45 percent of Latinos, and 67 percent of undocumented Latinos, stated that they are less likely to voluntarily offer information about crimes or to report a crime because they are afraid the police will ask them or people they know about their immigration status. Nik Theodore, *Insecure Communities Latino Perceptions of Police Involvement in Immigrant Enforcement* 5-6, University of Illinois at Chicago (May 2013).[3]

Predictably, then, overall crime rates are higher in counties where local law enforcement honor ICE detainers than in similar counties with sanctuary policies. Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Center for American Progress 5

---

[2] https://sixthcircuitcourt.com/pdf/1995AdminOrders.pdf.
[3] https://greatcities.uic.edu/wp-content/uploads/2014/05/Insecure_Communities_Report_FINAL.pdf.

(Jan. 26, 2017).[4] Significantly, "sanctuary practices are associated with a decrease in both property crime and violent crime within counties over time." Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary evidence from a county-level investigation in the United States,* 106 Social Science Research 102743 (Aug. 2022).

Sanctuary policies have a particularly strong impact on domestic and gender-based violence. Immigrant women are particularly vulnerable to such violence due to factors like language barriers, lack of familiarity with available support systems, and fear of police based on experiences in their country of origin. Michael Runner, *et al.*, Family Violence Prevention Fund, *Intimate Partner Violence in Immigrant and Refugee Communities: Challenges, Promising Practices and Recommendations*, Robert Wood Johnson Foundation 11(Mar. 2009).[5] Moreover, some abusers threaten their victims with deportation if they disclose the abuse. *Intimate Partner Violence*, *supra*, at 12. Thus, "the reluctance to report that is endemic to such offenses could be magnified in communities where reporting could turn a misdemeanor into a deportation." *Chicago*, 888 F.3d at 280. Given that reluctance, it is unsurprising that "the adoption of sanctuary policies is accompanied by a lower rate of domestic homicides involving a female *Hispanic* victim." Catalina Amuedo-Dorantes and Monica Deza, *Can Sanctuary Policies Reduce Domestic Violence*? 4, Working Paper 2020-008, The Center for Growth and Opportunity at Utah State University (May 2020) (emphasis in original).[6]

---

[4] https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/.
[5] https://irp.cdn-website.com/25448aaa/files/uploaded/IPV-in-Immigrant-and-Refugee-Communities-Challenges-Promising-Practices-Recommendations.pdf.
[6] https://www.congress.gov/118/meeting/house/116200/documents/ HHRG-118-JU01-20230713-SD001.pdf.

**B. The sanctuary policies preserve law enforcement resources for enforcing criminal law.**

In addition to encouraging trust and cooperation between law enforcement and immigrant communities, the TRUST Act protects public safety by ensuring that state and local law enforcement agencies focus on their core mission: enforcing criminal law. The crime rate among immigrants – whether documented or not – is the same or *lower* than that of citizens. *Debunking the Myth of Immigrants and Crime*, Fact Sheet, American Immigration Council (Oct. 2024) (citing studies)[7]; Michael T. Light, et al., *Comparing crime rates between undocumented immigrants, legal immigrants, and native-born US citizens in Texas*. 117 Proc. Nat'l Acad. Sci. USA 51 (Dec. 7, 2020). The City, County, and State have reasonably determined that rather than holding immigrants past their release dates, responding to queries, and arranging jail visits for ICE officers, law enforcement resources are better expended investigating crimes and apprehending suspects, regardless of their immigration or citizenship status. *See* Senate Hearing May 31 Tr. at 94 (Sen. Raoul) ("[W]e shouldn't pretend like … we have the resources to direct our local law enforcement to do anything other than focus on fighting crime. And to that extent, we shouldn't have local law enforcement focused on doing what we have a federal agency charged to do."); *Id.* at 96-97 (Sen. Aquino) ([T]here's a purpose for immigration enforcement – that's on the federal level. Our … police here in our State and … in our cities and so forth should be dealing with issues that … do not deal with immigration."). In fact, "data suggest that when local law enforcement focuses on keeping communities safe, rather than becoming entangled in federal immigration enforcement efforts, communities are safer[,] and community members stay more engaged in the local economy." *The Effects of Sanctuary Policies*, supra, 2. And "[t]he

---

[7] https://www.americanimmigrationcouncil.org/sites/default/files/research/debunking_the_myth_of_immigrants_and_crime.pdf

choice as to how to devote law enforcement resources—including whether or not to use such resources to aid in federal immigration efforts—would traditionally be one left to state and local authorities." *Chicago*, 888 F.3d at 282.

Consistent with this emphasis on law enforcement's crime-fighting mission, the TRUST Act expressly *allows* cooperation with federal authorities on federal *criminal* enforcement. 5 ILCS 805/15(i) ("Nothing in this Section shall preclude a law enforcement official from … investigating violations of criminal law and cooperating in such investigations with federal and other law enforcement agencies (including criminal investigations conducted by federal Homeland Security Investigations (HSI)) in order to ensure public safety."); 5 ILCS 805/15(h) (allowing law enforcement agencies to cooperate with immigration authorities when "presented with a federal warrant."). The TRUST Act therefore keeps law enforcement resources focused where they belong, on public safety.

### C. The Government's claim that sanctuary policies make Americans less safe is fallacious.

Despite the evidence that sanctuary policies enhance public safety, the United States repeatedly asserts that they are dangerous. Dkt. 1. ¶¶ 1, 6, 7, 11, 70. Apart from a single anecdote, *id.* ¶ 12, the United States makes no allegations that support their overblown rhetoric about the danger posed by sanctuary policies. Instead, it makes conclusory statements or cite numbers that are irrelevant to their argument.

For example, the United States claims that sanctuary policies "ha[ve] resulted in countless criminals being released into Chicago who should have been held for immigration removal from the United States," but the numbers it cites are a non-sequitur. It asserts that ICE's Enforcement and Removal Operations "arrested 13,564 aliens in Illinois, lodging 11,036 detainers." *Id.* ¶ 7. But it does not say how many of those arrested had been issued detainers, how

many people with detainers were released rather than detained, or how many of either group had been charged or convicted of a violent offense. Rather, it simply asserts that "many" were charged with such offenses. Nor does it acknowledge that ICE's detainers may not be accurate or valid under the Fourth Amendment. *See e.g., Gonzalez v. Immig. and Cust. Enf't,* 416 F. Supp. 3d 995, 1012-1018 (C.D. Cal. 2019), *rev'd and vacated sub nom. Gonzalez v. U.S. Immig. and Cust. Enf't,* 975 F.3d 788 (9th Cir. 2020) (trial evidence established that ICE detainers relied on unreliable databases to make probable cause determinations and wrongly detained U.S. citizens).

Illinois treats immigrants who are accused of violent crimes just like any other person so charged. They are arrested and detained, then brought before a judge to determine their disposition pending trial. Defendants who "pose[] a specific, real and present threat to a person, or ha[ve] a high likelihood of willful flight," are subject to pretrial detention. 725 ILCS 5/110-2(c). If a defendant is released, the court may impose conditions as "necessary to assure the defendant's appearance in court, assure the defendant does not commit any criminal offense, and complies with all conditions of pretrial release." 725 ILCS 5/110-2(b). Further, if the defendant is charged with a capital offense or one for which a life sentence may be imposed, the defendant "shall not be eligible for release pretrial until a hearing is held wherein such person has the burden of demonstrating that the proof of his guilt is not evident and the presumption [of guilt] is not great." 725 ILCS 5/110-4(b). As these provisions demonstrate, Illinois, Chicago, and Cook county do not release immigrants—or other defendants—who are accused of serious crimes willy-nilly.

Further, research indicates that sanctuary policies do not reduce deportations of people who have been convicted of violent offenses. Across several different statistical models, "sanctuary policies have *no effect* on deportations of people convicted of violent crimes, and

sanctuary policies have the largest effect on deportations of people who were never convicted of any crime and do not increase crime rates in sanctuary jurisdictions." David K. Hausman, *Sanctuary policies reduce deportations without increasing crime*, PNAS vol. 117 no. 44 (Nov. 3, 2020).[8]

## II. The Sanctuary Policies Help Ensure that Illinois Law Enforcement Officers Act According to the Constitution and State Law.

In addition to advancing public safety, sanctuary policies help state and local law enforcement officers stay within the bounds of the Constitution and state law. Proponents of the TRUST Act understood that complying with detainers often creates Fourth Amendment liability for local law enforcement agencies. As one legislator explained, "federal courts have consistently ruled that local jails can be sued under the Fourth Amendment if they hold immigrants on detainers after those immigrants could otherwise be released if there is no probable cause to hold them." House Tr. May 29, 2017, at 38-39 (Rep. Lang). *See also id.* at 37-38 (Rep. Mah) ("I believe that the TRUST Act, as put forth by Representative Welch, is consistent with the Fourth Amendment. And the last time I checked, the application of our civil liberties was not dependent on one's immigration status or citizenship."); Senate Tr. May 31, 2017 at 91 (Rep Harmon) ("The Illinois TRUST Act sets reasonable constitutional limits on local police interaction with ICE enforcement….").

Indeed, many federal courts have found that local governments have violated the Fourth Amendment when they detained someone based solely on an ICE detainer request. *See Creedle v. Miami-Dade Cnty.*, 349 F. Supp. 3d 1276 (S.D. Fla. 2018) (plaintiff plausibly alleged that County violated the Fourth Amendment by holding him based solely on an ICE detainer); *C.F.C. v. Miami-Dade Cnty.*, 349 F. Supp. 3d 1236 (S.D. Fla. 2018) (same); *Abriq v. Hall*, 295 F. Supp. 3d

---

[8] https://www.pnas.org/doi/epdf/10.1073/pnas.2014673117.

874 (M.D. Tenn. 2018) (same); *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934 (D. Minn. 2017) (detention based solely on immigration detainer violated Fourth Amendment absent probable cause to believe that plaintiff was likely to escape); *Morales v. Chadbourne*, 996 F. Supp. 2d 19 (D.R.I. 2014), *aff'd in part, dismissed in part,* 793 F.3d 208 (1st Cir. 2015) (plaintiff stated a Fourth Amendment claim against state for detaining him without probable cause based on a detainer request); *Villars v. Kubiatowski*, 45 F. Supp. 3d 791 (N.D. Ill. 2014) (plaintiff stated a Fourth Amendment claim against Village for continuing to hold him based on ICE detainer after he posted bond for traffic violation). Many local jurisdictions have paid large settlements to plaintiffs who were held pursuant to a detainer. *See Local jurisdictions remain legally vulnerable for honoring ICE detainers*, ACLU (Feb. 3, 2020) (listing cases)[9]; Luis Ferré-Sadurní, *New York City to Pay $92.5 Million to Improperly Detained Immigrants*, N.Y. Times, Dec.18, 2024.[10] Sanctuary policies eliminate this potential liability.

Assisting in ICE operations also increases state and local law enforcement's risk of liability for participating in ICE's own civil rights violations. In Illinois and across the country, ICE has been credibly accused of multiple constitutional and statutory violations since the beginning of the year. In *Castañon Nava v. DHS*, No. 1:18-cv-03757 (N.D.IL), Dkt. 164 (Mar. 13, 2025), for example, class counsel recently filed a motion for enforcement alleging that ICE violated a settlement agreement and 8 U.S.C. § 1357(a)(2) by conducting warrantless arrests without probable cause to believe both that the arrestee was both unlawfully present and likely to flee before a warrant could be obtained. The motion "raises 22 violations identified within a few weeks after January 21, 2025, and Plaintiffs' counsel have already identified more." *Id.* at 1-2.

---

[9] https://assets.aclu.org/live/uploads/document/ 200626detainer_one-pager-_aclu_branded.chw_.pdf.
[10] https://www.nytimes.com/2024/12/18/nyregion/migrants-detention-settlement-deportation.html.

Without sanctuary policies, state or local law enforcement could have been implicated in these alleged violations.

Outside of Illinois, in the first months of 2025 alone, ICE and DHS have been sued for multiple alleged constitutional violations, such as summarily removing Venezuelan nationals to El Salvador, *JGG v. Trump*, No. 1:25-cv-00766 (D.D.C.) (filed Mar. 15, 2025); unlawfully expanding the power of "expedited removal," *Make the Road N.Y. v. Huffman*, No. 1:25-cv-00190 (D.D.C.) (filed Jan. 22, 2025); removing immigrants to a military facility at Guantánamo Bay, Cuba, *Las Americas Immigrant Advocacy Center v. Noem*, No. 1:25-cv-00418 (D.D.C.) (filed Feb. 12, 2025); and detaining and attempting to deport a lawful permanent resident without due process in retaliation for his constitutionally protected speech, *Khalil v. Joyce*, No. 2:25-cv-01963 (D.N.J.) (filed Mar. 9, 2025). Overall, there are 31 pending lawsuits against the current federal government for its immigration enforcement. *See* Civil Rights Litigation Clearinghouse, Univ. of Mich.[11] Regardless of the outcomes of these lawsuits, Illinois, Cook County, and Chicago have good reason to eliminate the risk of state and local involvement in these allegedly unlawful activities – along with the litigation and liability risks that come with them.

### III.     Sanctuary Policies Preserve Strong Economies Driven by Immigrants.

#### A.  Local governments with sanctuary policies have stronger economies.

One nationwide study, comparing counties that assisted federal immigration enforcement with those that did not, concluded that "[e]conomies are stronger in sanctuary counties – from higher median household incomes, less poverty, and less reliance on public assistance to higher labor force participation, higher employment-to-population ratios, and lower unemployment." Wong, *supra,* at 3. On average, for counties with sanctuary policies, the median household

---

[11] https://clearinghouse.net/collections/38759 (last visited Mar. 24, 2025).

income was $4,353 higher, the poverty rate was 2.3 percent lower, and the unemployment rate was 1.1 percent lower. *Id.* at 1.

Poverty was lower for counties with sanctuary policies, which reflected statistically significant results. *Id.* at 7. In counties with sanctuary policies, the percentage of people living at or below the federal poverty line was on average 1.4 percent lower for whites and 2.9 percent lower for Latinos. *Id.* at 8. These counties also had fewer households relying on public assistance (4.9 percent lower). *Id.*

### B. Illinois immigrants without documentation pay taxes that fund state and local government and public services.

Illinois immigrants without documentation are notable members of the economy. Immigrants without documentation pay sales and excise taxes on their purchases, property taxes on their homes and as renters, and personal and business income taxes. These taxes fund public services provided by states and local governments. In 2022, nationwide, immigrants without documentation contributed an estimated $37.3 billion in state and local taxes. Carl Davis, Marco Guzman, & Emma Sifre, *Tax Payments by Undocumented Immigrants,* Institute on Taxation and Economic Policy 3 (July 30, 2024).[12]

In Illinois, immigrants without documentation provided an estimated $1.5 *billion* in state and local tax revenue, which includes $585.6 million in sales and excise taxes, $529.6 million in property taxes, and $418.3 million in personal and business income taxes. *Id.* at 14 (Appendix A: State-Level Disaggregation of the State and Local Tax Contributions of Undocumented Immigrants). This revenue funds government operations and public services. For example, Illinois uses its tax revenue to pay for public services, including education (elementary through higher education), public pensions, health (including Medicaid), social services, and public

---

[12] https://sfo2.digitaloceanspaces.com/itep/ITEP-Tax-Payments-by-Undocumented-Immigrants-2024.pdf.

protection and justice. *See e.g.,* Susana A. Mendoza, Illinois State Comptroller, *What Did Your Tax Dollars Pay for Fiscal Year 2023?*[13] Cook County uses its tax revenue to fund the Circuit Courts, Public Defenders, State's Attorneys, and the Sheriff. *See* Tony Preckwinkle, Pres., Cook County Bd. of Comms., *Fiscal 2025 Cook County Annual Appropriation Bill*, Executive Summary, 12.[14] Similarly, Chicago uses its tax revenue to pay for city leadership, operations, public safety (police and fire departments), and business and consumer services. *See* City of Chicago, Office of Budget and Management, FAQ.[15]

### C. If Illinois, Cook County, and Chicago are required to assist with the federal government's mass deportations, families and the economy will suffer.

Within days of President Trump's Executive Orders and threats to deport all immigrants regardless of criminal background, immigrants in Chicago stopped going to work, taking children to school, going to medical appointments, and frequenting businesses in neighborhoods. *See* Nell Salzman et al, '*People are scared': Fear permeates every aspect of life in Chicago, under threat of mass immigration deportations,* Chicago Tribune, Jan. 25, 2025.[16] Even months later, immigrants are staying home. *See* Rebecca Davis O'Brien & Miriam Jordan, *A Chill Sets in for Undocumented Workers, and Those Who Hire Them*, N.Y. Times, Mar. 9, 2025.[17]

This fear is warranted because detention and deportation affect more than individual immigrants. In Illinois, an estimated 817,066 people lived with at least one family member without documentation and 342,809 children lived with at least one family member without documentation. *See* Silva Mathema, *State-by-State Estimates of Family Members of*

---

[13] https://illinoiscomptroller.gov/__media/ tax%20refund%20insert%20FY%202023_web%20only.pdf.

[14] https://www.cookcountyil.gov/ sites/g/files/ywwepo161/files/documents/2025-02/Volume%20I%20Adopted%202025_Web.pdf

[15] https://www.chicago.gov/city/en/depts/obm/supp_info/faq.html (last visited Mar. 20, 2025).

[16] https://www.chicagotribune.com/2025/01/26/trump-chicago-immigration-deportation-fear/.

[17] https://www.nytimes.com/2025/03/09/business/economy/immigrant-workers-deportation-fears.html.

*Unauthorized Immigrants,* Center for American Progress (Mar. 16, 2017).[18] When breadwinners are detained or deported, the loss of income can make families struggle to pay rent or mortgages, utilities, and pay for food and medicine. *See* Akash Pillai, et al., *Potential Impacts of Mass Detention and Deportation Efforts on the Health and Well-Being of Immigrant Families,* KFF (Feb. 6, 2025).[19] With the separation of families, there are direct health impacts, including depression and worsening chronic conditions, and the inability to pay for health care. *Id.*

Even U.S. citizens not part of mixed-status families can be impacted by detentions and deportations if their jobs depend on immigrant workers. Under the Secure Communities program, the federal government deported 420,000 people from 2010-2015, resulting in the loss of 400,000 jobs for noncitizens and 600,000 jobs for citizens. *See* Chloe N. East, et al., *The Labor Market Effects of Immigration Enforcement,* IZA Institute of Labor Economics, 26-27 (Apr. 2018).[20] Overall, economists estimate mass deportations would negatively impact the economy with the loss of jobs for immigrants and U.S. citizens, less produced goods and services, and a loss of tax revenue. *See* Robert Lynch & Michael Ettlinger, *The Economic Impact on Citizens and Authorized Immigrants of Mass Deportation,* Univ. of New Hamp., Casey School of Public Policy 8 (Aug. 29, 204).[21]

## CONCLUSION

For the foregoing reasons, *Amici* respectfully urge the Court to grant Defendants' Motions to Dismiss.

---

[18] https://www.americanprogress.org/article/state-state-estimates-family-members-unauthorized-immigrants/.
[19] https://www.kff.org/racial-equity-and-health-policy/issue-brief/potential-impacts-of-mass-detention-and-deportation-efforts-on-the-health-and-well-being-of-immigrant-families/.
[20] https://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=2788436.
[21] https://carsey.unh.edu/sites/default/files/media/2025-01/literature-review-economic-impact-mass-deportation.pdf.

Dated: March 25, 2025         Respectfully submitted,

/s/ Rebecca K. Glenberg

Rebecca K. Glenberg
Michelle Teresa García
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan Ave, Suite 600
Chicago, IL 60601
Tel.: 312-201-9740
Fax: 312-201-9760
rglenberg@aclu-il.org
mgarcia@aclu-il.org

Mark Fleming
Keren Zwick
NATIONAL IMMIGRANT JUSTICE CENTER
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
Tel.: 312-660-1628
Fax: 312-660-1505
mfleming@immigrantjustice.org
kzwick@immigrantjustice.org