**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, <br><br>      Plaintiff, <br><br>      v. <br><br> STATE OF ILLINOIS; JB PRITZKER, Governor of Illinois, in his Official Capacity; THE CITY OF CHICAGO; BRANDON JOHNSON, Mayor of Chicago, in his Official Capacity; LARRY SNELLING, Chicago Police Superintendent, in his Official Capacity; COOK COUNTY, ILLINOIS; COOK COUNTY BOARD OF COMMISSIONERS; TONI PRECKWINKLE, President of the Cook County Board of Commissioners, in her Official Capacity; THOMAS J. DART, Cook County Sheriff, in his Official Capacity, <br><br>      Defendants. | Case No. 1:25-cv-1285-LCJ |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

    I. Governing Principles of Our System of Dual Sovereignty ............................................. 2

    II. Federal Immigration Law ........................................................................................... 3

    III. The Challenged Sanctuary Policies ........................................................................... 8

        A.Illinois ................................................................................................................. 8

        B. Chicago ................................................................................................................ 9

        C. Cook County ...................................................................................................... 11

    IV. This Litigation ......................................................................................................... 12

LEGAL STANDARDS ..................................................................................................... 12

ARGUMENT .................................................................................................................... 13

    I. The United States Has Standing to Defend its Interests ............................................... 13

    II. The Sanctuary Policies Violate the Supremacy Clause…..…................................... 19

        A. The Sanctuary Policies are Conflict Preempted by the INA……………….....19

           1.   The Sanctuary Policies Impede Congressionally Sanctioned and Authorized Federal Immigration Law. …..…................……..….….….......................................21

           2.   Defendants' Conduct is Not Sanctioned by the Tenth Amendment.............23

        B. The Sanctuary Policies Unlawfully Regulate the Federal Government………………………………………………………………....26

        C.. The Sanctuary Policies Unlawfully Discriminate Against the Federal Government………………………………………………………………...29

        D. The Sanctuary Policies' Restrictions on Information Sharing are Expressly Preempted by Section 1373..……………………………………………….34

i

CONCLUSION................................................................................................................ …38

# TABLE OF AUTHORITIES

CASES

*Arizona v. United States*,
567 U.S. 387 (2012) ............................................................................... *passim*

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................... 13

*Berger v. State of New York*,
388 U.S. 41 (1967) .................................................................................... 6, 27

*Bost v. Illinois State Bd. of Elections*,
114 F.4th 634 (7th Cir. 2024),
*docketing pet. for cert.*, No. 24-568 (S. Ct. Nov. 21, 2024) .................... 23

*California v. Superior Ct. of California*,
482 U.S. 400 (1987) ........................................................................ 2, 25, 26

*California v. Texas*,
593 U.S. 659 (2021) ..................................................................................... 15

*Chamber of Com. v. Whiting*,
563 U.S. 582 (2011) ..................................................................................... 20

*City of Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020) ...................................................................... 36

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ..................................................................................... 19

*Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*,
770 F.3d 586 (7th Cir. 2014) ...................................................................... 12

*Cunningham v. Neagle*,
135 U.S. 1 (1890) ........................................................................................ 27

*Davis v. Elmira Sav. Bank*,
161 U.S. 275 (1896) ............................................................................... 19, 21

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) ..................................................................................... 13

i

*Dawson v. Steager,*
    586 U.S. 171 (2019) ............................................................................ 29, 32

*Dep't of Revenue of Kentucky v. Davis,*
    553 U.S. 328 (2008) .................................................................................. 2

*Doe v. Holcomb,*
    883 F.3d 971 (7th Cir. 2018) ................................................................. 18

*Evers v. Astrue,*
    536 F.3d 651 (7th Cir. 2008) ................................................................. 13

*Galvan v. Press,*
    347 U.S. 522 (1954) ................................................................................ 20

*Geo Grp., Inc. v. Newsom,*
    50 F.4th 745 (9th Cir. 2022) ................................................................. 28

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ............................................................................ 19, 20

*Hively v. Ivy Tech Cmty. Coll. of Ind.,*
    853 F.3d 339 (7th Cir. 2017) ................................................................. 33

*Hodel v. Va. Surface Mining & Reclamation Ass'n,*
    452 U.S. 264 (1981) .......................................................................... 24, 25

*Johnson v. Maryland,*
    254 U.S. 51 (1920) .................................................................................. 26

*Kentucky v. Dennison,*
    65 U.S. 66 (1860) ................................................................................ 3, 26

*Lamar, Archer & Cofrin, LLP v. Appling,*
    584 U.S. 709 (2018) .......................................................................... 36, 37

*Leslie Miller, Inc. v. Arkansas,*
    352 U.S. 187 (1956) .......................................................................... 26, 28

*Loughrin v. United States,*
    573 U.S. 351 (2014) ................................................................................ 36

*Mayo v. United States,*
    319 U.S. 441 (1943) ................................................................................ 26

*McCulloch v. Maryland,*
    17 U.S. (4 Wheat.) (1819)..................................................................... 26, 32

*McHenry Cnty. v. Raoul,*
    44 F.4th 581 (7th Cir. 2022) .................................. 28, 29, 31, 32

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) ..................................................................... 34

*Murphy v. NCAA,*
    584 U.S. 453 (2018).......................................................... *passim*

*Nash v. Fla. Indus. Comm'n,*
    389 U.S. 235 (1967) ..................................................................... 21

*New York v. United States,*
    505 U.S. 144 (1992)..................................................................... 25

*Nielsen v. Preap,*
    586 U.S. 392 (2019) .................................................................. 7, 20

*North Dakota v. United States,*
    495 U.S. 423 (1990) ................................................................ 29, 31

*Patel v. Hurd,*
    2012 WL 1952845 (N.D. Ill. May 30, 2012) .......................... 23

*Pennsylvania v. West Virginia,*
    262 U.S. 623 (1923)..................................................................... 17

*Printz v. United States,*
    521 U.S. 898 (1997)....................................................... 23, 25, 35

*Puerto Rico v. Branstad,*
    483 U.S. 219 (1987)....................................................................... 3

*Reno v. Condon,*
    528 U.S. 141 (2000)..................................................................... 35

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana,*
    786 F.3d 510 (7th Cir. 2015) ..................................................... 13

*Russello v. United States,*
    464 U.S. 16 (1983)....................................................................... 37

*Schirmer v. Nagode*,
621 F.3d 581 (7th Cir. 2010) .......................................................................... 15

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996) ........................................................................................... 17

*Silha v. ACT, Inc.*,
807 F.3d 169 (7th Cir. 2015) .......................................................................... 15

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ......................................................................................... 13

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ........................................................................................... 15

*Truax v. Raich*,
239 U.S. 33 (1915) ........................................................................................... 20

*United States v. Alabama*,
443 F. App'x 411 (11th Cir. 2011) ............................................................... 17

*United States v. California*,
314 F. Supp. 3d 1077 (E.D. Cal. 2018),
*aff'd in part, rev'd in part and remanded*, 921 F.3d 865 (9th Cir. 2019) ................................ 36

*United States v. California*,
2018 WL 5780003 (E.D. Cal. Nov. 1, 2018) ............................................... 31

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .................................................................. 31, 35

*United States v. Ferrara*,
847 F. Supp. 964 (D.D.C. 1993),
*aff'd 54F.2d 825 (D.C. Cir. 1995)* ............................................................. 27

*United States v. Fresno Cnty.*,
429 U.S. 452 (1977) ......................................................................................... 32

*United States v. King County*,
122 F.4th 740 (9th Cir. 2024) ............................................................... *passim*

*United States v. Louisiana*,
340 U.S. 899 (1950) ......................................................................................... 17

*United States v. Missouri*,
114 F.4th 980 (8th Cir. 2024) ............................................................ 14, 15, 16

*United States v. Texas*,
143 U.S. 621 (1892) ........................................................................ 17

*United States v. Texas*,
340 U.S. 900 (1950) ........................................................................ 17

*United States v. Washington*,
596 U.S. 832 (2022) ................................................................. 29, 33

*Washington v. United States*,
460 U.S. 536 (1983) ........................................................................ 30

*Wyandotte Transp. Co. v. United States*,
389 U.S. 191 (1967) ........................................................................ 14

**U.S. CONSTITUTION**

U.S. Const. amend. X ......................................................................... 3

U.S. Const. art. I, § 8 .......................................................................... 3

U.S. Const. art. I, § 8, cl. 4 ......................................................... 1, 3, 4

U.S. Const. art. I, § 10 ........................................................................ 2

U.S. Const. art. IV, § 2 ...................................................................... 26

U.S. Const. art. VI, cl. 2 .................................................................. 1, 3

**STATUTES**

8 U.S.C. § 837 (a)(1)(C) ................................................................... 27

8 U.S.C. § 837 (a)(1)(D) ................................................................... 27

8 U.S.C. § 1101 .................................................................................. 4

8 U.S.C. § 1103(a)(3) .......................................................................... 5

8 U.S.C. § 1103(a)(11) ........................................................................ 4

8 U.S.C. § 1225–29a ........................................................................... 4

8 U.S.C. § 1226 ........................................................................................................ 7

8 U.S.C. § 1226(a) ............................................................................................. *passim*

8 U.S.C. § 1226(c) ................................................................................... 5, 6, 20, 21

8 U.S.C. § 1226(d)(1)(A) ........................................................................................ 6

8 U.S.C. § 1226(d)(1)(B) ........................................................................................ 6

8 U.S.C. § 1231 ........................................................................................ 4, 5, 8, 21

8 U.S.C. § 1231(a) ................................................................................................ 20

8 U.S.C. § 1231(a)(4)(A) .................................................................................. 6, 37

8 U.S.C. § 1231 (g) ................................................................................................ 4

8 U.S.C. § 1305 .................................................................................................... 37

8 U.S.C. § 1306 .................................................................................................... 37

8 U.S.C. § 1357(d) ................................................................................................. 5

8 U.S.C. § 1357(g)(10)(A) ..................................................................................... 7

8 U.S.C. § 1373 ............................................................................................... 2, 34

8 U.S.C. § 1373(a) ...................................................................................... 7, 34, 35

8 U.S.C. § 1373(c) ...................................................................................... 6, 36

8 U.S.C. § 1182 ...................................................................................................... 4

8 U.S.C. § 1644 ...................................................................................................... 7

34 U.S.C. § 41307 ................................................................................................ 35

42 U.S.C. § 5779(a) ............................................................................................. 35

49 U.S.C. App. § 1305(a)(1) (1988 ed.) ....................................................... 34, 35

Laken Riley Act, S. 5, 119th Cong. (2025) (codified at 8 U.S.C. § 1226(f)) ................... 8, 20, 25

## RULES

Fed. R. Civ. P. 15(a)(2) ............................................................................................ 19

Fed. R. Civ. P. 12(b)(1) ............................................................................................ 12

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 12, 13

## REGULATIONS

8 C.F.R. § 287.7(a) ...................................................................................................... 5

## EXECUTIVE ORDERS

Executive Order No.14,159, 90 Fed. Reg. 8443 (2025) ............................................. 7

Proclamation No. 10,886, *Declaring a National Emergency at the Southern Border of the United States*,
90 Fed. Reg. 8327 (Jan. 20, 2025) ........................................................................... 1

## OTHER AUTHORITIES

Articles of Confederation of 1781, art. IV ................................................................. 3

Chi. Police Dep't, *Search Arrests*,
https://publicsearch1.chicagopolice.org/CheckHuman?Next=https%3A%2F%2Fpublicsearch1
.chicagopolice.org%2FArrests%3FFirstName%3D%26LastName%3DLopez%26CbNumber%
3D%26ChargeId%3D%26CPDArea%3D%26District%3D%26Beat%3D (last visited Mar. 31,
2025) ...................................................................................................................... 23

Cook Cnty. Sheriff, *Detainee Discharge Tracker*, https://iic.ccsheriff.org/DetaineeDischarge
(last visited Mar. 31, 2025) .................................................................................... 23

Diane Pathieu & Michelle Gallardo, *Mayor Lori Lightfoot signs updated Welcoming City Ordinance, adding protections for undocumented residents* (Feb. 23, 2021),
https://abc7chicago.com/chicago-welcoming-city-ordinance-lori-lightfoot-mayor-
news/10364297/ .................................................................................................... 10

Executive Order No. 17 – The Welcoming Illinois Office (Aug. 2, 2021) .................. 18

FOX 32 Chicago, *Pritzker vows to fight Trump admin's sanctuary lawsuit, slams tariffs* (Feb. 7, 2025), https://www.fox32chicago.com/news/gov-pritzker-vows-fight-trump-admins-sanctuary-lawsuit-slams-tariffs ............................................................................................. 19

H.R. Rep. No. 104-725 (1996) ........................................................................................ 36

Ill. Dep't of Corrections, Individual in Custody Search, https://idoc.illinois.gov/offender/inmatesearch.html (last visited Mar. 31, 2025) .................. 23

Letter from James Madison to Edmund Randolph (Aug. 27, 1782)................................................ 4

Policy for Responding to ICE Detainers, Cook County, Illinois Ordinance 11-O-73 (2011) ........................................................... *passim*

Press Release, *Gov. Pritzker Signs Legislation Further Establishing Illinois as the Most Welcoming State in the Nation* (Aug. 2, 2021), https://www.illinois.gov/news/press-release.23653.html ............................................................................................................ 18

S. Rep. No. 104-249 (1996)............................................................................................ 36

The Federalist No. 42 (J. Madison) ............................................................................... 1, 4

Trust Act, 5 Ill. Comp. Stat. 805/1*et seq.* (2017)........................................................ *passim*

U.S. Immigr. & Customs Enf't, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017) ............................................................. 5

Welcoming City Ordinance, Chicago Code ch. 2-173 (2012)............................................ *passim*

## INTRODUCTION

The United States Constitution vests the power to regulate immigration exclusively in the Federal Government. *See* U.S. Const. art. I, § 8, cl. 4. That grant of power was designed to combat a specific defect in the Articles of Confederation, under which States with lax residency standards could serve as a gateway for the entry of "obnoxious aliens" into other States. *See* The Federalist No. 42 (J. Madison). The challenged policies of Illinois, Chicago, and Cook County – collectively referred to as the Sanctuary Policies – frustrate this feature of the Constitution's design. And they work an extraordinary assault on the Federal Government's enforcement of the immigration laws at a time when the United States is facing a "national emergency" from the unprecedented "illegal entry of aliens" into the country. Proclamation No. 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025).

The Sanctuary Policies have the purpose and effect of thwarting federal law enforcement efforts to detain and deport criminal illegal aliens. They deny federal immigration agents access to aliens who are in state and local custody. They prohibit state and local officers from releasing aliens, upon expiration of their state or local custody, into federal custody when federal agents present Congressionally authorized detainers and administrative warrants. The Sanctuary Policies also prevent otherwise willing state and local officers from all communications with federal immigration agents necessary for those agents to carry out their duties.

The Sanctuary Policies are therefore invalid under the Supremacy Clause of the United States Constitution for four independent, but related, reasons. *See* U.S. Const. art. VI, cl. 2. First, the Sanctuary Policies are conflict preempted by the Immigration and Nationality Act because they stand as an obstacle to achieving the full purposes and objectives of that Act. Second, the Sanctuary Policies foreclose federal agents from using the tools Congress provided for the efficient

enforcement of federal law, thereby unlawfully regulating the Federal Government in violation of the intergovernmental immunity doctrine. Third, the Policies single out the Federal Government for disfavored treatment, thereby violating the antidiscrimination component of the intergovernmental immunity doctrine. And fourth, the Policies impose restrictions on information sharing that violate 8 U.S.C. § 1373, so those provisions of the Policies are expressly preempted.

The effect of these policies is to allow criminal illegal aliens to move freely throughout the United States, inflicting harm on victims that would have been averted had the alien been detained and removed upon commission of his first predicate offense as required by federal law. Nothing in the Constitution – including the Tenth Amendment – tolerates this result. On the contrary, that is precisely the kind of harm the Framers sought to prevent in crafting the Constitution. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 418 (2012) (Scalia, J., concurring). Because such allegations clearly state a claim, this Court should deny Defendants' motions to dismiss.

## BACKGROUND

### I.    Governing Principles of Our System of Dual Sovereignty

The Constitution establishes a system of "dual sovereignty," in which the Federal Government and the States both wield sovereign powers. *See Murphy v. NCAA*, 584 U.S. 453, 458 (2018). Under that system, while the Federal Government lacks the "power to issue orders directly to the States," *id.* at 470, there are "certain limits on the sovereign powers of the States, limits that are an essential part of the Framers' conception of national identity and Union," *California v. Superior Ct. of California*, 482 U.S. 400, 405 (1987). For example, the Constitution expressly prohibits States from entering into treaties and laying duties on imports and exports. *See* U.S. Const. art. I § 10. It also implicitly restricts States from exercising their powers in a way that would undermine grants of power to the Federal Government or harm other States. *See, e.g.*, *Dep't*

2

*of Revenue of Kentucky v. Davis*, 553 U.S. 328, 337 (2008) (explaining that the Court has read into the Commerce Clause a limitation on States to effectuate the Framers' intent to prevent a State from retreating into economic isolation); *Puerto Rico v. Branstad*, 483 U.S. 219, 226 (1987) ("[T]he Extradition Clause creates a mandatory duty to deliver up fugitives upon proper demand[.]"); *Kentucky v. Dennison*, 65 U.S. 66, 100 (1860) ("[I]t is manifest that the statesmen who framed the Constitution were fully sensible, that from the complex character of the Government, it must fail unless the States mutually supported each other and the General Government[.]").

Finally, the Constitution grants enumerated legislative powers to Congress, *see* art. I, § 8, and confirms that legislative powers not granted to Congress are reserved for the States, *see* U.S. Const. amend. X. Under the Tenth Amendment, Congress must exercise its legislative power over individuals directly and may not commandeer States into enacting a federal regulatory program. *See Murphy*, 584 U.S. at 472. But when Congress exercises its enumerated powers to regulate individuals, States cannot stand in the way. The Supremacy Clause provides that federal law is the "supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding," art. VI, cl. 2. Under the Supremacy Clause, "when federal and state law conflict, federal law prevails and state law is preempted." *Murphy*, 584 U.S. at 471.

## II.    Federal Immigration Law

The Constitution affords Congress the power to "establish an uniform Rule of Naturalization," U.S. Const., art. I § 8, cl. 4. In so empowering the Federal Government with exclusive immigration authority, the Founders intended to solve a specific defect of the Articles of Confederation. Under the Articles, inhabitants of one State were entitled to all the privileges and immunities of citizens of the other States. *See* Articles of Confederation of 1781, art. IV.

Accordingly, "an unwelcome alien could obtain all the rights of a citizen of one State simply by first becoming an *inhabitant* of another." *Arizona*, 567 U.S. at 418 (Scalia, J., concurring in part). Writing in the Federalist 42, James Madison observed that allowing an alien, legally ineligible for certain rights in one State, to elude that incapacity by virtue of having previously resided in another State with laxer standards, "preposterously render[s] [the law of one State] paramount to the law of another, within the jurisdiction of the other." The Federalist No. 42 (J. Madison); *see also* Letter from James Madison to Edmund Randolph (Aug. 27, 1782).

Equally problematic, a State with particularly lax residency standards could "serve as a gateway for the entry of 'obnoxious aliens' into other States." *Arizona*, 567 U.S. at 418 (Scalia, J., concurring in part) (citing Letter from James Madison to Edmund Randolph (Aug. 27, 1782)). To avert the "serious" consequences likely to result from "the defect of the Confederation on this head," the new Constitution "authoriz[ed] the general government to establish a uniform rule of naturalization throughout the United States." The Federalist No. 42 (J. Madison); *see* U.S. Const. art. I, § 8, cl. 4.

Congress has exercised this authority through the Immigration and Nationality Act (INA) and related laws, *see* 8 U.S.C. § 1101 *et seq.*, which together make up the framework for the "governance of immigration and alien status," *see Arizona*, 567 U.S. at 395. Those laws confer upon the Executive Branch broad authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231. They also direct the Executive Branch to arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. *See, e.g., id.* §§ 1103(a)(11), 1231(g). Responsibility for enforcing these provisions is vested principally in the

U.S. Department of Homeland Security (DHS) and two of its component agencies – Immigration and Customs Enforcement (ICE) and Customs and Border Protection.

Congress provided DHS and its components several tools to effectuate their responsibilities under the INA. For example, the INA expressly authorizes federal immigration officers to arrest and detain aliens pursuant to administrative warrants. *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."). To acquire such a warrant, an ICE immigration officer "must establish probable cause to believe that the subject is an alien who is removable from the United States." U.S. Immigr. & Customs Enf't, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017).

Relevant to this litigation, if an alien DHS seeks is in the custody of another law enforcement agency, DHS may issue an "immigration detainer" to advise that agency that DHS seeks custody "for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see also* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration detainer is "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a). As a matter of policy, immigration detainers must be accompanied by an administrative warrant – either an alien arrest warrant or a warrant of removal – signed by an ICE immigration officer. U.S. Immigr. & Customs Enf't, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017).

In contrast to administrative warrants, judicial warrants are issued by an Article III judge and subject to a heightened evidentiary standard. To procure a judicial criminal warrant, for instance, the Federal Government must demonstrate probable cause to believe that the individual

committed a criminal offense. *See, e.g.*, *Berger v. State of New York*, 388 U.S. 41, 55 (1967) ("[Criminal] warrants may only issue 'but upon probable cause, supported by' . . . facts and circumstances . . . sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed." (citation omitted)).

In enacting the INA, Congress recognized that an alien who is subject to federal immigration proceedings may also be subject to state or local criminal law enforcement. Under the circumstances, the INA provides that federal officials generally "may not remove an alien who is sentenced to [state] imprisonment until the alien is released from [such] imprisonment." 8 U.S.C. § 1231(a)(4)(A). The INA further authorizes, and in some cases requires, federal officials to assume custody immediately upon the alien's release from state or local custody. *See id.* §§ 1226(a), 1226(c).

Several provisions of the INA regulate the manner in which federal, state, and local officials share information about aliens who are subject to both state criminal law enforcement and federal immigration enforcement. For example, the Federal Government must make resources available to state and local authorities to aid in determining whether individuals they have arrested for aggravated felonies are aliens. 8 U.S.C. § 1226(d)(1)(A). The INA also directs the Federal Government to designate liaisons to "State[] and local law enforcement and correctional agencies . . . with respect to the arrest conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B). And if state or local officials "seek[] to verify or ascertain the citizenship or immigration status of any individual," the Federal Government must share the requested information. *Id.* § 1373(c).

The INA similarly provides that federal, state, and local government entities and officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or

receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see also id.* § 1644 (similar); *id.* § 1357(g)(10)(A) (providing that no formal agreement is required "for any officer or employee of a State or political subdivision of a State[] to communicate with [federal immigration officials] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States").

The above-described laws and processes promote public safety. Although "[a] principal feature of the removal system is the broad discretion exercised by immigration officials," *Arizona*, 567 U.S. at 396, Congress was concerned "that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers," *Nielsen v. Preap*, 586 U.S. 392, 398 (2019) (citation omitted). To address that concern, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, amending 8 U.S.C. § 1226 to mandate the detention of certain aliens who, based on their commission of or arrest for specified "predicate crimes," pose a threat to public safety. *See Nielsen*, 586 U.S. at 398 ("The categories of predicates for mandatory detention identified in subparagraphs (A)–[(E)] generally involve the commission of crimes.").

In the wake of President Trump's declaration of a national emergency at the southern border from the unprecedented influx of illegal aliens, Executive Order No. 14,159, 90 Fed. Reg. 8443 (2025), Congress enacted the Laken Riley Act, expanding the list of predicate crimes triggering the mandatory detention requirement to include "burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]" Laken Riley Act, S. 5, 119th Cong. (2025) (codified at 8 U.S.C. § 1226(c)(1)(E)(ii)). Once an alien is ordered removed, the Attorney General must remove the

alien from the United States within 90 days, and the alien must be detained during the removal period. *See* 8 U.S.C. § 1231. If the Federal Government fails to detain an alien who is subject to mandatory detention, and the alien harms a State or its residents, the Laken Riley Act authorizes the relevant State to sue the Federal Government "to obtain appropriate injunctive relief." *See* Laken Riley Act, S. 5, 119th Cong. (2025) (codified at 8 U.S.C. § 1226(f)).

## III.    The Challenged Sanctuary Policies

### A.  Illinois

In 2017, Illinois passed the Illinois TRUST Act, making the entire State of Illinois a "sanctuary" for illegal aliens. *See* Trust Act, 5 Ill. Comp. Stat. 805/1 *et seq*. (2017). The Act prohibits state and local law enforcement officers from "enforcing federal civil immigration laws." *See id.* § 805/15. Specifically, no state, local, county, or municipal officer may detain or continue to detain an individual "solely on the basis of [an] immigration detainer or civil immigration warrant" or otherwise comply with such a detainer or warrant. *Id.* § 805/15(a). Nor may any such officer "inquire about or investigate the citizenship or immigration status" of any individual in their custody. *Id.* § 805/15(e).

And "[u]nless presented with a federal criminal warrant," state law enforcement officials may not participate in or assist in any capacity with a federal immigration agent's enforcement activities. *Id.* § 805/15(h). Under this subsection, officers may not offer collateral assistance, including coordinating an arrest with a federal immigration agent in a public facility; giving a federal immigration agent access, including by telephone, to an individual in custody; providing information in response to a federal immigration agent's inquiry regarding an individual in custody; or providing information to a federal immigration agent related to an individual's release or contact information that is not otherwise publicly available. *Id.* On its face, though, the TRUST

Act purports not to "prohibit or restrict any entity from sending to, or receiving from, the United States Department of Homeland Security or other federal, State, or local government entity information regarding the citizenship or immigration status of any individual under Sections 1373 and 1644 of Title 8 of the United States Code." *Id.* § 805/5.

In 2021, the Illinois Way Forward Act amended the TRUST Act to add the following prohibition on entering into agreements to detain individuals based on federal civil immigration violations:

> (1) No law enforcement agency, law enforcement official, or any unit of State or local government may enter into or renew any contract, intergovernmental service agreement, or any other agreement to house or detain individuals for federal civil immigration violations.

> (2) Any law enforcement agency, law enforcement official, or unit of State or local government with an existing contract, intergovernmental agreement or other agreement, whether in whole or in part, that is utilized to house or detain individuals for civil immigration violations shall exercise the termination provision in the agreement as applied to housing or detaining individuals for civil immigration violations no later than January 1, 2022.

*Id.* § 805/15(g).

## B. Chicago

In 2012, the Chicago City Council passed the "Welcoming City Ordinance." Chicago Code ch. 2-173. The ordinance's stated purpose is "to establish the City's procedures concerning immigration status and enforcement of federal civil immigration laws" with respect to a number of values the City purports to hold, including "protecting life and property" and "preventing crime and resolving problems" in light of "the City's limited resources; the complexity of immigration laws; the clear need to foster the trust of and cooperation from the public, including members of the immigrant communities; and to effectuate the City's goals[.]" *Id.* § 2-173-005.

Pursuant to the Ordinance, no Chicago City agency or agent shall "arrest, detain, or continue to detain a person . . . based upon an immigration detainer." *Id.* § 2-173-020(a)(1)(C). Nor shall City agents "permit ICE agents access, including by telephone, to a person . . . in the custody of, the agency or agent" or "use of agency facilities for investigative interviews or other investigative purpose." *Id.* § 2-173-020(a)(2). City agents are also not allowed to "expend their time responding to ICE inquiries or communicating with ICE regarding a person's custody status, release date, or contact information," *id.* § 2-173-020(a)(3), or "transfer any person into ICE custody for the sole purpose of civil immigration enforcement," *id.* § 2-173-020(a)(5). Finally, City agents shall not "request, maintain, or share the citizenship or immigration status of any person unless such disclosure has been authorized in writing by the individual to whom such information pertains[.]" *Id.* § 2-173-030(a)(1).

These bars on cooperation with federal immigration authorities are subject to a provision purporting to allow officers to engage in the prohibited activities described above if "required to do so by statute, federal regulation, court order, or a lawfully issued judicial warrant . . . ." *Id.* § 2-173-030(a).

There used to be an exception to the City Ordinance's prohibition on honoring detainers, granting access to detainees, and responding to ICE inquiries if the subject of the investigation had an outstanding criminal warrant, had been convicted of a felony or had a felony charge pending, or was a known gang member. *Id.* § 2-173-042(c). Those exceptions were removed in 2021.[1]

---

[1] *See* Diane Pathieu & Michelle Gallardo, *Mayor Lori Lightfoot signs updated Welcoming City Ordinance, adding protections for undocumented residents* (Feb. 23, 2021), https://abc7chicago.com/chicago-welcoming-city-ordinance-lori-lightfoot-mayor-news/10364297/ (explaining that amendments to the ordinance "close[] carve-outs, or loopholes" permitting police to cooperate with federal immigration authorities to deport illegal aliens who "are in the city's gang database, have charges or convictions in their background or have outstanding criminal warrants").

### C. Cook County

In 2011, the Cook County, Illinois, Board of Supervisors adopted Ordinance C, titled "Policy for Responding to ICE Detainers." Cook County, Illinois Ordinance 11-O-73 (2011). The policy purports to establish the "proper boundaries of the relationship between local law enforcement and" ICE, asserting in conclusory fashion that "ICE detainers are generally issued before a finding of probable cause that an individual is deportable," "are routinely imposed on individuals without any criminal convictions or whose cases are dismissed," and "encourage racial profiling and harassment[.]" Ordinance 11-O-73, pmbl.

The Ordinance requires the Cook County Sheriff to "decline ICE detainer requests unless there is a written agreement with the federal government by which all costs incurred by Cook County in complying with the detainer shall be reimbursed" and further provides that "there shall be no expenditure of any County resources or effort by on-duty County personnel for th[e] purpose" of complying with ICE detainers. Ordinance 11-O-73, § 46-37(a), (c). "Unless ICE agents have a criminal warrant, or County officials have a legitimate law enforcement purpose that is not related to the enforcement of immigration laws, ICE agents shall not be given access to individuals or allowed to use County facilities for investigative interviews or other purposes, and County personnel shall not expend their time responding to ICE inquiries or communicating with ICE regarding individuals' incarceration status or release dates while on duty." Ordinance 11-O-73, § 46-37(b). The Cook County Ordinance has no savings clause requiring compliance with federal law.

## IV.    This Litigation

On February 6, 2025, the United States filed this action against the State of Illinois, the City of Chicago, Cook County, and several individual officers sued in their official capacities. The Complaint alleges that the challenged Sanctuary Policies violate the Supremacy Clause by implicitly and expressly conflicting with federal immigration law, unlawfully regulating federal activities, and discriminating against the Federal Government. *See* Compl., ECF No. 1. The United States seeks a declaratory judgment that the challenged policies are invalid and injunctive relief barring their enforcement, as well as costs and attorneys' fees.

Defendants moved to dismiss the Complaint on March 4, 2025. The State of Illinois and Cook County moved to dismiss certain defendants for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See* Illinois Mot. to Dismiss, ECF Nos. 24, 25; Cook County Mot. to Dismiss, ECF Nos. 29–32. All Defendants moved to dismiss the claims against them under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. *See* Illinois Mot. to Dismiss, ECF Nos. 24, 25; Cook County Mot. to Dismiss, ECF Nos. 27, 28; Chicago Mot. to Dismiss, ECF Nos. 33, 34. The United States now files this consolidated memorandum in opposition to Defendants' motions to dismiss.

## LEGAL STANDARDS

Motions to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) "are meant to test the sufficiency of the complaint, not to decide the merits of the case." *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014). In deciding such a motion, the court "accept[s] as true the well pleaded factual allegations, drawing all reasonable inferences in favor of the plaintiff[.]" *Id.* (citation omitted). The plaintiff bears the burden of establishing that jurisdictional requirements have been met. *Id.* And the court may look

beyond the pleadings to determine whether in fact subject-matter jurisdiction exists. *Evers v. Astrue*, 536 F.3d 651, 657 (7th Cir. 2008). Here, the United States has met its burden of demonstrating that jurisdictional requirements have been satisfied.

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "must accept as true all factual allegations in the complaint." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 526 (7th Cir. 2015). While "[a] claim for relief must be plausible[,] rather than merely conceivable or speculative[,] . . . all this means is that the plaintiff must include enough details about the subject-matter of the case to present a story that holds together." *Id.* (internal quotation marks and citations omitted). At the pleading stage, the court "do[es] not ask whether these things actually happened; instead, the proper question to ask is still '*could* these things have happened.'" *Id.* (internal quotation marks and citations omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (allegations that "raise [the plaintiff's] right to relief above the speculative level" are adequate to survive a motion to dismiss). Because the United States' allegations satisfy that standard, Defendants' motions should be denied.

## ARGUMENT

### I.  The United States Has Standing to Defend its Interests.

The United States has standing to bring this suit. The doctrine of Article III standing stems from the Constitution's case-or-controversy limitation on judicial power. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). To have standing, a plaintiff must demonstrate a concrete injury in fact that is fairly traceable to the conduct of the party sued and judicially redressable. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

13

Here, the United States has suffered a concrete injury traceable to the Sanctuary Policies because each of those policies interferes with the Government's legally protected interest in enforcing federal law. *See United States v. Missouri*, 114 F.4th 980, 985 (8th Cir. 2024) ("Interference with the federal government's interest in enforcing federal law is sufficient to establish that the Act's implementation injured the United States."); *see also Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967) ("[T]he United States may sue to protect its interests."). That injury is judicially redressable because invalidating those policies and enjoining their enforcement would prevent such interference. Defendants Cook County and its Sheriff, as well as Defendant Governor Pritzker, nonetheless seek their dismissal for lack of standing. *See* ECF No. 28 at 3–7, ECF No. 32. ECF No. 25 at 24–25. They are wrong for several reasons.

The County asserts that "the United States has alleged no facts plausibly showing that it faces an actual and imminent injury resulting from the enforcement of the County Ordinance." ECF No. 28 at 5. To the contrary, the Complaint alleges that, over the past year, "there have been numerous instances where Cook County law enforcement officers failed to honor a federal immigration detainer request concerning an alien who was subsequently criminally charged following the alien's release from jail." Compl. ¶ 57. "Had the requested information sharing occurred in these instances," the Complaint continues, "the commission of numerous crimes likely would have been averted." *Id.* The County faults the United States for not naming specific individuals in its custody for whom information is presently sought, but such specificity is not required. The United States is challenging the County's Ordinance for its across-the-board, unconstitutional restrictions on County officials that remain in effect today, and which the United States alleges are implemented in an injurious manner, including over the past year. *See, e.g.*, Compl. ¶¶ 57–61. There is no plausible basis to conclude that the County does not currently

14

implement its own Ordinance or that it plans not to do so in the future.  These allegations, taken as true, plausibly allege a sufficient likelihood that the County will continue to act in accordance with its Ordinance and thus continue to injure the United States.  *See Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) ("[I]n evaluating whether a complaint adequately pleads the elements of standing, . . . [c]ourts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.").  The County's Rule 12(b)(1) motion should therefore be denied.[2]

Equally unpersuasive is the County's attack on a single sentence in the Complaint alleging that ICE detainers are removed from criminal files in Cook County.  *See* ECF No. 28 at 6 (discussing paragraph 58 of the Complaint).  According to the County, the Ordinance does not allow for removals of ICE detainers from criminal files, and thus the United States' allegation does not "reflect[] a faithful application of the County Ordinance."  *See id.*  As an initial matter, the United States plausibly alleges that it is harmed by the implementation of the express provisions on the face of the County Ordinance, and thus the County's legal view of what its Ordinance "*arguably* authorizes" is irrelevant.  *See id.* (emphasis in original).  Further, the County's argument finds no support in its cited authority, *Schirmer v. Nagode*, 621 F.3d 581 (7th Cir. 2010), which

---

[2] The County also asserts that the United States' requests for declaratory relief and litigation expenses cannot independently support standing.  *See* ECF No. 28 at 4.  This contention ignores that the United States is seeking injunctive relief which, if granted, would redress the United States' injuries by preventing Defendants from enforcing their unconstitutional policies.  *See California v. Texas*, 593 U.S. 659, 672 (2021) (a requested declaratory remedy "alone does not provide a court with jurisdiction," and thus courts "must look elsewhere to find a remedy"—such as an injunction—"that will redress the . . . plaintiffs' injuries"); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107–08 (1998) ("[R]eimbursement of the costs of litigation cannot alone support standing," and so "[t]he litigation must give the plaintiff *some other benefit* besides reimbursement" (emphasis added)).  To the extent the County argues that the United States is not entitled to these requested forms of relief, ECF No. 28 at 3–4, that confuses the standing inquiry with the merits of the United States' claims and its entitlement to relief, *see Missouri*, 114 F.4th at 985.

concerned a pre-enforcement challenge to a policy under the First Amendment based on the speculative possibility of consequences – circumstances entirely distinct from those at issue here, where the Ordinance has been regularly enforced in an injurious manner and remains in effect. *See, e.g.*, Compl. ¶¶ 57–61.

Defendant Cook County Sheriff joins in the County's arguments but purports to identify an "additional obstacle" to the United States' standing, namely, that enjoining the County ordinance would not require the Sheriff to accept any detainer requests or affirmatively provide information to the United States. ECF No. 32 at 4–5. This argument is irrelevant, as the United States does not contend that enjoining the County Ordinance would necessarily require that the Sheriff take a particular action, but merely that enjoining the Ordinance would ensure that the County refrains from continued implementation of an unconstitutional policy. Indeed, "[t]o say that the United States was injured by the withdrawal of state assistance is not to say that [it] is entitled" to that assistance. *Missouri*, 114 F.4th at 985 (second alteration in original) (citation omitted). Thus, the Sheriff's separate Rule 12(b)(1) argument should be rejected.

Finally, the Court should likewise reject the Illinois Governor's separate attempt to dismiss the claims against him for lack of Article III standing. *See* ECF No. 25 at 24–25. According to the Governor, "[t]he TRUST Act authorizes the Attorney General, not the Governor, to enforce its provisions," and thus the injuries that the United States suffers due to the TRUST Act (and the Way Forward Act) cannot be traced to the Governor. *See id.* at 25. In support, the Governor cites section 805/30 of the TRUST Act, which vests certain powers to enforce the Act's provisions in the Illinois Attorney General (who is not currently a named defendant in this action). *See id.* (citing 5 Ill. Comp. Stat. § 805/30 ("Attorney General enforcement provisions")). This argument is a red herring that the Court need not consider and, in any event, lacks merit.

16

This Court need not consider Governor Pritzker's standing arguments because a ruling in the Governor's favor would make no practical difference. That is, even if the Governor were dismissed from this action, no party disputes that the State of Illinois is a proper defendant, and an injunction against the State of Illinois would fully redress the United States' injuries as to its claims against the state laws. The Supreme Court has long recognized that "[t]he Federal Government can bring suit in federal court against a State" to "ensur[e] the State['s] compliance with federal law." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 71 n.14 (1996) (citing *United States v. Texas*, 143 U.S. 621, 644–45 (1892)). In cases where States are defendants, it is not unusual for a court to simply enjoin the State and leave it to the State to determine what actions should be taken by which state officers and agencies to achieve compliance. *See*, *e.g.*, *Pennsylvania v. West Virginia*, 262 U.S. 623, 624 (1923) (per curiam) (ordering "[t]hat the defendant state, and her several officers, agents and servants, are hereby severally enjoined from enforcing, or attempting to enforce" an unconstitutional law); *United States v. Alabama*, 443 F. App'x 411, 420 (11th Cir. 2011) (per curiam) (enjoining "the State of Alabama's enforcement" of two challenged provisions pending appeal); *United States v. Texas*, 340 U.S. 900 (1950) (Mem.) (enjoining "the State of Texas, its privies, assigns, lessees, and other persons claiming under it," from engaging in certain activities); *United States v. Louisiana*, 340 U.S. 899 (1950) (Mem.) (similar).

Here, the Court could simply enjoin the State of Illinois, its agents, officers, and employees, and all other persons and entities in active concert or participation with them, from taking any measures to enforce the challenged provisions of the TRUST Act or Way Forward Act. Such an injunction against the State of Illinois would thus render moot Governor Pritzker's contentions about Article III standing.

Assuming the Court reaches this issue, it should reject Governor Pritzker's standing argument because the Governor's own public statements and actions reflect that he has directed his administration – which includes the Illinois Attorney General – to implement the TRUST Act and the Way Forward Act in line with his policy prescriptions. *Cf. Doe v. Holcomb*, 883 F.3d 971, 975–96 (7th Cir. 2018) (discussing Article III standing and Eleventh Amendment immunity, which "overlap significantly" and require that a state official play "some role in enforcing" the challenged statute). Indeed, in an August 2, 2021 press release announcing his signing of the Way Forward Act, Governor Pritzker stated: "Throughout my governorship I've directed my administration to adopt policies that make Illinois a welcoming state for immigrants, and I'm proud to sign [the Way Forward Act] into law to advance our cause[.]"[3] That same day, Governor Pritzker established by Executive Order the "Welcoming Illinois Office," which "report[s] to the Office of the Governor" and will (among other tasks) "implement policies and practices" – presumably including the challenged policies – "to make Illinois a more welcoming and equitable state for immigrants."[4] *See* Executive Order No. 17 – The Welcoming Illinois Office (Aug. 2, 2021) ("The Welcoming Illinois Office shall . . . develop a policies and practices blueprint to . . . implement[] . . . the Immigrant Impact Task Force Act *and other relevant statutes*." (emphasis added)). Moreover, since this lawsuit commenced, Governor Pritzker has issued public statements further

---

[3] *See* Press Release, *Gov. Pritzker Signs Legislation Further Establishing Illinois as the Most Welcoming State in the Nation* (Aug. 2, 2021), https://www.illinois.gov/news/press-release.23653.html.

[4] *Id.*

demonstrating his promotion of the challenged policies and responding to the claims in this suit.[5]

Accordingly, Governor Pritzker is a proper defendant to the United States' claims.[6]

For these reasons, the United States has Article III standing, and none of the named

Defendants should be dismissed.[7]

## II. The Sanctuary Policies Violate the Supremacy Clause.

### A. The Sanctuary Policies Are Conflict Preempted by the Immigration and Nationality Act.

The United States' Complaint adequately alleges a claim of conflict preemption. State

laws cannot "stand[] as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Thus, state laws are invalid

if they "either frustrate[] the purpose of the national legislation or impair[] the efficiency of th[o]se

agencies of the federal government to discharge the duties, for the performance of which they were

created." *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896); *see also Crosby v. Nat'l Foreign*

*Trade Council*, 530 U.S. 363, 373 (2000) ("If the purpose of the [Federal law] cannot otherwise

be accomplished – if its operation within its chosen field else must be frustrated and its provisions

be refused their natural effect – the state law must yield[.]" (citation omitted)).

---

[5] *See, e.g.*, FOX 32 Chicago, *Pritzker vows to fight Trump admin's sanctuary lawsuit, slams tariffs* (Feb. 7, 2025), https://www.fox32chicago.com/news/gov-pritzker-vows-to-fight-trump-admins-sanctuary-lawsuit-slams-tariffs.

[6] Should the Court conclude otherwise, the United States will seek leave to amend its Complaint to add the Illinois Attorney General as a defendant. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend pleadings] when justice so requires.").

[7] The Cook County Board of Commissioners and Board President Toni Preckwinkle separately argue that they were improperly named in this litigation. *See* Cook Co. Board and Board President Toni Preckwinkle Br. at 2–3, ECF No. 30. As to those defendants, the United States named multiple defendants associated with one governmental body to ensure inclusion of all necessary parties for complete relief. To the extent the Court agrees that those defendants are redundant or improper, there is no question that Cook County itself is a proper defendant, or that any relief entered against Cook County would run to the appropriate County officers and entities.

Pursuant to its "broad, undoubted power over the subject of immigration and the status of aliens," *Arizona*, 567 U.S. at 394, Congress enacted the INA. The INA established a "comprehensive federal statutory scheme for regulation of immigration and naturalization[.]" *Chamber of Com. v. Whiting*, 563 U.S. 582, 587 (2011). To effectuate that scheme, the INA defines categories of aliens who may not be admitted to the United States; makes unlawful entry and reentry federal offenses; specifies which aliens may be removed from the United States and the procedures for such removal; and vests federal immigration officials with significant discretion, among other things. *See Arizona*, 567 U.S. at 396; *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress . . ."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration – to admit or exclude aliens – is vested solely in the Federal Government"); *see also Hines*, 312 U.S. at 68 ("[T]he power to restrict, limit, regulate, and register aliens as a distinct group is not an equal and continuously existing concurrent power of state and nation, but that whatever power a state may have is subordinate to supreme national law.").

Because Congress found that "deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers," *Nielsen*, 586 U.S. at 398 (citation omitted), Congress requires federal immigration agents to detain criminal illegal aliens immediately upon their release from State or local custody, pending their removal from the United States. *See, e.g.*, 8 U.S.C. §§ 1226(a), (c), 1231(a). And indeed, as noted above, the Federal Government is subject to civil suit by States should it fail to satisfy this duty. *See supra* Background Section II (discussing 8 U.S.C. § 1226(f)).

20

### 1. The Sanctuary Policies Impede Congressionally Sanctioned and Authorized Federal Immigration Law.

As alleged in the Complaint, the challenged Sanctuary Policies stand as an obstacle to federal immigration officers' ability to detain and remove criminal illegal aliens as required by the INA in several ways.

*First*, the Sanctuary Policies prevent state and local officers from turning aliens over to federal custody when presented with congressionally authorized detainers and administrative warrants – even after the alien's state or local custody has ended, extinguishing the State's regulatory interest in the alien. The statutory and regulatory framework make clear that Congress intended the detention and removal process to be an expedited procedure. *See, e.g.*, 8 U.S.C. § 1226(a) (expressly authorizing the use of administrative warrants); *id.* § 1226(c) (requiring federal agents to assume custody of an alien immediately upon the alien's release from state or local custody); *id.* § 1231 ("Once an alien is ordered removed, the Attorney General must remove the alien from the United States within 90 days, and the alien must be detained during the removal period.").

But by refusing to turn aliens over to federal custody pursuant to detainers and administrative warrants, the Sanctuary jurisdictions require federal agents to independently track down and rearrest aliens at large when (and if) they learn that the alien has been released from state custody – and those agents must do so before the alien reoffends or absconds to another jurisdiction. *See* Compl. ¶ 70. The prohibition on honoring detainers and administrative warrants therefore endangers federal agents, the public, and aliens themselves. And it obstructs and impairs the efficiency of the federal process in a way that is inconsistent with the Congressional design. *See Davis*, 161 U.S. at 283 (explaining that state laws cannot "impair[] the efficiency of th[o]se agencies of the federal government" in the "discharge [of] the[ir] duties"); *Nash v. Fla. Indus.*

21

*Comm'n*, 389 U.S. 235, 240 (1967); *see also Murphy*, 584 U.S. at 477 (noting preemption of state law is proper where "it impose[s] a duty that [i]s inconsistent – i.e., in conflict – with federal law").

Moreover, though they purport to require judicial warrants, the Sanctuary Policies themselves obstruct ICE's ability to procure such warrants by cutting ICE off from information – including that derived from access to detainees for investigatory purposes – needed to satisfy the heightened standard for a judicial warrant compared with an administrative warrant. Thus, the Sanctuary Policies simultaneously require a judicial warrant while refusing ICE the very access needed to secure such a warrant. At the same time, Illinois and its localities grant other law enforcement agencies access to detainees for investigatory purposes without requiring that they procure judicial warrants first, *see, e.g.*, Compl. ¶ 46, 59, which further underscores that these Policies are designed to and in fact interfere with federal immigration law enforcement.

*Second*, even if federal agents could stake out Illinois jail facilities to try to independently stage arrests when aliens emerge from custody, the Sanctuary Policies instruct state and local officials to refuse ICE agents' requests for information that is critical for that purpose. Chicago Code § 2-173-020; Illinois Trust Act, 5 Ill. Comp. Stat. § 805/15(h); Cook County, Illinois Ordinance 11-O-73. *See* Compl. ¶ 63, 66, 69, 70. The alien's release from state custody is a pre-condition to the initiation of federal custody, and state officers effectuate that release. Forcing federal agents to try to stage an arrest without even the most basic information about their target such as his release date, *see* Compl. ¶¶ 11, 63, is nearly impossible. Contrary to Defendants' assertion that release dates can be obtained through courtroom monitoring and inmate status websites, *see* ECF No. 28 at 17, information posted to publicly available online sites is limited and

22

unreliable, oftentimes providing only a projected release date that is highly variable if posted at all.[8]

Accordingly, the United States has stated a claim of conflict preemption.

## 2. Defendants' Conduct is Not Sanctioned by the Tenth Amendment.

Defendants erroneously characterize their obstruction of federal immigration enforcement, *see* ECF No. 25 at 7; ECF No. 28 at 13; ECF No. 35 at 9, as their prerogative under the Tenth Amendment. The Tenth Amendment anticommandeering doctrine prevents Congress from "compel[ling] the States to enact or enforce a federal regulatory program," or "circumvent[ing] that prohibition by conscripting the State's officers directly." *Printz v. United States*, 521 U.S. 898, 935 (1997); *see also Murphy*, 584 U.S. at 473. By preventing the Federal Government from commandeering the States, the Tenth Amendment serves as "one of the Constitution's structural protections of liberty," "promotes political accountability," and "prevents Congress from shifting the costs of regulation to the States." *Murphy*, 584 U.S. at 473 (citation omitted). But the Tenth Amendment is not implicated where the Federal Government seeks to regulate private actors. Indeed, *Murphy* expressly declined to disturb the bedrock principle under the Supremacy Clause that state and local laws that obstruct federal laws "regulat[ing] private actors" are "preempt[ed]."

---

[8] *See* Ill. Dep't of Corrections, *Individual in Custody Search*, https://idoc.illinois.gov/offender/inmatesearch.html (last visited Mar. 31, 2025); Chi. Police Dep't, *Search Arrests*, https://publicsearch1.chicagopolice.org/CheckHuman?Next=https%3A%2F%2Fpublicsearch1.chicagopolice.org%2FArrests%3FFirstName%3D%26LastName%3DLopez%26CbNumber%3D%26ChargeId%3D%26CPDArea%3D%26District%3D%26Beat%3D (last visited Mar. 31, 2025); Cook Cnty. Sheriff, *Detainee Discharge Tracker*, https://iic.ccsheriff.org/DetaineeDischarge (last visited Mar. 31, 2025); *see also Patel v. Hurd*, 2012 WL 1952845, at *4 (N.D. Ill. May 30, 2012) ("The Court may take judicial notice of facts drawn from public records available on a government website under Federal Rule of Evidence 201(b)[.])"; *Bost v. Illinois State Bd. of Elections*, 114 F.4th 634, 642 n.2 (7th Cir. 2024) (taking judicial notice of information posted on publicly available government website (citing Fed. R. Evid. 201)), *docketing pet. for cert.*, No. 24-568 (S. Ct. Nov. 21, 2024).

*Murphy*, 584 U.S. at 476–77. Because the Federal Government here seeks to regulate private individuals – aliens – and prevent Defendants from interfering with its ability to do so, prohibiting that interference would not run afoul of the Tenth Amendment.

Despite Defendants' attempts to frame their actions here as "opting out" of federal immigration enforcement, *see* ECF No. 25 at 7; ECF No. 28 at 13; ECF No. 35 at 9, Defendants' actions are far from passive. To the contrary, as alleged here, Defendants are actively facilitating aliens' evasion of federal law first by asserting criminal custody over aliens whom the Federal Government seeks to detain and remove, and then by terminating custody in a manner that hinders federal detention and removal. *See, e.g.*, Compl. ¶ 7 (alleging that Defendants affirmatively thwart federal law enforcement efforts). Unlike in *Murphy*, where the federal statutory provision at issue did not "impose any federal restrictions on private actors," but instead sought to prohibit states from authorizing sports gambling schemes, *id.* at 480, here, the Federal Government and the State both seek to regulate private individuals. The issue is therefore not whether the Federal Government has commandeered a State, but whether the State's scheme is preempted insofar as it poses an obstacle to the effectuation of the federal scheme. And it is precisely when two regulatory schemes collide in this fashion that the Supremacy Clause prohibits the State from using its authority to create an obstacle to the functioning of the federal scheme. *See Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289–90 (1981) (stating that it "is incorrect" to "assume that the Tenth Amendment limits congressional power to preempt or displace state regulation of private activities . . .").

Indeed, given its exclusive authority over immigration, Congress could have provided that it would immediately remove aliens regardless of pending state criminal prosecutions. Instead, Congress allows States to enforce their criminal laws against aliens before deportation. But if

States choose to do so, they cannot terminate custody in a way that frustrates the Federal Government in assuming custody for the purpose of removing the alien. Allowing state criminal custody to continue while requiring that States take the steps necessary to effect an orderly transfer to federal officers at the end of such custody does not in any sense "commandeer" the state into enforcing federal law, but merely places conditions on the state's exercise of its own regulatory authority. *See id.* at 290–91 ("We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role."). So long as Congress is expressly or implicitly preempting the State from interfering with federal regulation of private parties, it is not impermissibly regulating the State directly.

Unlike the "commandeering" cases where the Supreme Court was concerned about political accountability, the Federal Government here is not requiring Illinois and its localities to enforce federal law; it does not expect them to arrest particular aliens or extend the custody of those who would otherwise be released. *See Printz*, 521 U.S. at 926 (citing *New York v. United States*, 505 U.S. 144, 188 (1992)); *see also Murphy*, 584 U.S. at 473. Instead, it is the Federal Government that seeks to assume custody, and only of those aliens that Illinois and its localities have already decided, for their own reasons, to take into custody pursuant to state and local criminal law. When ICE shows up at a State or local facility to take an alien into federal custody, there is no question of whom to blame. The Federal Government bears sole responsibility for the actions it takes with respect to private persons pursuant to its regulatory authority. *Cf.* 8 U.S.C. § 1226(f) (allowing States to sue the Federal Government for decisions or failures with respect to the detention of aliens that cause harm to a State or its residents).

Ultimately, the Tenth Amendment must be understood in the context of the Constitution as a whole. Limits on the sovereign powers of the States "are an essential part of the Framers'

25

conception of national identity and Union." *California*, 482 U.S. at 405.  Writing on the Extradition Clause, the Supreme Court noted its "obvious objective" "that no State should become a safe haven for the fugitives from a sister State's criminal justice system." *Id.* at 406.  That Clause provides that one State may demand that another State return fugitives to its custody.  *See* U.S. Const. art. IV, § 2; *see also Kentucky*, 65 U.S. at 100 ("[I]t is manifest that the statesmen who framed the Constitution were fully sensible, that from the complex character of the Government, it must fail unless the States mutually supported each other and the General Government[.]").  If one State could demand that another State release a criminal into its custody without offending the Constitution, it follows that the United States can do the same.

For these reasons, Count I's conflict preemption claim withstands dismissal.

### B.  The Sanctuary Policies Unlawfully Regulate the Federal Government.

The Sanctuary Policies alternatively unlawfully regulate the Federal Government by preventing federal agents from using their Congressionally authorized tools to effectuate alien detentions and removals.  Stemming from the Supremacy Clause, the doctrine of intergovernmental immunity prevents States from regulating the activities of the Federal Government.  *See Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."); *see also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 436 (1819) (explaining that the States have no power to "in any manner control" the operations of the Federal Government); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956) (explaining that "the immunity of the instruments of the United States . . . extends to a requirement that they desist from performance until they satisfy a state officer" (quoting *Johnson v. Maryland*, 254 U.S. 51, 57 (1920)).  Thus, "even in the absence of a specific federal law, federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their

26

federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd* 54 F.2d 825 (D.C. Cir. 1995) (citing *Cunningham v. Neagle*, 135 U.S. 1 (1890)).

Under those principles, the Sanctuary Policies, as alleged in the Complaint, *see* Compl. ¶¶ 11, 75, 86–88, improperly regulate the Federal Government by requiring ICE agents to procure criminal warrants to access detainees and obtain information when Congress has authorized federal immigration officials to use detainers and administrative warrants for those purposes. *See* Cook County Ordinance § 46-37(b) ("Unless ICE agents have a criminal warrant . . . ICE agents shall not be given access to individuals"); Chicago Welcoming City Ordinance § 2-173-020, *id.* § 2-173-030 (preventing ICE agents access to detainees and information based on an administrative warrant but not a judicial warrant); 5 Ill. Comp. Stat. § 805/15 (similar). Congress expressly provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). And the Supreme Court has acknowledged the role that administrative warrants play in the detention and removal process. *See Arizona*, 567 U.S. at 407–08 (noting that the Attorney General has discretion to issue warrants, which are executed by federal officers).

Whereas administrative warrants issue on probable cause that the individual is an alien who is subject to removal (which does not necessarily require that the alien committed a criminal offense, *see, e.g.*, 8 U.S.C. §§ 237(a)(1)(C), (D)), criminal judicial warrants issue on probable cause that a crime has been committed, *see Berger*, 388 U.S. at 55. Congress allows federal agents to detain illegal aliens under the former standard, but Sanctuary jurisdictions prevent federal agents from doing so unless they satisfy the latter, higher standard. These jurisdictions therefore foreclose federal immigration officials' use of the Congressionally authorized detention method and directly impose a different method, with a different standard, on the Federal Government for effectuating

27

detentions. But Illinois and its localities have no such power to prevent federal agents from carrying out their duties "until they satisfy a state officer." *See Leslie Miller*, 352 U.S. at 190; *see also Arizona*, 567 U.S. at 406 (recognizing that "a conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy" (alterations and citation omitted)).

The Sanctuary Policies' denial of ICE officials' access to otherwise public state and local facilities likewise regulates federal functions. Specifically, as alleged in the Complaint, by barring federal officials "access to aliens in state or local custody upon their release as provided by federal law," the Sanctuary jurisdictions release dangerous criminal onto the streets, "where they all too often reoffend and commit serious crimes," Compl. ¶ 11, forcing federal immigration officers to engage in difficult and dangerous efforts to rearrest aliens who were previously in local custody, *id.* ¶ 70.

Collectively, these effects of the Sanctuary Policies "'require[] ICE to entirely transform its approach to' its sovereign function of transporting and removing noncitizen detainees." *See United States v. King County*, 122 F.4th 740, 756 (9th Cir. 2024). "Because this impermissibly override[s] the federal government's decision, pursuant to discretion conferred by Congress," as to how to effectuate detentions and removals, the Sanctuary Policies are invalid under the intergovernmental immunity doctrine's regulation prohibition. *See id.* Thus, the United States has sufficiently pled a claim of unlawful regulation.

Defendants cannot avoid that conclusion by suggesting, as the *McHenry County* court concluded, that laws that "regulat[] only State and local entities and law enforcement" cannot possibly regulate the Federal Government. *See* ECF No. 25 at 21, ECF No. 28 at 16–17; ECF No. 35 at 24–25 (citing *McHenry Cnty. v. Raoul*, 44 F.4th 581, 593 (7th Cir. 2022)). Since *McHenry County*, courts have recognized that laws can regulate the Federal Government even though, as

here, they purport to operate against others.  *See, e.g., Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (holding that California statute which phased out all private detention facilities within the State, as applied to ICE detention facilities operated by contractors, violated intergovernmental immunity); *King County*, 122 F.4th at 757 (finding unlawful regulation where a County Order directed local officials to ensure that operators who leased space from the County's airport would not service ICE charter flights, thereby overriding the Federal Government's choice to use contractors to run its flights).

Accordingly, Count III withstands dismissal.

## C. The Sanctuary Policies Unlawfully Discriminate Against the Federal Government.

Count II sufficiently pleads that the Sanctuary Policies constitute unlawful discrimination against the Federal Government.  The doctrine of intergovernmental immunity also prohibits States from discriminating against the Federal Government – or even just a part of it.  *See North Dakota v. United States*, 495 U.S. 423, 434–36 (1990).  A state law discriminates against the Federal Government "by singling out the Federal Government for unfavorable treatment."  *United States v. Washington*, 596 U.S. 832, 839 (2022).   And *any* discriminatory burden on the Federal Government is impermissible.  *See Dawson v. Steager*, 586 U.S. 171, 171 (2019).[9]  Although state laws that innocuously "touch[] on an exclusively federal sphere [are] not enough to establish discrimination," *McHenry Cnty.*, 44 F.4th at 594, state laws that uniquely *burden* federal activities violate this nondiscrimination rule.  And courts presume that such laws are invalid absent clear congressional authorization for that kind of state regulation.  *See Washington*, 596 U.S. at 839; s*ee also King County*, 122 F.4th at 757 (finding unlawful discrimination where a County Order

---

[9]  The principles of the intergovernmental tax immunity doctrine apply to the general intergovernmental immunity doctrine.  *See North Dakota*, 495 U.S. at 434–39.

directed local officials to ensure that operators who leased space from the County's airport would not service ICE charter flights).

The Sanctuary Policies unlawfully discriminate against the Federal Government by singling out federal immigration enforcement for unfavorable treatment. The Cook County and Chicago ordinances facially target ICE and only ICE, denying ICE agents access to detainees, state and local facilities, and information absent a criminal warrant. *See* Ordinance 11-O-73, § 46-37(b) ("ICE agents shall not be given access to individuals or allowed to use County facilities for investigative interviews" and "County personnel shall not expend their time responding to ICE inquiries"); Chicago Code § 2-173-020 (providing that no agent shall "permit ICE agents access" to detainees or "expend their time responding to ICE inquiries"). The Illinois TRUST Act similarly targets "immigration agents" and provides that state and local officers may not give such agents access to detainees or provide them any information that is not otherwise publicly available. *See* 5 Ill. Comp. Stat. § 805/15.

These provisions therefore treat ICE and immigration agents less favorably than the general public and other law enforcement agencies. On their face, the Sanctuary Policies do not prevent state and local agents from sharing the information that ICE seeks, including release dates and contact information, with anyone else – including members of the public and other law enforcement agencies. *See* Cook County Ord. § 46-37(b); Chicago Ord. § 2-173-020; 5 Ill. Comp. Stat. § 805/15(h)(6), (7). The Sanctuary Policies also facially treat federal immigration agents worse than even other federal law enforcement agents. *See, e.g.*, 5 Ill. Comp. Stat. § 805/15(i) ("Nothing in this Section shall preclude a law enforcement official from . . . cooperating with federal and other law enforcement agencies (including criminal investigations conducted by federal Homeland Security Investigations (HSI)) in order to ensure public safety"); *see also*

30

Compl. ¶¶ 14, 46, 59, 82. These jurisdictions therefore "treat[] someone else better than [they] treat[] [ICE]." *North Dakota*, 495 U.S. at 438 (quoting *Washington v. United States*, 460 U.S. 536, 544 (1983)).

Defendants' arguments to the contrary are unavailing. Defendants contend that their differential treatment of ICE is permissible because the more favorably treated groups are not "similarly situated" to ICE. *See* ECF No. 25 at 23; ECF No. 35 at 23 (citing *McHenry County*, 44 F.4th at 594). Because "only" ICE carries out civil immigration enforcement, the argument goes, there is no entity "similarly situated" to ICE, and, absent such a comparator, Defendants are free to discriminate with impunity. Singling out functions that only the Federal Government performs for differential treatment is evidence of discrimination. Defendants point to cases holding that discrimination cannot be found when a State "merely references or . . . singles out federal activities in an otherwise innocuous enactment." *California*, 921 F.3d at 881; *McHenry County*, 44 F.4th at 594. But here, the Sanctuary Policies do not single out an exclusively federal function innocuously. They discriminatorily burden the United States in carrying out that function specifically because of their disagreement with federal policy.

The "similarly situated" language cannot be read so narrowly as to foreclose membership by others to evade a finding of discrimination. To the contrary, if the only difference justifying the discriminatory treatment is the federal agency's enforcement of a particular federal law, the discrimination is clear. *See King County*, 122 F.4th at 757–58 (rejecting the County's argument that "significant differences" between ICE and others who chartered flights justified the discriminatory treatment of ICE where the difference was ICE's role in carrying out deportations); *United States v. California*, 2018 WL 5780003, at *6 (E.D. Cal. Nov. 1, 2018) (rejecting California's argument that it could discourage conveyances of federal public lands because those

lands, unlike private lands, are preserved for the public's benefit: "This quality of federal public lands, however, is so directly linked to their federal status that it cannot serve as the basis for non-discriminatory differentiation."); *cf. McHenry County*, 44 F.4th at 594 (finding the TRUST Act's prohibition on State and local officials entering into contracts to house immigration detainees in State or local facilities was nondiscriminatory partly because the provision touched on a federal sphere in an innocuous way but did not treat anyone else better than the Federal Government). Here, the Federal Government suffers the "differential treatment" the *McHenry County* Court found lacking because other law enforcement agencies and the public are given access to government facilities, detainees, and information on more favorable terms than ICE. *See, e.g.*, Compl. ¶¶ 14, 46, 59, 74, 82.

More fundamentally, the "similarly situated" language must be understood in context. Since *McCulloch*, 17 U.S. (4 Wheat.) at 316, the Supreme Court has held that States may not impose taxes directly on the Federal Government. But States may impose nondiscriminatory taxes that indirectly increase costs for the Federal Government so long as the tax is "imposed equally on the other similarly situated constituents of the State." *United States v. Fresno Cnty.*, 429 U.S. 452, 462 (1977). Underlying this principle is the rationale that taxes imposed solely on federal employees "could be escalated by a State so as to destroy the federal function performed by them[.]" *Id.* at 464 n.11. But if the tax were also imposed on residents and voters of the State, that would provide a political check against abuse of the taxing power and abate the danger to the Federal Government. *Id.*; *cf. Dawson*, 586 U.S. at 171 (holding that a State statute exempting from state taxation the pension benefits of state and local law enforcement officers, but not the federal pension benefits of a retired federal marshal, violates intergovernmental immunity).

In contrast, when the target of the impermissible discrimination is the Federal Government itself, or even just a part of it, the danger is at its peak.  *See Washington*, 596 U.S. at 842 (noting the absence of a "ballot-box safeguard" for laws that discriminate solely against the Federal Government); *King County*, 122 F.4th at 757–58 ("[B]urdening federal operations, and *only* federal operations . . . violates the anti-discrimination principle[.]" (citation omitted)); *cf. Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 346 (7th Cir. 2017) (policy that discriminates against some women constitutes prohibited sex discrimination even if it does not affect every woman). Here too, there is no political check on the unlawful discrimination as long as frustrating ICE's enforcement of federal immigration law remains popular with voters of the State.  Allowing discrimination of this sort to stand would undercut the Supremacy Clause by enabling states to thwart federal policy so long as that policy were implemented by only one federal agency.  *See Washington*, 596 U.S. at 841 (explaining that absent the prohibition on discrimination, nothing prevents a State from imposing unduly high costs on the Federal Government for the benefit of the State's own citizens).

Finally, Defendants argue that invalidating the discriminatory provisions of their policies would create a back-end anticommandeering problem.  *See* ECF No. 25 at 23–24; ECF No. 35 at 24 ("[T]he Tenth Amendment's anticommandeering doctrine forecloses Plaintiff's discrimination claim.").  Defendants are wrong.  At the outset, Defendants cannot seriously contend that actively discriminating against the Federal Government is constitutionally protected inaction.  Rather, to the extent these jurisdictions choose to give other law enforcement agencies and members of the public access to information, detainees in their custody, and facilities, they cannot withhold the same from ICE just because of their disagreement with federal immigration priorities.  *See King County*, 122 F.4th at 758.  Just as there is no "threat of unconstitutional commandeering when ICE

33

uses county highways to transport immigration detainees from one place to another just because the county owns its highways," *King County*, 122 F.4th at 758, there is no such threat when ICE accesses detainees upon their release from state and local custody (including in the public lobbies of state and local facilities) or when ICE accesses information already collected by the State and its localities.

The United States therefore has sufficiently pled a claim of discrimination in Count II.

### D. The Sanctuary Policies' Restrictions on Information Sharing Are Expressly Preempted by 8 U.S.C. § 1373.

Independent of conflict preemption, the United States has also stated a claim of express preemption of the Sanctuary Policies' restrictions on information sharing by 8 U.S.C. § 1373(a). Express preemption occurs when Congress explicitly precludes state or local regulation in a particular area. *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (finding express preemption where the federal law provided that "[N]o State . . . shall enact or enforce any law . . . relating to rates, routes, or services of any air carrier" (49 U.S.C. App. § 1305(a)(1) (1988 ed.)).

Section 1373(a)'s preemptive language provides that a "[s]tate . . . or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). That provision makes clear Congress's intent that States not stand in the way of the Federal Government's regulation of aliens, thereby codifying the constitutional principles outlined above. *See also Murphy*, 584 U.S. at 478 (explaining that "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the

States" but in substance merely prevent the States from obstructing federal regulation of private parties); *see id.* (discussing 49 U.S.C. app. § 1305(a)(1) (1988)).

And contrary to Defendants' suggestion, this type of information-sharing law does not implicate the Tenth Amendment's anticommandeering principle. *See* ECF No. 25 at 17–19; ECF No. 28 at 14–16; ECF No. 35 at 18–20. In *Printz*, although the Court held that local law enforcement officers could not be required to perform background checks to validate the legality of gun sales under federal law, it distinguished statutes that "require only the provision of information to the Federal Government," as they "do not involve . . . the forced participation of the States' executive in the actual administration of a federal program." *Printz*, 521 U.S. at 918. The Supreme Court's Tenth Amendment cases are therefore not properly read to invalidate reporting requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice." *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a), transferred to 34 U.S.C. § 41307); *see Reno v. Condon*, 528 U.S. 141, 151 (2000) (Constitution does not prohibit federal enactments that "do[] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[ ] the States as the owners of data bases"). Invalidating the unconstitutional restrictions on information sharing, thereby giving state officers the choice to communicate with federal agents, would therefore not violate the Tenth Amendment.

Moreover, the preemptive effect of Section 1373(a) is not as narrow as Defendants contend. Rather, the statutory text, structure, and purpose of Section 1373 confirm that "information regarding citizenship or immigration status" also covers aliens' contact information and release dates. By its terms, Section 1373(a) applies to any "information *regarding* [an individual's] citizenship or immigration status[.]" 8 U.S.C. § 1373(a) (emphasis added). As the Supreme Court

has explained, statutory terms like "regarding" or "related to" have "a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717–18 (2018) (citing authorities); *see also United States v. California*, 314 F. Supp. 3d 1077, 1104 (E.D. Cal. 2018) (determining that the phrase "information regarding" should be read to "serve[] a purpose even when the statute is read narrowly"), *aff'd in part, rev'd in part and remanded*, 921 F.3d 865 (9th Cir. 2019).

Reading the term "regarding" to have such a "broadening effect," *Lamar*, 584 U.S. at 717, is especially appropriate in this statutory context, because 8 U.S.C. § 1373(c), which establishes federal officials' duty to share information with States, does not include the term in requiring federal officials to provide "the citizenship or immigration status of any individual" to States. Congress' inclusion of "regarding" in Section 1373(a), juxtaposed with its omission of such a term in an otherwise-parallel provision of the same statute, indicates that "Congress intended a difference in meaning." *Loughrin* v. *United States*, 573 U.S. 351, 358 (2014).

And, while the applicable context of "regarding" is important, "[p]roper interpretation [of language in a statute] considers not only the specific context in which the language is used, but the overall structure of the statute as a whole, as well as its history and purpose." *City of Chicago v. Barr*, 961 F.3d 882, 898–99 (7th Cir. 2020). The legislative history of Section 1373 provides additional insight into the meaning of "regarding" here. *See Arizona*, 567 U.S. at 405 (considering legislative history as part of a conflict-preemption analysis). Congress enacted Section 1373 to ensure that state and local officials can "communicate with [federal immigration authorities] regarding *the presence, whereabouts, or activities of illegal aliens*," not merely their legal classification. H.R. Rep. No. 104-725, at 383 (1996) (emphasis added); *see also* S. Rep. No. 104-249, at 19–20 (1996) ("The acquisition, maintenance, and exchange of immigration-related

36

information by State and local agencies is . . . of considerable assistance to . . . achieving of the purposes and objectives of the [INA].").

Furthermore, the detention and removal provisions of the INA establish a clear relationship between an alien's release date and his or her immigration status. 8 U.S.C. § 1231(a)(4)(A) (providing that a convicted alien in state criminal custody who is subject to a final removal order may not be removed until "released from imprisonment"). The release date thus dictates when such an alien must be detained and removed from the United States – a matter directly related to (and thus "regarding") the alien's "immigration status." Accordingly, Section 1373(a) expressly preempts the Sanctuary Policies' restrictions on sharing information about a detainee's upcoming release from custody.

Contact information, including current addresses, also directly bears on an alien's immigration status. Aliens must "notify the Attorney General in writing of each change of address and new address within ten days from the date of such change[.]" 8 U.S.C. § 1305. Failure to comply with that provision is itself grounds for mandatory detention and removal, unless excused. *See* 8 U.S.C. § 1306. An alien's current address reveals whether the alien has complied with the notification requirement, which in turn dictates whether the alien is subject to detention and removal. Contact information, like release-date information, is therefore also directly related to the alien's immigration status.

Defendants point to out-of-circuit, non-binding caselaw narrowly construing Section 1373 as only covering citizenship and immigration status. This interpretation, however, gives short shrift to recent Supreme Court precedent instructing that "regarding" is a word of breadth, *see Lamar*, 584 U.S. at 716–17, as well as the principle that Congress's selective decision to include "regarding" in Section 1373(a) but not in Section 1373(c) should be given meaning, *see Russello*

v. *United States*, 464 U.S. 16, 23 (1983). Defendants' observation that Congress could have used even broader language in Section 1373(a), does not rebut the United States' argument that the language Congress *did* choose is broad enough to expressly preempt the Sanctuary Policies.

Against that backdrop, the Sanctuary Policies' restrictions on information sharing are expressly preempted by Section 1373. Chicago's Welcoming City Ordinance states that City agents are not permitted to "request, maintain, or share the citizenship or immigration status of any person unless such disclosure has been authorized in writing by the individual to whom such information pertains." Chicago Welcoming City Ordinance § 2-173-030(a)(1). Nor can Chicago point to its purported savings clause to avert the conflict. Although the savings clause allows agents to undertake those activities "if required to do so by statute," *id*. § 2-173-030(a), Section 1373 does not require States and local governments to share and maintain that information but only prohibits restrictions on those activities. Chicago has therefore prohibited the sharing of information that federal law expressly contemplates States will share, so its Ordinance is expressly preempted. *See id.* § 2-173-030(a)(1).

Similarly, Cook County and Illinois' Sanctuary policies prohibit their agents from disclosing to an immigration agent release-date and contact information of detainees that is not otherwise publicly available. Ordinance 11-O-73, § 46-37(b); 5 Ill. Comp. Stat. § 805/15(h). Although Cook County's and Illinois' ordinances do not explicitly include the phrase "citizenship or immigration status," they, too, run afoul of Section 1373 for the reasons already explained.

Accordingly, the United States' express preemption claim is sufficiently pled and should withstand dismissal.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motions to dismiss.

Dated: April 1, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director

JACQUELINE COLEMAN SNEAD
Assistant Director

*/s/ Elisabeth J. Neylan*
ELISABETH J. NEYLAN (N.Y. Bar Reg.
No. 6125736)
CRISTEN C. HANDLEY (MO Bar No.
69114)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel:  (202) 616-3519
Fax:  (202) 616-8460
E-mail:  Elisabeth.J.Neylan@usdoj.gov

*Attorneys for the United States*