# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

UNITED STATES OF AMERICA,       :
          *Plaintiff,*            :
                                  :     Case No. 1:25-cv-1285
v.                                :     Judge Lindsay C. Jenkins
STATE OF ILLINOIS, et al.,        :
          *Defendants.*           :
                                  :
                                  :
                                  :

---

## BRIEF OF *AMICI CURIAE* OHIO AND 22 OTHER STATES IN SUPPORT OF PLAINTIFF

---

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION AND STATEMENT OF *AMICI* INTERESTS ................................ 1

ARGUMENT ........................................................................................................... 3

I. The Defendants' decisions to shield illegal aliens from detection harm Amici States. .................................................................................................... 3

    A. The Defendants' laws thwart the constitutional bargain whereby the States ceded some of their sovereignty to Congress for stronger protection of their collective interests. .................................................... 4

    B. The federal government is responding to an illegal immigration crisis of national scale. .............................................................................. 6

    C. The illegal immigration crisis has severe consequences for the Amici States. ...................................................................................................... 7

II. The Defendants' laws that bar federal agents from accessing illegal aliens conflict with federal immigration law. ............................................ 12

    A. States may decline to implement a federal program or enforce federal laws, but they may not legislate in conflict with federal laws. ........................................................................................................ 13

    B. The Defendants' laws impermissibly order law enforcement officers to act in violation of 8 U.S.C. §1324. .................................................... 14

    C. The Defendants' laws violate intergovernmental immunity by interfering with the operations of the federal government and discriminating against federal immigration agents. ........................... 17

CONCLUSION ...................................................................................................... 20

ADDITIONAL COUNSEL .................................................................................... 21

CERTIFICATE OF SERVICE ................................................................................ 22

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Arizona v. United States*,
567 U.S. 387 (2012) ............................................................. 2, 12, 13, 14

*Chamber of Comm. v. Whiting*,
563 U.S. 582 (2011) ............................................................. 13

*Geo Group v. Newsom*,
50 F.4th 745 (9th Cir. 2022) ............................................ 17, 18, 19

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ........................................ 14

*McHenry Cnty. v. Kwame Raoul*,
44 F.4th 581 (7th Cir. 2022) ........................................... 18, 19

*New York, et al., v. U.S. Dep't of Just.*,
951 F.3d 84 (2d Cir. 2020) .............................................. 11, 19

*The Passenger Cases*,
48 U.S. (7 How.) 283 (1849) ........................................... 4

*Plyler v. Doe*,
457 U.S. 202 (1982) ........................................................ 2, 13

*Printz v. United States*,
521 U.S. 898 (1997) ........................................................ 12, 14

*Tafflin v. Levitt*,
493 U.S. 455 (1990) ........................................................ 13

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) .......................................... 11

*Trump v. Vance*,
591 U.S. 786 (2020) ........................................................ 17

*United States v. Costello*,
666 F.3d 1040 (7th Cir. 2012) ........................................ 16

*United States v. Locke*,
529 U.S. 89 (2000) .......................................................... 12, 14

*United States v. Texas,*
   97 F.4th 268 (5th Cir. 2024) ............................................................ 6, 11

*United States v. Washington,*
   596 U.S. 832 (2022) ............................................................ 17, 18, 19

*Wyeth v. Levine,*
   555 U.S. 555 (2009) ............................................................ 15

**Statutes and Constitutional Provisions**

U.S. Const. art. VI, cl. 2 ............................................................ 2

U.S. Const. art. X ............................................................ 1, 14

5 ILCS 805/5 ............................................................ 16

5 ILCS 805/15 ............................................................ 16, 18

8 U.S.C. §1226 ............................................................ 19

8 U.S.C. §1231 ............................................................ 19

8 U.S.C. §1324 ............................................................ *passim*

8 U.S.C. §1357 ............................................................ 12

8 U.S.C. §1373 ............................................................ 16

42 U.S.C. §1395dd ............................................................ 8

Chi. Mun. Code 2-173-020 ............................................................ 15

Chi. Mun. Code 2-173-030 ............................................................ 16

Cook Cnty. Code §46-37 ............................................................ 15, 16

**Other Authorities**

89 Fed. Reg. 48487 (June 3, 2024) ............................................................ 2

Articles of Confederation, art. IV (1777) ............................................................ 4

Black's Law Dictionary (Bryan A. Garner, ed.) (12th ed. 2024) ............................................................ 15

Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225 (2000) ............................................................ 14

Federation for American Immigration Reform, *The Fiscal Burden of Illegal Immigration on U.S. Taxpayers 2023 Report* ............................................... 8

Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833 (1993)............................................ 13

Hans A. von Spakovsky, *Federal Report Shows Open Borders Bring Increased Crimes and Costs for Taxpayers*, The Heritage Foundation (Dec. 17, 2021) .................................................................... 10

Heather Cherone, *Budget Hearings Kick Off with Intense Scrutiny on Costs to Care for Migrants in Chicago*, WWTW New (Oct. 16, 2023) ................. 12

*How Americans View the Situation at the U.S.-Mexico Border, Its Causes and Consequences*, Pew Research Center (Feb. 15, 2024).......................... 2

James E. Pfander & Theresa R. Wardon, *Reclaiming the Immigration Constitution of the Early Republic: Prospectivity, Uniformity, and Transparency*, 96 Va. L. Rev. 359 (2010)........................................ 4, 5, 13

Jesse Bedayn, *Democratic-led cities pay for migrants' tickets to other places as resources dwindle*, Associated Press (Nov. 19, 2023) ............................ 12

Muzaffar Chishti and Colleen Putzel-Kavanaugh, *After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal*, Migration Policy Institute (Aug. 1, 2024), ........................................ 10, 12

Nikolas Bowie and Norah Rast, *The Imaginary Immigration Clause*, 120 Mich. L. R. 1419 (2022) ..................................................... 13

Ohio Department of Education & Workforce, *FY2024 District Profile Report*........................................................................ 9

*Profile of the Unauthorized Population: Ohio*, Migration Policy Institute, ...................................................................... 9

*Profile of the Unauthorized Population: United States*, Migration Policy Institute ...................................................................... 9

"Securing Our Borders" Exec. Order (Jan. 20, 2025) ................................. 2

Steven A. Camarota, et al., *Mapping the Impact of Immigration on Public Schools*, Center for Immigration Studies (June 20, 2023) .................. 9, 10

U.S. Customs and Border Protection, *Nationwide Encounters* (Mar. 13, 2025)....................................................................... 1, 6

iv

U.S. Department of Health and Human Services, *Expenditure Reports From MBES/CBES*.............................................................................. 8

U.S. Department of Justice, *Non-U.S. Citizens in the Federal Criminal Justice System, 1998-2018*, Special Report (Nov. 2021) ...................... 10

U.S. Drug Enforcement Administration, *Facts About Fentanyl*................. 7

U.S. Homeland Security Committee, *"Every State is Now a Border State": House Homeland Security Committee Hears Testimony from Colleagues on Impacts of the Border Crisis* (Dec. 7, 2023)...................... 1

U.S. House Committee on Homeland Security, *The Historic Dollar Costs of DHS Secretary Alejandro Mayorkas' Open-Border Policies*, Phase 4 Interim Majority Report (Nov. 13, 2023) ................................... 8

U.S. House Committee on Homeland Security, *Startling Stats Factsheet* (Oct. 24, 2024), ................................................................... 6, 7

U.S. House Committee on the Judiciary, *New Data Reveal Worsening Magnitude of the Biden Border Crisis and Lack of Interior Immigration Enforcement*, Interim Staff Report (Jan. 18, 2024)................... 7, 11

U.S. Immigration and Customs Enforcement, *ICE Annual Report: Fiscal Year 2023* (Dec. 29, 2023) .......................................................... 11

**INTRODUCTION AND STATEMENT OF *AMICI* INTERESTS**

Amici States Ohio, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, Tennessee, Texas, Virginia, West Virginia, and Wyoming jealously guard their sovereignty and constitutionally reserved police powers to regulate for the welfare of their citizens. U.S. Const. art. X. They also have an obligation to address the disastrous effects of the illegal immigration crisis, which has fallen heavily on Amici States and the American taxpayers residing in them. Amici write to highlight the States' constitutional role in the sphere of immigration and explain how some provisions in laws enacted by Defendants Illinois, Chicago, and Cook County exceed that authority, with serious consequences for all States.

The national immigration crisis has rendered "every state … a border state." U.S. Homeland Security Committee, *"Every State is Now a Border State": House Homeland Security Committee Hears Testimony from Colleagues on Impacts of the Border Crisis* (Dec. 7, 2023), https://perma.cc/HTS5-BP7U. When the Biden administration refused to enforce the immigration laws Congress enacted, the States bore the brunt of the economic, health, and public safety issues generated by the resultant mass migration. The past four years brought an unprecedented influx of illegal aliens—over 9 million—overwhelming the national infrastructure and causing national outcry. *See* U.S. Customs and Border Protection, *Nationwide Encounters* (Mar. 13, 2025), https://tinyurl.com/2jkrn8t5.

"Americans overwhelmingly fault[ed] the [federal] government" for its handling of the immigration crisis, with 80% saying that the previous presidential

administration was doing a "bad job." *How Americans View the Situation at the U.S.-Mexico Border, Its Causes and Consequences*, Pew Research Center (Feb. 15, 2024), https://tinyurl.com/ycn6f7rm. The federal government responded. In June 2024, the executive branch reversed course and temporarily suspended the entry of aliens at the southern border. Proclamation 10773, 89 Fed. Reg. 48487 (June 3, 2024). And the current administration has taken a strong enforcement stance from the outset. *See, e.g.*, "Securing Our Borders" Exec. Order (Jan. 20, 2025), https://tinyurl.com/32mhpxm4.

Rogue States and cities cannot now thwart the nation's "political will" on illegal immigration, twice expressed, via Congress's laws and the president's policies. *See Arizona v. United States*, 567 U.S. 387, 416 (2012). To be sure, constitutional text and historical context support a role for the States in immigration, and the Supreme Court has blessed state immigration laws that complement federal immigration laws. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 225 (1982); *Arizona*, 567 U.S. at 412. But States have no right to enact laws conflicting with federal immigration statutes. U.S. Const. art. VI, cl. 2. Defendants ignored that basic premise of federalism when they enacted laws ordering local law enforcement to bar federal immigration agents from accessing illegal aliens in state or local custody. Those access bans violate the Supremacy Clause twice over. They directly conflict with a federal statute that imposes criminal penalties on any person who "conceals, harbors, or shields from detection" an illegal alien "in any place." 8 U.S.C. §1324(a)(1)(A)(iii). And they run afoul of intergovernmental immunity by controlling the operations of federal immigration agents. In

more practical terms, Defendants' policies also contribute to a crisis affecting citizens and lawful aliens throughout Amici States.

The access-bar provisions in Defendants' laws both stymie enforcement of the nation's immigration laws, duly enacted by the people's representatives in Congress, and frustrate the policy of immigration enforcement adopted by the new executive—elected by the people in the wake of one of the most significant illegal immigration surges in the country's history. When individual States and cities attempt to frustrate federal immigration laws that protect all States, the result is harm reaching far outside their borders.

## ARGUMENT

### I. The Defendants' decisions to shield illegal aliens from detection harm Amici States.

Illinois's so-called sanctuary policies break the bargain struck at the Founding, under which the States agreed to cede some sovereignty over naturalization to the federal government to prevent States with the loosest naturalization requirements from imposing their liberal immigration standards on the rest of the country. When a minority of States like Illinois seek to thwart the enforcement of duly enacted federal immigration laws and policies, they impose the costs of their overreach on the rest of the Nation. Over the last four years, record levels of illegal immigration, combined with the executive's non-enforcement approach to federal immigration law, created a national crisis. The unprecedented influx of illegal immigrants has strained state welfare programs, emergency services, public education, and affordable

housing, all while increasing crime. In short, illegal immigration has real costs for Amici States, including fewer resources and higher taxes for their citizens and lawful aliens.

### A. The Defendants' laws thwart the constitutional bargain whereby the States ceded some of their sovereignty to Congress for stronger protection of their collective interests.

The Constitution places power over naturalization in Congress's hands. That authority derives from an agreement among the States, which yielded some of their sovereignty to the federal government to prevent States with the most permissive laws from relaxing citizenship standards for the rest of the country.

The naturalization clause was introduced at the Philadelphia Convention with the simple explanation that the "rule for naturalization ought to be the same in every State." 1 The Records of the Federal Convention of 1787, at 242, 245 (Farrand ed., 1911). This was a complete change from existing practice, in which each State had power to naturalize new citizens. James E. Pfander & Theresa R. Wardon, *Reclaiming the Immigration Constitution of the Early Republic: Prospectivity, Uniformity, and Transparency*, 96 Va. L. Rev. 359, 383 (2010); *see also The Passenger Cases*, 48 U.S. (7 How.) 283, 440 (1849) (Opinion of Catron, J.). The Framers ratified the naturalization clause against the backdrop of the Articles of Confederation, which allowed the "free inhabitants" of every State to move throughout the United States and granted them all the "privileges and immunities" of free citizens in the several States. Articles of Confederation, art. IV (1777). That language "effectively permitted an alien to seek naturalization in a state with permissive naturalization practices and then move to a state with tighter restrictions, and still be entitled to all the incumbent

4

rights of naturalized citizens in the second state." Pfander & Wardon at 384. The resultant "[i]nterstate mobility inevitably put pressure on the states' ability to maintain restrictive views of citizenship." *Id.* at 383.

Discussions at ratification reflected these concerns. James Madison wrote that under the Articles, the States possessed a "very improper power" to "naturaliz[e] aliens in every other State"—a fault the new Constitution "made provision against." *Federalist No. 42* (Madison). Charles Pinckney warned that "younger States will hold out every temptation to foreigners, by making the admission to office less difficult in their Governments, than the older," and that "a foreigner, as soon as he is admitted to the rights of citizenship in one, becomes entitled to them in all." 3 The Records of the Federal Convention of 1787, at 120 (Max Farrand ed., 1911). And the drafting history of the naturalization clause revealed a concern for "inter-state comity." Pfander & Wardon at 389 (quoting 2 Farrand at 144 (Committee of Detail, IV)). The States thus ceded some sovereignty over naturalization to Congress, which represented all States, to prevent one State from subjecting all the others to citizens they did not wish to admit.

The same concerns that informed the naturalization clause at the Founding are present in our immigration debates today. Many States still (rightly) worry that so-called sanctuary policies in a minority of States will incent illegal immigration that affects all States. That risks the welfare of everyone, including lawful citizens and legal aliens, and it breaches the bargain the Constitution itself struck.

## B. The federal government is responding to an illegal immigration crisis of national scale.

The consequences of loose immigration policies over the last four years has been a historic surge of illegal immigration into the United States. From fiscal years 2021-2024, Border Patrol reported over 10.8 million encounters with illegal aliens—more than triple the total encounters from 2017-2020. U.S. House Committee on Homeland Security, *Startling Stats Factsheet* (Oct. 24, 2024), https://homeland.house.gov/2024/10/24/startling-stats-factsheet-fiscal-year-2024-ends-with-nearly-3-million-inadmissible-encounters-10-8-million-total-encounters-since-fy2021/. December 2023 set the record high for monthly border encounters, with more than a quarter million. U.S. Customs and Border Protection, *Nationwide Encounters*. On top of these numbers, Border Patrol recorded an additional 2 million known "gotaways" during the 2021-2024 period, which the then-chief of Border Patrol testified could be underreported by up to 20%. U.S. House Committee on Homeland Security, *Startling Stats Factsheet*.

The "national security implications of this unprecedented influx are concerning." *Id.* Border Patrol apprehended over 390 illegal aliens on the terrorist watchlist attempting to cross U.S. borders in fiscal years 2021-2024, a more than 3,000% increase from the preceding four years. *Id.* At the same time, 9,055 pounds of fentanyl were seized between ports of entry by Border Patrol, compared to 1,604 pounds from 2017-2020. *Id.* For perspective, that amount of fentanyl is enough to kill the entire American population many times over. *See United States v. Texas*, 97 F.4th 268, 302 (5th Cir. 2024) (Oldham, J., dissenting). Between 2020-2021, overdose deaths

6

involving synthetic opioids (predominantly fentanyl) skyrocketed by 55.6% and "appear to be the primary driver of the increase in total drug overdose deaths." U.S. Drug Enforcement Administration, *Facts About Fentanyl*, https://www.dea.gov/resources/facts-about-fentanyl. Despite this, the number of criminal aliens arrested and removed by the Department of Homeland Security (DHS) dropped precipitously from the preceding years. U.S. House Committee on Homeland Security, *Startling Stats Factsheet*.

Instead, the Biden administration compounded the wave of illegal immigration through a policy of non-enforcement. From 2021-2024, DHS released into the U.S. over 85% of the illegal immigrants encountered and apprehended at the border—over 3.3 million illegal aliens. U.S. House Committee on the Judiciary, *New Data Reveal Worsening Magnitude of the Biden Border Crisis and Lack of Interior Immigration Enforcement*, Interim Staff Report, at 1–3 (Jan. 18, 2024), https://tinyurl.com/ykrst3ab [Interim Staff Report]. At the height of illegal immigrant apprehensions during December 2023, DHS was releasing an average of 5,000 illegal immigrants into the interior every day. *Id.* Over half of the roughly 6 million illegal aliens encountered between Jan. 2021 and Sept. 2023 had no confirmed departure date as of 2024. *Id.* This caused a crisis of epic proportions for American taxpayers and Amici States.

## C. The illegal immigration crisis has severe consequences for the Amici States.

As of 2022, the net cost of illegal immigration to U.S. citizens, after subtracting taxes paid by illegal aliens, was conservatively estimated at a staggering $150.7

billion every year. U.S. House Committee on Homeland Security, *The Historic Dollar Costs of DHS Secretary Alejandro Mayorkas' Open-Border Policies*, Phase 4 Interim Majority Report at 3–4 (Nov. 13, 2023), https://tinyurl.com/4py74rzk [House Rep.]. That cost is disproportionately paid by the States and their political subdivisions, which now spend over $115 billion on illegal immigrants each year, *id.* at 3, and shoulder "the fiscal burden of illegal immigration at every level and across nearly all aspects of life"—healthcare, education, housing, social welfare, and criminal justice. Federation for American Immigration Reform, *The Fiscal Burden of Illegal Immigration on U.S. Taxpayers 2023 Report* at 1, 42–65, https://tinyurl.com/2p9p377p.

Start with healthcare. Over half of the millions of illegal immigrants in the U.S. are uninsured, a sizeable percentage compared to the 8.4% of American citizens in that category. House Rep. at 6. Uninsured "illegal aliens often rely on emergency rooms and services as a source of free or cheap health care," *id.* at 7, because federal law requires that public hospitals provide emergency medical services to anyone seeking treatment, regardless of their immigration status or ability to pay. 42 U.S.C. §1395dd. That strains already scarce resources in hospitals and limits the availability of medical care to citizens and legal aliens. House Rep. at 7–11. It also imposes significant costs for taxpayers. In 2021, the Medicaid costs to cover emergency services for illegal aliens totaled over $7 billion–a more than 435% increase in cost from five years earlier. U.S. Department of Health and Human Services, *Expenditure Reports From MBES/CBES*, https://tinyurl.com/yvm8j94w (Financial Management Reports for fiscal years 2021, line 82 and 2016, line 75).

8

Turn to education. "The costs of providing education services to illegal alien children, or the U.S.-born children of illegal aliens, represent enormous expenditures for the states" as well. House Rep. at 21. In 2019, there were over 650,000 children who were unlawfully present enrolled in school. *Profile of the Unauthorized Population: United States*, Migration Policy Institute, https://tinyurl.com/39wttty5. With the 2021-2024 surge in illegal immigration, that number has only grown. The costs fall heavily on the States, which provide free public education to children of illegal aliens. In Ohio, for example, it costs $16,310.87 per student to provide public education. Ohio Department of Education & Workforce, *FY2024 District Profile Report*, https://tinyurl.com/a5kbtd9z. For just the 6,000 children of illegal aliens currently enrolled in Ohio schools, that adds an additional $97.8 million to the State's education costs. *Profile of the Unauthorized Population: Ohio*, Migration Policy Institute, https://tinyurl.com/ypj6epjr. All told, educating undocumented children and children of illegal aliens costs States an estimated $75.9 billion per year. House Rep. at 21. This does not include the billions more in State and federal welfare benefits paid to illegal alien households with U.S.-citizen children, under programs such as SNAP and WIC. *Id.* at 26–27.

Many schools face the added challenges of assimilating large waves of illegal alien children, since the "impact of immigration on schools tends to be concentrated" rather than evenly dispersed. Steven A. Camarota, et al., *Mapping the Impact of Immigration on Public Schools*, Center for Immigration Studies (June 20, 2023), https://tinyurl.com/2zztt64y. These children are disproportionately low-income

students and "often settle in areas of high poverty," which further straps the re-sources of schools that are already struggling. *Id.* Most of these children have limited English proficiency, requiring language programs and services with 8- to 9-digit costs in several school districts. House Rep. at 21–23. Because illegal aliens now come from over 160 countries speaking a multitude of languages, even schools with the resources to hire new English-language teachers may not be able to adequately pro-vide for these students. *Id.* at 23.

Next, take housing. States are struggling to address the affordable housing crisis, a shortage exacerbated by an influx of millions of illegal aliens. *Id.* at 28–33. Even interior States and cities have found their capacities stretched to breaking. New York City was forced to temporarily amend its universal right to shelter in 2024, which had been on the books since 1979, due to the "unsustainable" housing crisis caused by the flood of illegal immigrants. Muzaffar Chishti and Colleen Putzel-Ka-vanaugh, *After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal*, Migration Policy Institute (Aug. 1, 2024), https://tinyurl.com/msm436e3. Other major U.S. cities have responded similarly by closing shelters and limiting ac-cess. *Id.*

Finally, consider crime. In 2018, over 40% of federal criminal prosecutions were against illegal aliens, and illegal aliens accounted for roughly one quarter of all federal drug offense prosecutions. U.S. Department of Justice, *Non-U.S. Citizens in the Federal Criminal Justice System, 1998-2018*, Special Report (Nov. 2021), https://tinyurl.com/3kudj2ps; Hans A. von Spakovsky, *Federal Report Shows Open*

*Borders Bring Increased Crimes and Costs for Taxpayers*, The Heritage Foundation (Dec. 17, 2021), https://tinyurl.com/49u8f3ex. As of January 2024, over 617,000 aliens in the U.S. on Immigration and Custom Enforcement's non-detained docket had criminal convictions or charges against them. U.S. House Judiciary Committee, *Interim Staff Report* at 9. Despite that, the Biden administration removed almost 50% fewer criminal aliens in 2023 than were removed in 2019 and made thousands fewer criminal arrests for weapons, drug, assault, and sex offenses. *Id.* at 8-9; *see also* U.S. Immigration and Customs Enforcement, *ICE Annual Report: Fiscal Year 2023* at 27 (Dec. 29, 2023), https://tinyurl.com/y7xkdnaj. The federal government is now course correcting, but Defendants seek to block those efforts by barring federal agents from accessing illegal aliens in State or local custody. Defendants' policies require law enforcement officers to shield the worst offenders—illegal aliens incarcerated on criminal convictions or charges. The access bar protects criminal offenders from removal. *See New York, et al., v. U.S. Dep't of Just.*, 951 F.3d 84, 91, 123 (2d Cir. 2020).

When States like Illinois enact laws to encourage illegal immigration and shield illegal aliens from detection, all States pay the price—including the many like Amici that want enforcement of the national immigration laws. *See, e.g.*, *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (broad relief is necessary in immigration context because illegal aliens in the country are "free to move among states"); *Texas*, 97 F.4th at 334 (Oldham, J., dissenting) ("the influx of illegal immigrants affects many more States than just Texas" or other border States). At the height of the illegal immigration surge in 2023, States and cities with sanctuary policies (including

Chicago) "took on a different posture when resources ran thin, encouraging migrants not to come or to move elsewhere." Chishti and Putzel-Kavanaugh, *After Crisis of Unprecedented Migrant Arrivals*; *see also* Jesse Bedayn, *Democratic-led cities pay for migrants' tickets to other places as resources dwindle*, Associated Press (Nov. 19, 2023), https://tinyurl.com/2s3bunr6; Heather Cherone, *Budget Hearings Kick Off with Intense Scrutiny on Costs to Care for Migrants in Chicago*, WWTW News (Oct. 16, 2023) https://news.wttw.com/2023/10/16/budget-hearings-kick-intense-scrutiny-costs-care-migrants-chicago. One State's policy encouraging illegal immigration always spills over to other states. The immigration tsunami of 2023 forced those cities to make explicit what has always been beath the surface—that encouraging illegal immigration imposes nationwide costs.

## II. The Defendants' laws that bar federal agents from accessing illegal aliens conflict with federal immigration law.

The Constitution preserves a role for States in immigration enforcement. On the one hand, States may enact legislation that mirrors or complements federal immigration law, *see, e.g.*, *Arizona*, 567 U.S. at 412–13, and they may work cooperatively with the federal government within the federal immigration scheme. 8 U.S.C. §1357(g)(10)(B). On the other hand, States may opt out of joint federal-state enforcement schemes. *Printz v. United States*, 521 U.S. 898, 935 (1997). But enacting legislation that aggressively interferes with enforcement of Congress's immigration laws is not on the menu of options. *See, e.g.*, *United States v. Locke*, 529 U.S. 89, 109 (2000). Defendants' access-bar provisions do just that and run headlong into conflict preemption and intergovernmental immunity.

### A. States may decline to implement a federal program or enforce federal laws, but they may not legislate in conflict with federal laws.

States "possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). That general principle holds true in the immigration context and fits well within Founding-era understanding. *See generally, e.g.*, Nikolas Bowie and Norah Rast, *The Imaginary Immigration Clause*, 120 Mich. L. R. 1419, 1442–43 (2022). Indeed, state laws regulating immigration after the constitutional ratification predated the first federal regulation of immigrant entry. Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833, 1883 (1993); Pfander & Wardon at 359–60.

Under the Supreme Court's current interpretation of federal power over immigration, "States do have some authority to act with respect to illegal aliens" to "further[] a legitimate state goal." *Plyler*, 457 U.S. at 225. States' "broad authority under their police powers" also permit them to enact immigration-related laws even when there is no corresponding federal legislation. *Chamber of Comm. v. Whiting*, 563 U.S. 582, 588, 600 (2011) (quotation omitted). In *Whiting*, for example, the Supreme Court upheld a state law requiring employers to verify employees' immigration status, a requirement not imposed under federal law. *Id.* at 608. Even *Arizona v. United States*—the high-water mark for federal preemption in the immigration context—upheld a section of Arizona's immigration law. 567 U.S. at 411–15. The Court has thus acknowledged that there is room for States to legislate in the sphere of immigration, provided that such legislation restricts (rather than expands) immigration.

13

At the same time, the federal government cannot require States to enforce federal laws, and States must have the choice to opt out of any cooperative program. U.S. Const., art. X; *Printz*, 521 U.S. at 935. But the opt-out option does not permit States and localities to enact laws that conspicuously conflict with federal statutes. It is a federalism fundamental, expounded over 200 years ago, that "the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819). If legislating coextensively with federal immigration laws may sometimes interfere with the federal immigration scheme, *Arizona*, 567 U.S. at 392–94, 408, 416, then legislating in conflict with those laws surely must.

### B. The Defendants' laws impermissibly order law enforcement officers to act in violation of 8 U.S.C. §1324.

Defendants' laws must yield under the Supremacy Clause because those laws require state and local law enforcement officers to prevent federal agents from accessing illegal aliens in state or local custody. These directives contradict §1324, a federal statute criminalizing any efforts to "conceal, harbor, or shield from detection" an illegal alien. 8 U.S.C. §1324(a)(1)(A)(iii).

Federal preemption applies when compliance with state and federal laws is "impossible," *Locke*, 529 U.S. at 109 (quotation omitted), or where the state law "contradicts" a federal statute, Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 264 (2000). The focus is on "whether the ordinary meanings of state and federal law conflict."

*Wyeth v. Levine*, 555 U.S. 555, 588 (2009) (Thomas, J., concurring) (quotation omitted).

Begin with the Defendants' laws. Illinois's TRUST Act provides that "a law enforcement agency or official may not … give any immigration agent access, including by telephone, to any individual who is in that agency's custody." 5 ILSC 805/15(h)(2). "Access" does not mean holding an illegal alien on an immigration detainer, which is separately addressed in 805/15(a). Rather, "access" is best read to have its plain (and capacious) meaning—"to enter, approach, pass to and from, or communicate with." *Access*, Black's Law Dictionary 16 (Bryan A. Garner, ed.) (12th ed. 2024). That reading is supported by the statutory example of access via telephone. Chicago and Cook County have similar provisions requiring local agents to bar federal immigration agents from accessing illegal aliens in custody. Chi. Mun. Code 2-173-020(a)(2)(A); Cook Cnty. Code §46-37(b).

Now consider federal law. Section 1324 imposes criminal penalties on "any person" who "conceals, harbors, or shields from detection" an "alien in any place," if the person acts "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law." 8 U.S.C. §1324(a)(1)(A)(iii). Section 1324's broad language—"any person" and "any place"—encompasses law enforcement officers and state or local jails. The knowledge requirement may be satisfied if federal immigration agents inform local law enforcement officers that aliens in custody are present illegally or officers otherwise know an

15

alien's immigration status. That leaves only the relevant conduct—"conceals, harbors, or shields from detection."

The Seventh Circuit's interpretation of the harboring component shows why the Defendants' laws conflict with §1324. In *United States v. Costello*, the Court distinguished between mere provision of shelter versus "active efforts to keep illegal aliens in the United States." 666 F.3d 1040, 1045–47 (7th Cir. 2012) (Posner, J.). So, a hospital's overnight treatment of an alien or a citizen allowing an illegal alien boyfriend to cohabitate would not fall within §1324. But a church that advertised sanctuary for illegal aliens and "committed to resist any efforts by the authorities to enter the church's premise to arrest them" would be impermissibly "harboring." *Id.* at 1047. The Defendants' laws resemble the latter example. The central aim of their sanctuary policies is to "shelter" illegal aliens "from detection" by federal immigration agents. By barring federal agents from accessing known illegal aliens in State and local custody, the Defendants are "safeguarding members of a specified group from the [immigration] authorities"—exactly what §1324 prohibits. *Id.* at 1044.

While the Defendants' laws represent that they do not conflict with certain federal statutes (such as 8 U.S.C. §1373), there is no exception for §1324. *See* 5 ILCS 805/5, 805/15(e); Chi. Mun. Code 2-173-030; Cook Cnty. Code §46-37(c). Section 1324, in turn, contains no carve-out for state or local law enforcement officers shielding them from criminal liability. And it is beyond debate that on-duty officers can commit federal crimes in their personal capacities, such as bribery. Because law enforcement

officers and agents cannot comply with both the Defendants' access-bar provisions and §1324, the Supremacy Clause preempts the access-bar provisions.

### C. The Defendants' laws violate intergovernmental immunity by interfering with the operations of the federal government and discriminating against federal immigration agents.

The related doctrine of intergovernmental immunity, also rooted in the Supremacy Clause, places two limits on state laws. *First*, it "prohibit[s] States from interfering with or controlling the operations of the Federal Government." *United States v. Washington*, 596 U.S. 832, 838 (2022); *see also Trump v. Vance*, 591 U.S. 786, 800 (2020). *Second*, intergovernmental immunity forbids the States from "singling out the Federal Government for unfavorable treatment." *Washington*, 596 U.S. at 839. The Defendants' access bans violate both proscriptions.

The Ninth Circuit recently applied this doctrine in the immigration context. *Geo Group v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (en banc). That case involved a California law prohibiting private detention facilities, which DHS had relied on "almost exclusively" for years because of "practical and legal constraints." *Id.* at 750–51. To comply, DHS "would have to cease its ongoing immigration detention operations in California and adopt an entirely new approach in the state," even though federal law permitted the use of private detention facilities. *Id.* at 758. The Court held that violated the Supremacy Clause. California's law could not "override the federal government's decision, pursuant to discretion conferred by Congress, to use private contractors to run its immigration detention facilities." *Id.* at 750–51.

The Defendants' access bars are more problematic than California's law, across three dimensions: the directness of the regulation, level of interference, and

discriminatory aim. California attempted to *indirectly* limit DHS's immigration enforcement by regulating private actors. The Defendants here *directly* regulate federal immigration agents by prohibiting their access to illegal aliens. California's law interfered with DHS's ability to exercise congressionally conferred *discretion* over the means of detention. The Defendants' access bans interfere with DHS's discharge of a congressional *mandate* requiring federal agents to detain and deport illegal aliens. And unlike California's law, Defendants' access bans openly discriminate against federal operations by singling out federal "immigration agent[s]," *see, e.g.*, 5 ILCS 805/15(h)(2), "for less favorable treatment" on a "basis related to their governmental status," *Washington*, 596 U.S. at 839 (quotation omitted). Nothing in the Defendants' laws prohibits law enforcement officers from other States from accessing illegal aliens in Illinois, Chicago, or Cook County custody.

In sum, the access bans go beyond "incidental effects in an area of federal interest" and "control federal [immigration] operations" in Illinois. *Geo Group*, 50 F.4th at 761 (quotation omitted). The access bans also impermissibly discriminate against the federal government by "explicitly treat[ing] federal [officers] differently" than law enforcement officers from other jurisdictions in Illinois or from other States. *Washington*, 596 U.S. at 839. The access bans thus violate intergovernmental immunity along both axes.

When state or local law implicates intergovernmental immunity, the State law cannot stand. The Seventh Circuit's decision in *McHenry County v. Kwame Raoul* is not to the contrary. 44 F.4th 581 (7th Cir. 2022). *McHenry* addressed a distinct

18

aspect of Illinois's law—the provision prohibiting state agencies from contracting with the federal government to house immigrant detainees. *Id.* at 586. The Court concluded that this provision did not directly or indirectly regulate the federal government. *Id.* at 593. In contrast to California's law in *Geo Group*, the federal government "remain[ed] free" to contract with private parties in Illinois and carry out its congressional mandate to detain illegal aliens. *Id.* The Court also held that this provision did not discriminate against the federal government because the plaintiffs did not identify anyone receiving better treatment. *Id.* at 594.

Illinois's access ban differs on both counts. It bars only federal agents from accessing incarcerated illegal aliens but does not apply to officers and agents from other jurisdictions in Illinois or other States. And it directly operates on federal agents by prohibiting their access to deportable illegal aliens. Federal law allows illegal aliens to serve their sentences for state crimes prior to deportation. *See* 8 U.S.C. §§1226(c), 1231(a)(1)(B)(iii), (a)(4). But the Constitution does not permit Illinois to abuse the federal government's comity in such statutes. Federal immigration agents must still be able to access removable aliens in local custody to fulfill their statutory mandate from Congress—a step that requires no information or resources from States. *See New York*, 951 F.3d at 121. DHS simply needs "to be afforded access to State-incarcerated aliens (or suspected aliens) so that DHS can *itself* ascertain their potential removability before release." *Id.* (emphasis added).

19

## CONCLUSION

Because the Defendants' access-ban provisions violate the Supremacy Clause twice over, the Court should deny Illinois's, Chicago's, and Cook County's motions to dismiss the United States's claims against them as to these provisions.

Respectfully submitted,

DAVE YOST
Attorney General of Ohio

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General
  *Counsel of Record*
KATIE ROSE TALLEY
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
thomas.gaiser@ohioago.gov

*Counsel for State of Ohio*

## ADDITIONAL COUNSEL

STEVE MARSHALL
Alabama Attorney General

TREG R. TAYLOR
Alaska Attorney General

TIM GRIFFIN
Arkansas Attorney General

JAMES UTHMEIER
Florida Attorney General

CHRISTOPHER M. CARR
Georgia Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

KRIS KOBACH
Kansas Attorney General

LIZ MURRILL
Louisiana Attorney General

LYNN FITCH
Mississippi Attorney General

ANDREW BAILEY
Missouri Attorney General

AUSTIN KNUDSEN
Montana Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

DREW H. WRIGLEY
North Dakota Attorney General

GENTNER DRUMMOND
Oklahoma Attorney General

ALAN WILSON
South Carolina Attorney General

JONATHAN SKRMETTI
Tennessee Attorney General
and Reporter

KEN PAXTON
Texas Attorney General

JASON MIYARES
Virginia Attorney General

JOHN B. MCCUSKEY
West Virginia Attorney General

BRIDGET HILL
Wyoming Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2025 a copy of the foregoing pleading was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER