**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>STATE OF ILLINOIS; JB PRITZKER, Governor of Illinois, in his Official Capacity; THE CITY OF CHICAGO; BRANDON JOHNSON, Mayor of Chicago, in his Official Capacity; LARRY SNELLING, Chicago Police Superintendent, in his Official Capacity; COOK COUNTY, ILLINOIS; COOK COUNTY BOARD OF COMMISSIONERS; TONI PRECKWINKLE, President of the Cook County Board of Commissioners, in her Official Capacity; THOMAS J. DART, Cook County Sheriff, in his Official Capacity,<br><br>    Defendants. | Case No. 1:25-cv-1285<br><br>Judge Lindsay C. Jenkins |

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**</u>

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

LEGAL STANDARDS ............................................................................................... 1

ARGUMENT ............................................................................................................... 1

    I.    The Sanctuary Policies Are Conflict Preempted by the Immigration and Nationality Act. 1

    II.   The Sanctuary Jurisdictions Unlawfully Regulate the Federal Government. ...................... 5

    III.  The Sanctuary Policies Unlawfully Discriminate Against the Federal Government ......... 9

    IV.  The Sanctuary Policies' Restrictions on Information Sharing are Expressly Preempted by Section 1373 .................................................................................................... 13

CONCLUSION .......................................................................................................... 14

i

# TABLE OF AUTHORITIES

CASES

*Arizona v. United States,*
    567 U.S. 387 (2021) .................................................................................... 2, 6, 7

*Berger v. New York,*
    388 U.S. 41 (1967) ............................................................................................. 7

*Blackburn v. United States,*
    100 F.3d 1426 (9th Cir. 1996) ........................................................................... 8

*Chamber of Com. v. Whiting,*
    563 U.S. 582 (2011) ........................................................................................... 2

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) ........................................................................................... 1

*Cunningham v. Neagle,*
    135 U.S. 1 (1890) ............................................................................................... 6

*Davis v. Elmira Sav. Bank,*
    161 U.S. 275 (1896) ....................................................................................... 1, 4

*Dawson v. Steager,*
    586 U.S. 171 (2019) ..................................................................................... 9, 12

*Galvan v. Press,*
    347 U.S. 522 (1954) ........................................................................................... 2

*Geo Grp., Inc. v. Newsom,*
    50 F.4th 745 (9th Cir. 2022) ............................................................................. 9

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ......................................................................................... 1, 2

*Hively v. Ivy Tech Cmty. Coll. of Ind.,*
    853 F.3d 339 (7th Cir. 2017) ........................................................................... 12

*Johnson v. Maryland,*
    254 U.S. 51 (1920) ............................................................................................. 6

*Leslie Miller, Inc. v. Arkansas,*
  352 U.S. 187 (1956) .......................................................................................... 6, 7

*Mayo v. United States,*
  319 U.S. 441 (1943) .............................................................................................. 6

*McCulloch v. Maryland,*
  17 U.S. (4 Wheat.) (1819) ............................................................................... 6, 12

*McHenry Cnty. v. Raoul,*
  44 F.4th 581 (7th Cir. 2022) ....................................................................... *passim*

*Murphy v. NCAA,*
  584 U.S. 453 (2018) .............................................................................................. 4

*Nash v. Fla. Indus. Comm'n,*
  389 U.S. 235 (1967) .............................................................................................. 4

*Nielsen v. Preap,*
  586 U.S. 392 (2019) .............................................................................................. 2

*North Dakota v. United States,*
  495 U.S. 423 (1990) ......................................................................................... 9, 11

*Rivera v. Grossinger Autoplex, Inc.,*
  274 F.3d 1118 (7th Cir. 2001) ............................................................................. 1

*Salvadori v. Franklin Sch. Dist.,*
  293 F.3d 989 (7th Cir. 2002) ............................................................................... 1

*Truax v. Raich,*
  239 U.S. 33 (1915) ................................................................................................ 2

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019) ............................................................................. 11

*United States v. California,*
  No. 2:18-cv-721-WBS-DB, 2018 WL 5780003 (E.D. Cal. Nov. 1, 2018) ............ 11

*United States v. City of Arcata,*
  629 F.3d 986 (9th Cir. 2010) ............................................................................... 8

*United States v. Ferrara,*
  847 F. Supp. 964 (D.D.C. 1993),
  *aff'd*, 54 F.2d 825 (D.C. Cir. 1995) ...................................................................... 6

*United States v. Fresno Cnty.*,
429 U.S. 452 (1977) ............................................................................ 12

*United States v. King Cnty.*,
122 F.4th 740 (9th Cir. 2024) ...................................................... *passim*

*United States v. Washington*,
596 U.S. 832 (2022) .......................................................... 9, 10, 12, 13

*Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*,
278 F.3d 693 (7th Cir. 2002) ............................................................ 1

*Washington v. United States*,
460 U.S. 536 (1983) ......................................................................... 11

## U.S. Constitution

U.S. Const. art. IV, § 2, cl. 2 ............................................................. 5

## Statutes

8 U.S.C. § 1226(a) ........................................................................ 2, 3, 6

8 U.S.C. § 1226(c) ................................................................................. 3

8 U.S.C. § 1226(f) ................................................................................. 2

8 U.S.C. § 1227(a)(1)(C) ...................................................................... 7

8 U.S.C. § 1227(a)(1)(D) ...................................................................... 7

8 U.S.C. § 1231 ..................................................................................... 3

8 U.S.C. § 1231(a) ................................................................................. 2

## Rules

Fed. R. Civ. P. 56 ................................................................................ 1

**REGULATIONS**

8 C.F.R. § 287.7(a) ................................................................................................................ 3

**OTHER AUTHORITIES**

Policy for Responding to ICE Detainers,
 Cook County, Illinois Ordinance 11-O-73 (2011) ............................................. 5, 6, 10

Illinois Trust Act, 5 Ill. Comp. Stat. 805/1 *et seq*. (2017) .................................... 4, 6, 10

Welcoming City Ordinance, Chicago Code ch. 2-173 (2012) ............................... 4, 6, 10

## INTRODUCTION

The United States hereby incorporates the Introduction and Background sections from its Memorandum of Law in Opposition to Defendants' Motions to Dismiss, ECF No. 50. For the reasons below, the United States is entitled to judgment in its favor on all of its claims.

## LEGAL STANDARDS

Summary judgment is appropriate "when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Rivera v. Grossinger Autoplex, Inc.*, 274 F.3d 1118, 1121 (7th Cir. 2001); *see also* Fed. R. Civ. P. 56. And "[t]he mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion." *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002). Rather, "[t]o successfully oppose the motion, the nonmovant must present definite, competent evidence in rebuttal." *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 996 (7th Cir. 2002) (citing *Vukadinovich*, 278 F.3d at 699). Since there is no genuine dispute as to any material fact and the United States is entitled to judgment as a matter of law, this Court should grant summary judgment in favor of the United States.

## ARGUMENT

### I. The Sanctuary Policies Are Conflict Preempted by the Immigration and Nationality Act.

The United States is entitled to summary judgment on its conflict-preemption claim. State laws cannot "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Thus, state laws are invalid if they "either frustrate[] the purpose of the national legislation or impair[] the efficiency of th[o]se agencies of the federal government to discharge the duties[,] for the performance of which they were created." *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("If the purpose of the [Federal law] cannot otherwise be accomplished – if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect – the state law must yield." (citation omitted)).

1

Pursuant to its "broad, undoubted power over the subject of immigration and the status of aliens," *Arizona v. United States*, 567 U.S. 387, 394 (2012), Congress enacted the INA. The INA established a "comprehensive federal statutory scheme for regulation of immigration and naturalization[.]" *Chamber of Com. v. Whiting*, 563 U.S. 582, 587 (2011). To effectuate that scheme, the INA defines categories of aliens who may not be admitted to the United States; makes unlawful entry and reentry federal offenses; specifies which aliens may be removed from the United States and the procedures for such removal; and vests federal immigration officials with significant discretion, among other things. *See Arizona*, 567 U.S. at 396; *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration – to admit or exclude aliens – is vested solely in the Federal Government"); *see also Hines*, 312 U.S. at 68 ("[T]he power to restrict, limit, regulate, and register aliens as a distinct group is not an equal and continuously existing concurrent power of state and nation, but that whatever power a state may have is subordinate to supreme national law.").

Because Congress found that "deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers[,]" *Nielsen v. Preap*, 586 U.S. 392, 398 (2019) (citation omitted), Congress requires federal immigration agents to detain criminal illegal aliens immediately upon their release from state or local custody, pending their removal from the United States, *see, e.g.*, 8 U.S.C. §§ 1226(a), (c), 1231(a). And indeed, the Federal Government is subject to civil suit by States should it fail to satisfy this duty. *See* ECF No. 50, Background Section II (discussing 8 U.S.C. § 1226(f)).

The challenged Sanctuary Policies stand as an obstacle to federal immigration officers' ability to detain and remove criminal illegal aliens as required by the INA in several ways.

*First*, the Sanctuary Policies prevent state and local officers from turning aliens over to federal custody when presented with congressionally authorized detainers and administrative warrants – even after the alien's state or local custody has ended, extinguishing the State's

2

regulatory interest in the alien.[1]  The statutory and regulatory framework make clear that Congress intended the detention and removal process to be an expedited procedure.  *See, e.g.*, 8 U.S.C. § 1226(a) (expressly authorizing the use of administrative warrants); *id.* § 1226(c) (requiring federal agents to assume custody of an alien immediately upon the alien's release from state or local custody); *id.* § 1231 (providing that once an alien is ordered removed, the Attorney General must remove the alien from the United States within 90 days, and the alien must be detained during the removal period).

But by refusing to turn aliens over to federal custody pursuant to detainers and administrative warrants, the Sanctuary jurisdictions require federal agents to independently track down and rearrest aliens at large when (and if) they learn that the alien has been released from state custody.  *See, e.g.*, Statement of Material Facts (SOMF) ¶ 29 (citing Declaration of Samuel J. Olson, Field Office Director (FOD) within the Chicago Field Office of ERO (Olson Decl.) ¶ 10).[2]  While ICE is engaged in such reapprehension efforts, "the alien remains at-large in the community and free to commit further crimes or otherwise threaten public safety."  *Id.*; *see also id.* ¶ 41 (citing Olson Decl. ¶ 22–27).  The prohibition on honoring detainers and administrative warrants therefore endangers federal agents, the public, and aliens themselves.  And it obstructs and impairs the efficiency of the federal process in a way that is inconsistent with the

---

[1] *McHenry County* is therefore distinguishable from this case: States and localities may refrain from entering into contracts with the Federal Government to house immigration detainees.  *See McHenry Cnty. v. Raoul*, 44 F.4th 581, 593 (7th Cir. 2022); *cf.* 8 C.F.R. § 287.7(a) (explaining that a detainer soliciting extended detention of an alien when ICE cannot "gain[] immediate physical custody" is a request).  The Federal Government does not purport to force States to detain aliens on its behalf by extending the period of detention that would otherwise be warranted under state law.  But upon the expiration of the state or local detention period, Defendants cannot obstruct federal officers in carrying out their statutorily mandated duty of assuming custody of aliens.

[2] In support of its summary judgment arguments, the United States provides a Declaration from ICE's Chicago Field Office Director, Samuel J. Olson.  *See* Olson Decl.  The facts provided in this Declaration are straightforward and indisputable; they are intended to explain the purposes and processes behind federal immigration officials' coordination with state officials in enforcing immigration laws, and the ways in which Defendants have implemented their own policies.  Still, the Court need not rely on Mr. Olson's Declaration to enter judgment in the United States' favor and may instead do so based on the legal issues that predominate the United States' claims.

Congressional design. *See Davis*, 161 U.S. at 283 (explaining that state laws cannot "impair[] the efficiency of th[o]se agencies of the federal government" in the "discharge [of] the[ir] duties"); *Nash v. Fla. Indus. Comm'n*, 389 U.S. 235, 240 (1967); *see also Murphy v. NCAA*, 584 U.S. 453, 478 (2018) (noting preemption of state law is proper where "it impose[s] a duty that [i]s inconsistent – i.e., in conflict – with federal law").

Moreover, though they purport to require judicial warrants, the Sanctuary Policies themselves obstruct ICE's ability to procure such warrants by cutting ICE off from information needed to satisfy the heightened standard for a judicial warrant compared with an administrative warrant. The Sanctuary Policies also prevent ICE from acquiring this information on its own by denying ICE access to detainees for investigatory purposes. *See* SOMF ¶¶ 39, 40 (citing Olson Decl. ¶ 19 (explaining that ICE often needs to interview an alien to obtain the requisite facts for a judicial warrant)). Thus, the Sanctuary Policies simultaneously require a judicial warrant while refusing ICE the very access and information needed to secure such a warrant. At the same time, Illinois and its localities grant other law enforcement agencies access to detainees for investigatory purposes without requiring that they procure judicial warrants first, *see id.* ¶ 47 (citing Olson Decl. ¶ 28–31), which further underscores that these Policies are designed to and in fact interfere with federal immigration law enforcement.

*Second*, even if federal agents could stake out Illinois jail facilities to try to independently stage arrests when aliens emerge from custody, the Sanctuary Policies instruct state and local officials to refuse ICE agents' requests for information that is critical for that purpose. *See* Welcoming City Ordinance, Chicago Code Ch. 2-173, § 2-173-020 (2012); Illinois Trust Act, 5 Ill. Comp. Stat. 805/15(h) (2017); Policy for Responding to ICE Detainers, Cook County, Illinois Ordinance 11-O-73 (2011); *see also* SOMF ¶¶ 31, 33 (citing Olson Decl. ¶¶ 12, 14–18). The alien's release from state custody is a pre-condition to the initiation of federal custody, and state officers effectuate that release. Forcing federal agents to try to stage an arrest without even the most basic information about their target, such as his release date, is nearly impossible. *See id.* Contrary to Defendants' assertion that release dates can be obtained through courtroom monitoring

4

and inmate status websites, *see* Mem. in Supp. of Mot. to Dismiss Filed by Cook County at 17, ECF No. 28, information posted to publicly available online sites is limited and unreliable, oftentimes providing only a projected release date that is highly variable if posted at all, *see* SOMF ¶ 33 (citing Olson Decl. ¶ 14–18).

Moreover, even when public information concerning the date of release is accurate, withholding the time and specific location of release erects additional obstacles, among them risks to officer and public safety. *See* SOMF ¶ 37–38 (citing Olson Decl. ¶ 18 (explaining that facilities often have several exits, those exits tend to be trafficked by the public, and "without knowing where an inmate will emerge upon release, officers are unable to safely stage and prepare for an apprehension")). Even when, notwithstanding those obstacles, federal agents try to stage an arrest in the public parking lot of an Illinois facility, facility staff command ICE officials to depart. *See id.* Indeed, staff go so far as to delay the release of an alien who has completed his sentence until after federal officials have left, making it impossible for ICE to take the alien into custody at that time. *See id.*[3] Such active interference with federal law enforcement is clearly not sanctioned by the Tenth Amendment. *See* ECF No. 50 at 23–26 (explaining that States cannot avail themselves of the Tenth Amendment to justify interfering with federal laws that regulate private actors); *see also id.* at 26 (reasoning that the Constitution permits one State to demand that another return fugitives to its custody, so the United States may do the same (citing U.S. Const. art. IV, § 2, cl. 2)).

Accordingly, the United States is entitled to summary judgment on its conflict-preemption claim.

### II. The Sanctuary Jurisdictions Unlawfully Regulate the Federal Government.

Pursuant to the Sanctuary Policies, Illinois and its localities alternatively unlawfully regulate the Federal Government in three ways: 1) they prevent federal agents from using Congressionally authorized detainers and administrative warrants to effectuate alien detentions

---

[3] Defendants' actions therefore do not constitute mere "opting out" of federal immigration enforcement, as Defendants claim, *see* ECF No. 25 at 7; ECF No. 28 at 13; ECF No. 35 at 9.

and removals; 2) they bar ICE agents from accessing aliens in and near their facilities, thereby dictating how ICE carries out its statutory mandate to take such aliens into custody; and 3) they further regulate the Federal Government by controlling the downstream sharing of information between federal agencies. Stemming from the Supremacy Clause, the doctrine of intergovernmental immunity prevents States from regulating the activities of the Federal Government. *See Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."); *see also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 436 (1819) (explaining that the States have no power to "in any manner control" the operations of the Federal Government); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956) (explaining that "the immunity of the instruments of the United States . . . extends to a requirement that they desist from performance until they satisfy a state officer . . . ." (quoting *Johnson v. Maryland*, 254 U.S. 51, 57 (1920))). Thus, "even in the absence of a specific federal law, federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993) (citing *Cunningham v. Neagle*, 135 U.S. 1 (1890)), *aff'd*, 54 F.2d 825 (D.C. Cir. 1995).

Under those principles, the Sanctuary Policies improperly regulate the Federal Government by requiring ICE agents to procure criminal warrants to access detainees and obtain information when Congress has authorized federal immigration officials to use detainers and administrative warrants for those purposes. *See* Cook County Ordinance § 46-37(b) ("Unless ICE agents have a criminal warrant . . . ICE agents shall not be given access to individuals"); Chicago Code §§ 2-173-020, 2-173-030 (preventing ICE agents access to detainees and information based on an administrative warrant but not a judicial warrant); 5 Ill. Comp. Stat. § 805/15 (similar); *see also* SOMF ¶¶ 39, 40 (citing Olson Decl. ¶ 19). Congress expressly provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). And the Supreme Court has acknowledged the role that administrative warrants play in the detention and removal process. *See Arizona*, 567 U.S. at 407–08 (noting that the Attorney General has discretion to issue

6

warrants, which are executed by federal officers); *see also* SOMF ¶¶ 25, 26 (citing Olson Decl. ¶ 8–12 (explaining that successful transfers of inmates into federal custody generally hinge on the relevant jurisdiction honoring detainers and administrative warrants)).

Whereas administrative warrants issue on probable cause that the individual is an alien who is subject to removal (which does not necessarily require that the alien committed a criminal offense, *see, e.g.*, 8 U.S.C. §§ 1227(a)(1)(C), (D)), criminal judicial warrants issue on probable cause that a crime has been committed, *see Berger v. New York*, 388 U.S. 41, 55 (1967). Congress allows federal agents to detain illegal aliens under the former standard, but Sanctuary jurisdictions prevent federal agents from doing so unless they satisfy the latter, higher standard. These jurisdictions therefore foreclose federal immigration officials' use of the Congressionally authorized detention method and directly impose a different method, with a different standard, on the Federal Government for effectuating detentions. But Illinois and its localities have no such power to prevent federal agents from carrying out their duties "until they satisfy a state officer." *See Leslie Miller*, 352 U.S. at 190 (citation omitted); *see also Arizona*, 567 U.S. at 406 (recognizing that "a conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy" (alterations and citation omitted)).

The Sanctuary Policies likewise regulate federal functions by denying ICE officials' access to aliens. Specifically, upon an alien's release from custody, these jurisdictions bar federal agents from accessing the alien even in otherwise public areas of state and local facilities. *See* SOMF ¶ 30 (citing Olson Decl. ¶ 11). These jurisdictions go so far as to prevent ICE agents from staging arrests outside of such facilities by commanding those agents to leave the premises and delaying the release of aliens until after federal agents have left. *See id.* ¶¶ 37, 38 (citing Olson Decl. ¶ 18). Thus, rather than allow federal agents to take criminal aliens into federal custody upon expiration of their state or local sentence, as required by federal law, the Sanctuary jurisdictions release dangerous criminals onto the streets, forcing federal immigration officers to engage in difficult and dangerous efforts to rearrest aliens who were previously in local custody, *id.* ¶ 29.

7

The Sanctuary jurisdictions also directly control the downstream sharing of information between federal agencies; this attempt to regulate interactions between federal agencies is clearly not sanctioned by the Tenth Amendment. *See, e.g.*, *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (enjoining an ordinance prohibiting military recruiters from targeting minors because it sought to constrain the conduct of federal agents); *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996) (holding that the California Resort Act, which required resort operators to comply with certain safety requirements, would constitute a direct regulation of the Federal Government if applied to the operation of national parks). Specifically, ICE's Homeland Security Investigations (HSI) office had been using a state database to access information including police reports, addresses, and driver's license photos until Illinois learned that HSI was assisting ERO with civil immigration enforcement. *See* SOMF ¶ 49 (citing Olson Decl. ¶ 29). At that point, Illinois restricted HSI's access to the database and conditioned its restoration on HSI's disassociating itself with immigration enforcement. *Id.* Only after HSI complied did Illinois reinstate HSI's access. *Id.* Similarly, when ERO inquired about gaining access to some of this information through the Department of Navy's LinX system, ERO learned that the Chicago Police Department included a stipulation within its agreement with the Department of Navy that its data are prohibited from being used for immigration enforcement. SOMF ¶ 50 (citing Olson Decl. ¶ 29). Illinois therefore unlawfully regulates the downstream use of information acquired by federal agencies.

Collectively, these effects of the Sanctuary Policies "'require[] ICE to entirely transform its approach to' its sovereign function of transporting and removing noncitizen detainees." *See United States v. King Cnty.*, 122 F.4th 740, 756 (9th Cir. 2024). "Because this impermissibly override[s] the federal government's decision, pursuant to discretion conferred by Congress," as to how to effectuate detentions and removals, the Sanctuary Policies are invalid under the intergovernmental immunity doctrine's regulation prohibition. *See id.* (citation omitted). Defendants cannot avoid that conclusion by suggesting, as the *McHenry County* court concluded, that laws that "regulate[] only State and local entities and law enforcement" cannot possibly

regulate the Federal Government. *See* Mem. in Supp. of the State of Illinois & Governor Pritzker's Mot. to Dismiss at 21, ECF No. 25; ECF No. 28 at 16–17; Mem. in Supp. of Defs. City of Chicago, Brandon Johnson & Larry Snelling's Mot. to Dismiss at 24–25, ECF No. 35 (citing *McHenry Cnty.*, 44 F.4th at 593). Since *McHenry County*, courts have recognized that laws can regulate the Federal Government even though, as here, they purport to operate against others. *See, e.g.*, *Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (holding that a California statute that phased out all private detention facilities within the State, as applied to ICE detention facilities operated by contractors, violated intergovernmental immunity); *King Cnty.*, 122 F.4th at 757 (finding unlawful regulation where a County Order directed local officials to ensure that operators who leased space from the County's airport would not service ICE charter flights, thereby overriding the Federal Government's choice to use contractors to run its flights). And here, the Sanctuary jurisdictions go further by attempting to control even the downstream use of information acquired by certain federal agencies.

Accordingly, the United States is entitled to summary judgment on Count III.

## III. The Sanctuary Policies Unlawfully Discriminate Against the Federal Government.

The United States is alternatively entitled to judgment in its favor on its claim that the Sanctuary Policies constitute unlawful discrimination against the Federal Government. The doctrine of intergovernmental immunity also prohibits States from discriminating against the Federal Government – or even just a part of it. *See North Dakota v. United States*, 495 U.S. 423, 434–36 (1990). A state law discriminates against the Federal Government "by singling out the Federal Government for unfavorable treatment." *United States v. Washington*, 596 U.S. 832, 839 (2022). And *any* discriminatory burden on the Federal Government is impermissible. *See Dawson v. Steager*, 586 U.S. 171, 171 (2019).[4] Although state laws that innocuously "touch[] on an exclusively federal sphere [are] not enough to establish discrimination," *McHenry Cnty.*, 44 F.4th

---

[4] The principles of the intergovernmental tax immunity doctrine apply to the general intergovernmental immunity doctrine. *See North Dakota*, 495 U.S. at 434–39.

at 594, state laws that uniquely *burden* federal activities violate this nondiscrimination rule. And courts presume that such laws are invalid absent clear congressional authorization for that kind of state regulation. *See Washington*, 596 U.S. at 839; s*ee also King Cnty.*, 122 F.4th at 757 (finding unlawful discrimination where a County Order directed local officials to ensure that operators who leased space from the County's airport would not service ICE charter flights).

The Sanctuary Policies unlawfully discriminate against the Federal Government by singling out federal immigration enforcement for unfavorable treatment. The Cook County and Chicago ordinances facially target ICE and only ICE, denying ICE agents access to detainees, state and local facilities, and information absent a criminal warrant. *See* Cook County Ordinance § 46-37(b) ("ICE agents shall not be given access to individuals or allowed to use County facilities for investigative interviews" and "County personnel shall not expend their time responding to ICE inquiries"); Chicago Code § 2-173-020 (providing that no agent shall "permit ICE agents access" to detainees or "expend their time responding to ICE inquiries"). The Illinois TRUST Act similarly targets "immigration agents" and provides that state and local officers may not give such agents access to detainees or provide them any information that is not otherwise publicly available. *See* 5 Ill. Comp. Stat. § 805/15.

The Sanctuary Policies therefore treat ICE and immigration agents less favorably than the general public and other law enforcement agencies. Pursuant to these Policies, the Sanctuary jurisdictions bar ICE from accessing areas of state and local facilities open to the public. *See* SOMF ¶¶ 30, 37 (citing Olson Decl. ¶¶ 11, 18). These jurisdictions further prevent their officers from sharing with ICE information the agency seeks – including release dates and contact information, but not with members of the public or other law enforcement agencies. *See* Cook County Ordinance § 46-37(b); Chicago Code § 2-173-020; 5 Ill. Comp. Stat. § 805/15(h)(6), (7). And these jurisdictions treat federal immigration agents worse than even other federal law enforcement agents. *See, e.g.*, 5 Ill. Comp. Stat. § 805/15(i) ("Nothing in this Section shall preclude a law enforcement official from . . . cooperating in such investigations with federal and other law enforcement agencies (including [HSI]) in order to ensure public safety"). In particular,

10

the FBI; Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); Drug Enforcement Administration (DEA); and United States Marshals Service routinely receive information from Illinois facilities about their inmates and access to detainees for investigatory purposes – and these localities impose no requirement that they obtain judicial warrants first. SOMF ¶ 47 (citing Olson Decl. ¶ 28–31). These jurisdictions therefore "treat[] someone else better than [they] treat[] [ICE]." *North Dakota*, 495 U.S. at 438 (quoting *Washington v. United States*, 460 U.S. 536, 544 (1983)).

Defendants' arguments to the contrary are unavailing. Defendants contend that their differential treatment of ICE is permissible because the more favorably treated groups are not "similarly situated" to ICE. *See* ECF No. 25 at 23; ECF No. 35 at 23 (citing *McHenry Cnty.*, 44 F.4th at 594). Because "only" ICE carries out civil immigration enforcement, the argument goes, there is no entity "similarly situated" to ICE, and, absent such a comparator, Defendants are free to discriminate with impunity. Singling out functions that only the Federal Government performs for differential treatment is evidence of discrimination. Defendants point to cases holding that discrimination cannot be found when a State "merely references or . . . singles out federal activities in an otherwise innocuous enactment." *United States v. California*, 921 F.3d 865, 881 (9th Cir. 2019); *McHenry Cnty.*, 44 F.4th at 594. But here, the Sanctuary Policies' singling out is hardly innocuous. Rather, they discriminatorily burden the United States in carrying out that function specifically because of their disagreement with federal policy.

The "similarly situated" language cannot be read so narrowly as to foreclose membership by others to evade a finding of discrimination. On the contrary, if the only difference justifying the discriminatory treatment is the federal agency's enforcement of a particular federal law, the discrimination is clear. *See King Cnty.*, 122 F.4th at 757–58 (rejecting the County's argument that "significant differences" between ICE and others who chartered flights justified the discriminatory treatment of ICE where the difference was ICE's role in carrying out deportations); *United States v. California*, 2018 WL 5780003, at *6 (E.D. Cal. Nov. 1, 2018) (rejecting California's argument that it could discourage conveyances of federal public lands because those lands, unlike private

11

lands, are preserved for the public's benefit: "This quality of federal public lands, however, is so directly linked to their federal status that it cannot serve as the basis for non-discriminatory differentiation."); *cf. McHenry Cnty.*, 44 F.4th at 594 (finding the TRUST Act's prohibition on State and local officials entering into contracts to house immigration detainees in State or local facilities was nondiscriminatory partly because the provision touched on a federal sphere in an innocuous way but did not treat anyone else better than the Federal Government). Here, the Federal Government suffers the "differential treatment" the *McHenry County* Court found lacking because other law enforcement agencies and the public are given access to government facilities, detainees, and information on more favorable terms than ICE.

More fundamentally, the "similarly situated" language must be understood in context. Since *McCulloch*, 17 U.S. (4 Wheat.) at 316, the Supreme Court has held that States may not impose taxes directly on the Federal Government. But States may impose nondiscriminatory taxes that indirectly increase costs for the Federal Government so long as the tax is "imposed equally on the other similarly situated constituents of the State." *United States v. Fresno Cnty.*, 429 U.S. 452, 462 (1977). Underlying this principle is the rationale that taxes imposed solely on federal employees "could be escalated by a State so as to destroy the federal function performed by them[.]" *Id.* at 463 n.11. But if the tax were also imposed on residents and voters of the State, that would provide a political check against abuse of the taxing power and abate the danger to the Federal Government. *Id.*; *cf. Dawson*, 586 U.S. at 171 (holding that a State statute exempting from state taxation the pension benefits of state and local law enforcement officers, but not the federal pension benefits of a retired federal marshal, violates intergovernmental immunity).

In contrast, when the target of the impermissible discrimination is the Federal Government itself, or even just a part of it, the danger is at its peak. *See Washington*, 596 U.S. at 842 (noting the absence of a "ballot-box safeguard" for laws that discriminate solely against the Federal Government); *King Cnty.*, 122 F.4th at 757–58 ("[B]urdening federal operations, and *only* federal operations . . . violates the anti-discrimination principle[.]" (citation and alteration omitted)); *cf. Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 346 (7th Cir. 2017) (policy that discriminates

12

against some women constitutes prohibited sex discrimination even if it does not affect every woman). Here too, there is no political check on the unlawful discrimination as long as frustrating ICE's enforcement of federal immigration law remains popular with Illinois voters. Allowing such discrimination clearly undermines the Supremacy Clause by enabling states to thwart federal policy so long as it is implemented by a single federal agency. *See Washington*, 596 U.S. at 841 (explaining that absent the prohibition on discrimination, nothing prevents a State from imposing unduly high costs on the Federal Government for the benefit of the State's own citizens).

Finally, Defendants argue that invalidating the discriminatory provisions of their policies would create a back-end anticommandeering problem. *See* ECF No. 25 at 23–24; ECF No. 35 at 24 ("[T]he Tenth Amendment's anticommandeering doctrine forecloses Plaintiff's discrimination claim."). Defendants are wrong. At the outset, Defendants cannot seriously contend that actively discriminating against the Federal Government is constitutionally protected inaction. Rather, to the extent these jurisdictions choose to give other law enforcement agencies and members of the public access to information, detainees in their custody, and facilities, they cannot withhold the same from ICE just because of their disagreement with federal immigration priorities. *See King Cnty.*, 122 F.4th at 758. Just as there is no "threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways," *id.*, there is no such threat when ICE accesses detainees upon their release from state and local custody (including in the public lobbies of state and local facilities) or when ICE accesses information already collected by the State and its localities.

The United States is therefore entitled to summary judgment on Count II.

## IV. The Sanctuary Policies' Restrictions on Information Sharing are Expressly Preempted by Section 1373.

The United States is also entitled to summary judgment on its express preemption claim. Because this question of law previously was addressed in the United States' opposition to Defendants' motions to dismiss, that discussion is incorporated by reference here as if fully stated herein. *See* ECF No. 50 at 34–38.

13

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment in favor of the United States on all of its claims.

Dated: April 14, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director

JACQUELINE COLEMAN SNEAD
Assistant Director

*/s/ Elisabeth J. Neylan*
ELISABETH J. NEYLAN (N.Y. Bar Reg.
No. 6125736)
CRISTEN C. HANDLEY (Mo. Bar No.
69114)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel:  (202) 616-3519
Fax:  (202) 616-8460
E-mail:  Elisabeth.J.Neylan@usdoj.gov

*Attorneys for the United States*