**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> STATE OF ILLINOIS; JB PRITZKER, Governor of Illinois, in his Official Capacity; THE CITY OF CHICAGO; BRANDON JOHNSON, Mayor of Chicago, in his Official Capacity; LARRY SNELLING, Chicago Police Superintendent, in his Official Capacity; COOK COUNTY, ILLINOIS; COOK COUNTY BOARD OF COMMISSIONERS; TONI PRECKWINKLE, President of the Cook County Board of Commissioners, in her Official Capacity; THOMAS J. DART, Cook County Sheriff, in his Official Capacity, <br><br> Defendants. | Case No. 1:25-cv-1285-LCJ |

**DECLARATION OF SAMUEL J. OLSON**

I, Samuel J. Olson, declare as follows:

1. I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as Field Office Director (FOD) within the Chicago Field Office of ERO. I have held this position since October 20, 2024.

2. I have been employed by ICE since July 9, 2006. Prior to my position as FOD, I served as the Deputy Field Office Director (DFOD), Assistant Field Office Director (AFOD),

Supervisory Detention and Deportation Officer (SDDO), and Deportation Officer (DO) all for ERO in the St. Paul Field Office from 2006 through 2024.

## BACKGROUND

3. Responsibility for enforcing the federal immigration laws lies primarily with DHS and two of its components: ICE and Customs and Border Protection (CBP).

4. ICE is a component within DHS. ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001, terrorist attacks, by combining components of the former Immigration and Naturalization Service and the former U.S. Customs Service, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which is the focus of this declaration and which consists of 25 field offices led by Field Office Directors; (2) Homeland Security Investigations (HSI), which consists of 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which consists of 26 field offices led by Chief Counsel.

5. ERO personnel include ICE deportation officers who are immigration officers under 8 U.S.C. § 1357 and possess limited delegated customs-officer authority under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, a federal misdemeanor, and those who

illegally reenter the United States after having been removed, a federal felony—or otherwise undermine the integrity of federal immigration laws and border control efforts. ERO oversees programs and conducts operations to identify and apprehend removable aliens, to detain these individuals when necessary, and to remove illegal aliens from the United States. ERO prioritizes the apprehension, arrest, and removal of aliens who threaten the safety of our nation's communities and the integrity of U.S. immigration laws.

6. ICE ERO Chicago is responsible for interior enforcement of U.S. immigration laws in all 102 counties within the State of Illinois. This includes the identification and apprehension of aliens removable from the United States, the service of legal documents on removable aliens, and immigration case management during removal proceedings. ERO is also tasked with carrying out orders by Immigration Judges regarding the continued detention, release, or removal of aliens who have been placed in removal proceedings by other DHS immigration components.

7. As the FOD within ERO Chicago, I direct and maintain oversight of all immigration enforcement, detention, monitoring, and removal operations in all 102 counties within the State of Illinois, as well as in Wisconsin, Indiana, Kentucky, Missouri, and Kansas. As relevant to this litigation, my primary responsibilities are managerial oversight of the Criminal Alien Program (CAP) and the Fugitive Operations Program (FOP). Due to my experience and the nature of my official duties, I am familiar with ICE's CAP and FOP procedures.

- CAP focuses on the Federal Government's identification, arrest, and removal of aliens who are incarcerated at federal, state, county, or local levels, as well as at-large criminal aliens. Through CAP, ERO takes criminal aliens into federal custody in a controlled environment, decreasing risks to officers, aliens, and the community. When ERO directly assumes custody of a criminal alien through CAP, it prevents

3

that alien from being released back into the community where the alien may reoffend.

- FOP consists of Fugitive Operations Teams (FOTs) that target and arrest aliens who are not in the custody of a law enforcement agency (LEA) and present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally or otherwise undermine the integrity of federal immigration laws and border control efforts.

### INTER-GOVERNMENTAL COORDINATION IN IMMIGRATION ENFORCEMENT

8. To accomplish ICE's important immigration enforcement objectives, ERO coordinates closely with law enforcement partners within the United States and around the world. ERO works with federal, state, county, and local law enforcement partners in the shared responsibility for ensuring the safety of our communities through a variety of resources and programs.

9. One of the most notable law enforcement coordination and partnership efforts within ERO involves the identification, arrest, and removal of criminal aliens who are incarcerated within state, county, or local jails. As noted above, one of CAP's duties is to transfer these criminal aliens into federal custody in a safe and controlled manner. *See supra* ¶ 7. Successful transfers generally hinge on the relevant state, county, or local jurisdiction honoring ICE detainers. A detainer is a notice that DHS issues to federal, state, and local LEAs to inform the LEA that ICE intends to assume custody of an individual from the LEA's custody for purposes of arresting and removing the individual. A detainer also typically includes a description of the information needed from the relevant non-federal facility, including release date and other booking information.

4

Further, a detainer is accompanied by either an alien arrest warrant or a warrant of removal signed by an ICE immigration officer. *See* 8 U.S.C. § 1226(a). Acquiring an alien arrest warrant or warrant of removal (also referred to as "administrative warrants" or "civil immigration warrants") requires that an ICE immigration officer "establish probable cause to believe that the subject is an alien who is removable from the United States." U.S. Immigration & Customs Enforcement, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017) (ICE Policy). ICE's authority to issue detainers derives from 8 U.S.C. §§ 1226, 1357 and federal regulation 8 C.F.R. § 287.7.

10. When a detainer is not honored or an alien is released from a non-federal facility without notification or transfer to ICE, FOTs must conduct investigations and perform targeted enforcement actions to re-apprehend the alien. The amount of resources needed to conduct these at-large enforcement efforts far surpasses the resources needed to assume custody through a detainer of an alien incarcerated at a non-federal facility. And while FOTs are undertaking re-apprehension efforts, the alien remains at-large in the community and free to commit further crimes or otherwise threaten public safety. Pursuant to the Sanctuary Policies challenged in this litigation, no state, county, or local jurisdiction in Illinois currently honors ICE detainers.

11. State and local jurisdictions that honor ICE detainers to effectuate inmate transfers do so primarily by allowing ICE officers access to the secure area(s) of the state, county, or local jail, including the sallyport (i.e., a secure, controlled entryway that serves as a buffer between the exterior and interior of a detention facility, allowing for the safe entrance and exit of prisoners) and booking areas, where officers can more safely secure the alien in preparation to assume custody and transport the alien to an ICE office for processing. This access plays a critical role in ICE's safe and effective accomplishment of its immigration-enforcement functions. Yet, as

discussed further below, pursuant to the Sanctuary Policies challenged in this litigation, no state, county, or local jurisdiction in Illinois currently allows ICE this access – not access to a sallyport, secure booking, or even a public lobby of a state, county, or local jail.

12. Another way in which non-federal jurisdictions typically cooperate with ICE is by providing booking information for suspected illegal aliens, such as the date an alien is booked into, and out of, a jail. Further, non-federal jurisdictions typically cooperate with ICE by providing custody and release information for suspected illegal aliens, including their legal status, location, and details on whether the alien is released, remanded, or awaiting trial. Yet again, the State of Illinois, and the law enforcement entities therein, deny ICE's requests for any such booking, custody, or release information for suspected illegal aliens. That is, ICE, through ERO, continues to place detainers seeking these kinds of information from LEAs in Illinois state, city, and county (including Cook County) facilities but consistently receives no response. This obstructs ICE from assuming custody of criminal aliens in a safe and controlled environment within the State of Illinois.

### IMPACT OF DEFENDANTS' SANCTUARY POLICIES ON IMMIGRATION ENFORCEMENT

13. As explained above, cooperation with state, county, and local jurisdictions plays a key role in keeping communities safe through appropriate immigration enforcement. Defendants' Sanctuary Policies create insurmountable obstacles to such enforcement in several respects.

*Reduced Capacity to Access Information Necessary to Planning or Executing Safe Arrests of Criminal Aliens*

14. ICE needs the cooperation of local law enforcement to verify the accuracy of custody and release information, which is vital to ensuring a safe custodial transfer of the alien and averting the alien's release into the public. Illinois Trust Act 5 Ill. Comp. State § 805/15(h)

6

prohibits access to this information. Without such cooperation, it is oftentimes impossible for ICE to verify when and where an alien will be released from a non-federal facility. For example, release information for inmates in custody of Illinois jurisdictions posted to publicly available online sites is unreliable and oftentimes not posted at all. The information posted to the Illinois Department of Corrections website is, as relevant here, limited to an inmate's name, place of incarceration, and his or her "projected discharge date," which is based on when that inmate's term expires. *See* https://idoc.illinois.gov/offender/inmatesearch.html. Because the projected discharge date is merely based on when the inmate's term expires, it is rarely accurate given that an inmate's term often changes for a variety of reasons, including an accelerated release because of good behavior or securing an immediate bond for release. The Illinois Department of Corrections website is rarely updated in a manner that timely provides ICE with these types of changes to those dates. Specifically, because release date information is subject to change, ICE is frequently unaware of updates to the website without constant observation. Similarly, the City of Chicago Police's website provides release dates, but those dates are unreliable for the same reasons and are sometimes posted after the inmate is already released. *See* https://publicsearch1.chicagopolice.org/Arrests?FirstName=&LastName=Lopez&CbNumber=&ChargeId=&CPDArea=&District=&Beat=. Finally, Cook County's website does not provide readily accessible or reliable discharge information; it merely "tracks detainees' progress through various stages of the [discharge] process and provides a general idea of when discharge will be completed." *See* https://iic.ccsheriff.org/DetaineeDischarge.

15. Besides these limitations, Illinois has 102 counties, so it is nearly impossible to monitor every county website (assuming there is one at all) for release information, which again is subject to unpredictable changes and unreliability. Nor would it be practicable for ICE to call or

7

otherwise contact individual facilities any time it needs to verify a given alien's release information given the significant number of inquiries that would require, assuming a facility would even provide ICE such verification.

16. In addition to these Illinois state and local websites, ICE utilizes the Victim Information and Notification Everyday (VINELink) system to access limited custody release information. VINELink is a privately operated nationwide database intended for victims of crime and other concerned citizens to access incarcerated individual's custody status information, such as arrival dates, discharge dates, and the reporting agency. For reasons similar to those pertaining to the above-mentioned Illinois state and local websites, the custody status information accessed through VINELink is also unreliable.

17. When ICE officers stage arrests at non-federal facilities, they do so with the word "ICE" clearly exposed on their badges, and they wear vests with "ICE" or "ERO" markings. Sometimes the designation of "POLICE" is also displayed.

18. Oftentimes, non-federal facilities in Illinois (and elsewhere) have several exits from which the released alien could emerge. When these jurisdictions withhold the date, time, and specific location of release, it forces ICE to deploy additional manpower. And, in many instances, without knowing where an inmate will emerge upon release, officers are unable to safely stage and prepare for an apprehension. Moreover, the exits are oftentimes open to the public, and ICE cannot prevent the public flow of persons trafficking into and out of the facilities. The public presence complicates ICE's ability to plan for a safe arrest. Additionally, many times released aliens are reuniting with family members who are awaiting them at the facility's exit. This unnecessarily increases the likelihood of an altercation with law enforcement amongst multiple individuals and places the safety of bystanders and officers at risk. In practice, the multiple variables involved

oftentimes create such a substantial risk that ICE ultimately forgoes the pursuit of the arrest at the site of release, delaying, or even preventing, ICE's ability to carry out its law enforcement objectives. Further, when ICE officers successfully locate accurate release information and attempt to stage an arrest outside of a facility—including in the public parking lot of the facility—facility staff, usually at the direction of the warden, oftentimes command ICE officers to leave the premises. In some instances, prison staff, again usually at the direction of the warden, have even delayed the release of an alien when they are aware of ICE's presence outside, making it impossible then for ICE to take the alien into its custody at that time.

19. While the challenged Sanctuary Policies purport to permit cooperation based on ICE's acquisition of a judicial warrant, in practice those same policies obstruct ICE's ability to acquire such a warrant for many aliens in non-federal custody. That is principally because, in many instances, it is necessary for ICE to interview the alien in order to obtain the facts necessary to demonstrate the requisite probable cause for acquiring a judicial warrant, which is higher than the standard for acquiring an administrative warrant stated above, *supra* ¶ 9, and requires ICE to show probable cause that the alien committed a federal criminal offense. Thus, the laws simultaneously require a judicial warrant while refusing ICE the very access needed to secure such a warrant. Moreover, because Illinois agencies are prohibited from sharing information and cooperating with ICE as explained above, ICE has low, or no, visibility into whether a suspected illegal alien is in the custody of state or local law enforcement in the State of Illinois or has already been released. At times, this prohibition on information sharing prevents ICE from obtaining a judicial warrant because ICE does not learn that a criminal illegal alien is in state or local law enforcement custody where ICE would need to present such a warrant.

### *Inability to Form Critical Partnerships with Local Police*

20.     As demonstrated above, the challenged Sanctuary Policies prevent state officers from complying with congressionally authorized immigration detainers or civil immigration warrants. This prohibition occurs even when state actors express a willingness or affirmative desire to cooperate with their ICE law enforcement partners. Numerous Illinois agencies have recently expressed a desire to cooperate with ICE but for these laws that prevent them from doing so. In recent months, ERO has been invited to attend several Illinois Chief of Police association meetings. After attending these meetings, my staff members reported to me that several Illinois LEA leaders approached them to convey their desire to collaborate with ICE but for the restrictions applied under Illinois' current Sanctuary Policies.

21.     In addition, many Chicago Police Department (CPD) officers have expressed to ICE officials a willingness to cooperate with ICE but fear they will face discipline for violating these Sanctuary Policies. In particular, many CPD officers have expressed a willingness to cooperate with ICE for the purpose of reducing the threat to public safety but are chilled from doing so by the extreme punitive measures that the State has undertaken. Notably, ICE received information that the Chicago Mayor's office hired a company to drive around Chicago looking to film ICE enforcement efforts for the purpose of disciplining city officers caught assisting ICE with such efforts.

### *More Dangerous and Difficult Arrests of*
### *Criminal Aliens Must Occur in Local Communities*

22.     The challenged Sanctuary Policies also facilitate the release of dangerous criminals into the community by directing State and local officials to refuse to transfer such aliens to federal officials in a secure environment—thereby resulting in their release onto the streets, where they

all too often reoffend and commit serious crimes. These laws thus jeopardize the safety of Illinois residents and the public at large. An increase in these dangerous and difficult arrests of criminal aliens occurring in local communities is a direct result of Illinois Trust Act 5 Ill. Compl. Stat. § 805/15(h)(1), (3), (7).

### *Increased Likelihood of Reoffending in Illinois and Other Jurisdictions*

23. According to the ICE Law Enforcement Statistical Tracking Unit, from Fiscal Year 2016 until 2025, ERO arrested 13,564 aliens in Illinois, lodging 11,036 detainers. For those arrested, many were charged with serious crimes including assault, larceny, sexual, and drug-related offenses. When ICE is unable to detain—or even interview—criminals, they remain at-large in communities where they are free to repeat the same or worse crimes. Illinois Trust Act 5 Ill. Comp. Stat. § 805/15 prohibits the continued detention based on an immigration detainer or even the coordination necessary to transfer an alien whose state custody has ended into federal custody.

24. For example, in August 2024, federal officials issued a detainer request for an alien being held in Cook County jail on domestic violence charges. The detainer was not honored, and the alien was subsequently arrested on October 10, 2024 for aggravated criminal sexual assault and abuse of a minor.

25. Another example of state officials refusing to cooperate with ICE occurred on September 28, 2024. On that date, federal officials issued a detainer request for an alien being held in Cook County jail for criminal trespass and who was later transferred to Will County jail for a warrant for that same criminal trespass and also for obstruction of the police. Pursuant to the Illinois Way Forward Act and Cook County's restrictions, the detainer was not honored by law enforcement officers in either jurisdiction. Following the alien's release from local custody on

11

October 5, 2024, he was again arrested, this time for aggravated assault of a police officer, gun charges, resisting an officer, obstruction of justice, and criminal trespass.

26. Similarly, on September 1, 2024, federal officials issued a detainer request for an alien held at the McHenry County jail on aiding, abetting, and possession/selling of a stolen vehicle. The detainer was not honored due to the Illinois Way Forward Act. Following his release from state custody on October 10, 2024, the Elgin Police Department arrested him for aggravated criminal sexual abuse with a minor (two counts), traveling to meet a minor, and contributing to the delinquency of a minor (two counts).

27. Most recently, in January 2025, federal officials issued a detainer request for an alien who was being held in Cook County jail on sexual assault of a minor charges. Pursuant to Cook County's restrictions, law enforcement officers did not respond to the detainer request. Following the alien's release from local jail, he was arrested and charged with homicide just 17 days later.

***Discriminatory Treatment and Regulation of the Federal Government***

28. The Sanctuary Policies do not impose restrictions on other forms of information sharing, other law enforcement agencies outside of the Federal Government, or the public. Further, they do not preclude a state law enforcement official from cooperating with other federal agencies. Illinois facilities routinely provide information about their inmates to other federal agencies who contact them, such as the Federal Bureau of Investigation (FBI); Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); Drug Enforcement Administration (DEA); and United States Marshals Service.

29. Moreover, Illinois restricted HSI's access to the State's LEADS 3.0 database once it learned that HSI was assisting ERO with civil immigration enforcement. The Illinois Secretary

12

of State's Office controls the LEADS 3.0 database, and the Illinois State Police manage its use. LEADS 3.0 provides law enforcement with information such as police reports with fulsome narratives of previous encounters, addresses, and current driver's license photos. Illinois conditioned the restoration of this access on HSI's changing its law enforcement Originating Agency Identifier (ORI) from "ICE" to disassociate itself with immigration enforcement. Only after HSI made this change did Illinois reinstate HSI's access. Moreover, when ERO inquired about gaining access to some of this information through the Department of Navy's LinX system, ERO learned that the Chicago Police Department included a stipulation within its agreement with the Department of Navy that its data are prohibited from being used for immigration enforcement. And thus, ERO was unable to secure this information through other means.

30. In addition, these laws deny ICE access to individuals in custody for investigative purposes e.g., interviews. This limitation only applies to ICE.

31. Illinois facilities continue to grant the FBI, ATF, DEA, and United States Marshals Service access to inmates for investigative purposes – including interviews and evidence collection – without judicial warrants. These limitations add conditions to federal immigration enforcement activities that were not envisioned or legislated by Congress and that are not required by federal law.

32. Because Illinois and its localities deny ICE access to inmates and fail to honor detainers, ICE has been unable to interview or detain criminal aliens, who are then released by state and local officers back into the community where they remain at-large.

33. The lack of cooperation that the Sanctuary Policies require has also led to requests for assistance from ICE going unanswered by local law enforcement, prompting officer and public

safety concerns and reallocation of ICE resources. The lack of cooperation and interference with ICE's duties cause ICE to deviate, and sometimes refrain, from potential arrests.

34. This declaration is based upon my personal knowledge and information made available to me in my official capacity. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above captioned case. If called upon to testify, I could and would do so.

Dated this 14th day of April 2025.

_____